IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GEORGE V. KELLY,** | ) | **Case No. 3:18-cv-126** |
| | ) | |
| | ) | **JUDGE KIM R. GIBSON** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PEERSTAR LLC and LARRY J. NULTON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

### I.     Introduction

This case arises from a dispute regarding the obligations of Defendants Peerstar LLC ("Peerstar") and Larry J. Nulton ("Dr. Nulton") under a settlement agreement entered into with Plaintiff George V. Kelly ("Kelly"), as well as counterclaims by Peerstar and Dr. Nulton and claims by Charles J. Kennedy ("Dr. Kennedy") that relate to Kelly's allegedly improper use of Dr. Nulton and Dr. Kennedy's names and National Provider Identifier ("NPI") numbers to submit medical insurance claims for reimbursement.[1]  Pending before the Court is Kelly's Motion for Summary Judgment (ECF No. 80) and Peerstar, Dr. Nulton, and Dr. Kennedy's Motion for Summary Judgment (ECF No. 78).  The Motions are fully briefed (ECF Nos. 79, 81, 88, 89, 100, 101) and ripe for disposition.  For the reasons that follow, the Court **GRANTS IN PART** Kelly's Motion and **DENIES** Peerstar, Dr. Nulton, and Dr. Kennedy's Motion.

---

[1] Dr. Kennedy's claims in *Kennedy v. Kelly*, No. 3:18-cv-187 (W.D. Pa.) were consolidated with the above captioned case on November 28, 2018.  (ECF No. 37.)

## II.    Jurisdiction and Venue

This Court has subject-matter jurisdiction because the parties are diverse and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a).  Venue is proper because a substantial part of the events giving rise to the parties' claims occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391(b)(2).

## III.   Factual Background

The following facts are undisputed unless otherwise noted.[2]

### A.  The Formation of Children's Behavioral Health

Dr. Nulton is a licensed psychologist who owns Nulton Diagnostic and Treatment Center ("NDTC"), which provides a variety of mental health services throughout Pennsylvania.  (ECF No. 84 ¶ 7.)  Dr. Kennedy is a licensed psychologist who has worked for NDTC for approximately 18 years.  (*Id.* ¶ 8.)  In the late 1990s, Dr. Nulton hired Kelly to perform various administrative roles at NDTC; Kelly eventually became NDTC's Chief Operating Officer ("COO").  (*Id.* ¶¶ 9–10.)

In 2005, Dr. Nulton sold a segment of NDTC to Providence Service Corporation ("Providence"), which was spun off into a separate entity called Children's Behavioral Health ("CBH").  (*Id.* ¶ 11.)  CBH provides behavioral health rehabilitation services ("BHRS") for children, including children with autism.  (*Id.* ¶ 12.)  As part of this sale, Kelly was transferred from NDTC to CBH and became the COO of CBH.  (*Id.* ¶ 14; ECF No. 82 ¶ 6.)  Providence was

---

[2] The Court derives these facts from a combination of Plaintiff's Concise Statement of Undisputed Material Facts in Support of His Motion for Summary Judgment (ECF No. 82), Larry J. Nulton, Charles J. Kennedy, and Peerstar LLC's Counterstatement of Undisputed Material Facts in Opposition to George V. Kelly's Motion for Summary Judgment (ECF No. 90), their own Concise Statement of Undisputed Material Facts (ECF No. 84), and George V. Kelly's Counterstatement of Undisputed Material Facts in Opposition to Larry J. Nulton, Charles Kennedy, and Peerstar's Motion for Summary Judgment (ECF No. 91).

also the parent company of The ReDCo Group ("ReDCo"), another mental health services company. (ECF No. 84 ¶ 15.) Kelly asserts that he has never been employed by ReDCo. (ECF No. 82 ¶ 2.) Neither Dr. Nulton nor Dr. Kennedy were employed by CBH or ReDCo, and neither rendered or supervised BHRS services to CBH or ReDCo patients. (ECF No. 84 ¶ 17.)

Following the spinoff, Dr. Nulton and Dr. Kennedy had limited relationships with CBH and ReDCo, serving, on a case-by-case basis, as consultants for CBH and ReDCo. (*Id.* ¶¶ 16, 18.) As consultants, Dr. Nulton and Dr. Kennedy were available to consult with CBH or ReDCo staff but they did not supervise CBH or ReDCo's care providers. (*Id.* ¶¶ 19–20.)

In April 2015, Kelly provided Dr. Nulton with a written agreement for Dr. Nulton's consulting arrangement with ReDCo. (*Id.* ¶ 22.) Prior to April 2015, Dr. Nulton and Dr. Kennedy had not formalized their consulting relationship in a written agreement with CBH and ReDCo. (*Id.* ¶ 21.) Dr. Nulton agreed to continue providing "clinical case consultation" for ReDCo and signed the agreement. (*Id.* ¶ 24.) Dr. Nulton executed a similar agreement with CBH in December 2015. (*Id.* ¶ 25.)

### B. Pennsylvania Enacts Act 62

In 2009, Pennsylvania passed the Autism Insurance Act ("Act 62"), which requires private health insurance companies to cover services for the diagnosis and treatment of Autism Spectrum Disorders ("ASD") in children. (ECF No. 84 ¶ 27.) Act 62 became effective on July 1, 2009. (*Id.* ¶ 28.) Act 62 mandated that patients are to be treated by qualified professionals by requiring that a licensed physician or licensed psychologist develop their treatment plans. (*Id.* ¶ 32.) Act 62 also mandated insurance coverage for services provided by non-professional providers, such as

technical system support therapists, mobile therapists, or behavioral specialist consultants. (*Id.* ¶ 33.)

With Act 62 enacted, CBH and ReDCo, both providers of BHRS services provided by non-professional providers, became eligible to bill private insurers for their services. (*Id.*) CBH and ReDCo contracted with Highmark to bill Highmark for BRHS services that CBH and ReDCo provided. (*Id.* ¶ 34.) As part of Highmark's claim submission system, Highmark required CBH and ReDCo to identify a licensed psychologist as the performing or rendering provider. (*Id.* ¶ 34.) Without this information, Highmark could not load these entities into its system to enable CBH or ReDCo to receive payment. (*Id.* ¶ 35.) Highmark referred to this process of adding individual providers to its network as "credentialing." (*Id.* ¶ 36.)

Although certain services could be provided by someone other than a psychiatrist or psychologist under Act 62, Highmark required that CBH and ReDCo identify a performing provider that needed to be licensed and credentialed through its system. (*Id.* ¶ 38.) Highmark could not individually credential non-psychologist or psychiatrist service providers like technical system support therapists, mobile therapists, or behavioral specialist consultants, meaning Highmark's system could not process claims with only these therapists' names on them. (*Id.*) When an individual provider was credentialed, a group that employed the provider, such as CBH or ReDCo, could submit a Request for Assignment of Account, which allowed the group to be paid for services provided or supervised by the individual provider. (*Id.* ¶ 39.)

CBH and ReDCo were required to provide the individual rendering provider's NPI number when submitting claims through Highmark's Navinet system, an electronic version of the HCFA 1500 form, a standardized claim form. (*Id.* ¶¶ 40, 42.) As licensed psychologists, Dr.

Nulton and Dr. Kennedy each have a unique 10-digit NPI number that is used to identify them as a provider when billing insurers. (*Id.* ¶ 41.) CBH and ReDCo could bill Highmark for their services either by filing claims on a UB-04 form or a HCFA 1500 form. (ECF No. 83-11 at 133:8–134:17.) These two forms are similar, but one difference between the forms is that HCFA 1500 form has a field in which to list the rendering/performing provider, but the UB-04 form does not have this field. (*Id.* at 136:12–18.) Highmark told CBH and ReDCo that it would prefer, but not require, CBH and ReDCo to use the HCFA 1500 form to submit claims for BHRS services through Highmark's electronic claim submission portal. (*Id.* at 134:17–136:18.)

### C.  CBH and ReDCo Submit Assignment Account Request Forms to Highmark

In May 2009, Kelly instructed Michelle Hershberger, a CBH employee, to complete the appropriate Highmark Request for Assignment Account and other forms that were necessary to affiliate Dr. Nulton and Dr. Kennedy with CBH for reimbursement from Highmark. (ECF No. 84 ¶ 53.) Kelly told her that he would get Dr. Nulton and Dr. Kennedy's consent, signatures and professional credentials on the Highmark forms. (*Id.*) Dr. Nulton and Dr. Kennedy assert that neither Kelly nor Hershberger communicated with them about using their identifying information on the Highmark forms. (*Id.* ¶¶ 55, 56.) Kelly sent Hershberger the completed Assignment Account Request form for CBH with what purported to be the signatures of Dr. Nulton and Dr. Kennedy. (*Id.* ¶ 58.) Dr. Nulton and Dr. Kennedy assert that they never saw the Assignment Account Request form, did not sign it, and did not authorize anyone to sign it for them. (*Id.* ¶¶ 59–61.) Kelly signed the Assignment Account Request form on behalf of CBH and Hershberger mailed the fully completed application to Highmark. (*Id.* ¶¶ 63, 66.) After Hershberger submitted the Assignment Account Request Form to Highmark, Dr. Nulton and Dr.

Kennedy were identified as "rendering providers" for CBH in Highmark's billing system. (*Id.* ¶ 67.)

In July 2009 ReDCo and Kelly also discussed adding Dr. Nulton to ReDCo's Highmark Assignment Account for billing purposes. (*Id.* ¶¶ 73–75.) Mary Catherine Symons, a ReDCo employee, faxed the request to Kelly so that it could be filled out and sent back. (*Id.* ¶ 77.) Kelly returned the form with Dr. Nulton's identifying information filled in and bearing what purported to be Dr. Nulton's signature. (*Id.* ¶¶ 78–79.) Dr. Nulton asserts that he was never consulted about this form, nor did he give permission for his identifying information to be used on it. (*Id.* ¶ 80.)

On June 11, 2009, Kelly executed CBH's contract with Highmark for BHRS reimbursements, known as the Participating Provider Agreement, identifying Dr. Nulton and Dr. Kennedy as employed practitioners of CBH. (*Id.* ¶¶ 68–69.) After receiving these agreements, Highmark began processing and paying CBH for Act 62 BHRS claims for children with ASD, claims on which CBH identified Dr. Nulton and Dr. Kennedy as rendering providers. (*Id.* ¶ 71.) Between July 2009 and November 2017, CBH and ReDCo submitted thousands of insurance claims to Highmark with Dr. Nulton and Dr. Kennedy listed as the rendering provider. (*Id.* ¶¶ 84–85.)

### D.  The Formation of Peerstar and the Settlement Agreement

On April 15, 2009, Dr. Nulton formed a company with James P. Kimmel, Jr. called Peerstar LLC. (*Id.* ¶ 87.) Peerstar is engaged in the business of providing behavioral health peer support services in Pennsylvania. (*Id.* ¶ 88.) After Peerstar was formed, Dr. Nulton decided that Peerstar needed to bring on someone to handle operations full time. (*Id.* ¶ 89.) Kelly was then brought on to serve as Peerstar's COO in exchange for a 25 percent ownership stake in the company. (*Id.*

¶ 90.)   Kelly executed Peerstar's operating agreement in September 2009 (the "Operating Agreement"), which was amended in 2014, when Kimmel sold his stake in the company (the "2014 Amendment"). (*Id.* ¶ 91.)  After Kimmel sold his share in Peerstar, Kelly's equity interest in Peerstar increased to 38.46 percent.  (*Id.* ¶ 92.)   The Operating Agreement contained an integration clause, stating that the Operating Agreement "constitutes the entire agreement among the parties hereto and supersedes any prior understandings, agreements, or representations by or among the parties, written or oral, to the extent they have related in any way to the subject matter hereof."  (ECF No. 78-32 at 38.)  The 2014 Amendment contained this same integration clause.  (ECF No. 78-40 at 42.)

In 2016, Dr. Nulton filed suit against Kelly, seeking declaratory judgment to force the sale of Kelly's membership interest in Peerstar.  (ECF No. 82 ¶ 23.)  This litigation was resolved by a settlement agreement in September 2016 (the "Settlement Agreement").  (*Id.* ¶ 24.)  As part of the Settlement Agreement, Kelly and Dr. Nulton and Peerstar agreed to mutual release, for Kelly to resign from Peerstar, and for Dr. Nulton to pay Kelly $4.3 million in sixty equal installments over a period of sixty months.  (*Id.* ¶ 24.)  The Settlement Agreement contained an integration clause, stating that the Settlement Agreement "constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof."  (ECF No. 78-42 at 5–6.)  The Settlement Agreement also contained a release, stating that the parties agreed to "release and discharge" each other "from all known and unknown [claims,] accrued or unaccrued, which any Party has, or may have had as of the date of this Agreement against the other Party, whether or not apparent or yet to be discovered."  (*Id.* at 4.)  Nineteen of the sixty installment payments were made to

Kelly; however, no payments have been made after May 1, 2018 after Dr. Nulton discovered that his NPI number was used on CBH and ReDCo claim reimbursements. (ECF No. 82 ¶¶ 26–27.)

### E. Highmark Investigates the Claims

When Dr. Nulton discovered that his name was being used for CBH and ReDCo billing in late 2017, he reported it to Highmark's fraud unit. (ECF No. 84 ¶ 98.) Highmark's office of Financial Investigations and Provider Review ("FIPR") investigates potential instances of fraud for the insurer. (ECF No. 82 ¶ 13.) FIPR performed an investigation into the CBH and ReDCo claims submitted to Highmark which included the names and NPI numbers of Dr. Nulton and Dr. Kennedy. (*Id.* ¶ 15.) FIPR's investigation concluded that the claims submitted by CBH and ReDCo were payable because the services Highmark paid had been performed by CBH or ReDCo; FIPR then closed its investigation into these claims. (*Id.* ¶¶ 16–17.)

In its investigation, Highmark examined whether the services that were billed were performed, whether they were eligible for payment, and whether Highmark paid a claim that it should not have paid. (ECF No. 83-10 at 210:15–21.) The identity of the listed rendering provider on each claim was not material to Highmark's fraud investigation. (*Id.* at 176:11–177:3.) FIPR made no referral to any law enforcement agency, or other appropriate entity, to further investigate the potential of fraud. (ECF No. 82 ¶ 18.) Highmark is not seeking the recoupment of any funds paid for claims made by CBH or ReDCo which contain the names and NPI numbers of Dr. Nulton or Dr. Kennedy. (*Id.* ¶ 19.) Highmark paid, and did not recoup, the claims submitted by CBH and ReDCo. (ECF No. 90 ¶ 14.) Kelly asserts that Highmark does not pay on claims found to be fraudulent and attempts to recoup paid funds when fraud is found after a claim has been paid. (ECF No. 82 ¶ 14.)

IV.     **Procedural Background**

On August 15, 2018, Kelly filed an Amended Complaint against Peerstar and Dr. Nulton,

alleging breach of the Settlement Agreement.  (ECF No. 15.)  Peerstar and Dr. Nulton answered

on September 14, 2018, and asserted counterclaims for: (1) identity theft; (2) misappropriation; (3)

unauthorized use of name or likeness in violation of 42 Pa. Cons. Stat. § 8316 ("Section 8316"); (4)

fraudulent inducement of the Operating Agreement; (5) fraudulent inducement of the 2014

Amendment; (6) fraudulent inducement of the Settlement Agreement; (7) breach of fiduciary

duty; and (8) declaratory judgment.  (ECF No. 16.)  On September 20, 2018, Dr. Kennedy filed a

Complaint against Kelly, asserting claims for: (1) identity theft; (2) misappropriation; and (3)

unauthorized use of name or likeness; the Court consolidated these claims into this case on

November 28, 2018.  (ECF No. 37.)  Kelly answered Dr. Kennedy's Complaint on December 3,

2018.  (ECF No. 39.)

On November 22, 2019, Peerstar, Dr. Nulton, and Dr. Kennedy moved for summary

judgment.  (ECF No. 78.)  Kelly also moved for summary judgment that same day. (ECF No. 80.)

The parties filed their responses in opposition to the motions for summary judgment on January

10, 2020.  (ECF Nos. 88–89.)  The Court held argument on the Motions on July 30, 2020.  (ECF No.

98.)  The parties filed supplemental briefing on August 20, 2020.  (ECF Nos. 100, 101.)

V.      **Legal Standard**

This Court will grant summary judgment "if the movant shows there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom,*

*Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine if the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In deciding a summary judgment motion, this Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

-10-

VI.   **Discussion**

   A. **The Court Denies Kelly's Motion for Summary Judgment on Peerstar, Dr. Nulton, and Dr. Kennedy's Identity Theft Claims**

   1. **The Parties' Arguments**

Kelly asserts that he is entitled to summary judgment on Peerstar, Dr. Nulton, and Dr. Kennedy's identity theft claims. (ECF No. 81 at 27.) First, Kelly cannot be held liable for the 60,000 claim submissions which contain Dr. Nulton and Dr. Kennedy's identifying information because Kelly did not create those submissions. (ECF No. 88 at 13.) Peerstar, Dr. Nulton, and Dr. Kennedy's only allegations regarding Kelly's actual use of the information was on the Assignment of Account forms for CBH and ReDCo, not these claim submissions. (*Id.*) He cannot be liable for the acts of third persons under the identity theft statute because an unlawful "use" of someone's identity does not mean "cause to be used." (*Id.*)

Second, Kelly could not unlawfully possess Dr. Nulton and Dr. Kennedy's names and NPI numbers because this information is not private data and is public information that can be found online. (*Id.* at 26.) Moreover, under federal law, providers may use the NPI numbers of other individuals and entities in their standard transactions. (*Id.*) CBH and ReDCo therefore did not need an Assignment of Account to use Dr. Nulton and Dr. Kennedy's names and NPI numbers for billing for BHRS services that Dr. Nulton or Dr. Kennedy prescribed and CBH or ReDCo carried out. (*Id.* at 27.)

Third, Peerstar, Dr. Nulton, and Dr. Kennedy cannot show that Kelly used their identifying information for an unlawful purpose. (*Id.* at 27.) The field for identifying information on Highmark's Assignment of Account forms was used to process reimbursements from an

insurance provider for claims that the insurance provider confirmed to be legitimate.  (*Id.* at 28.)
CBH receiving reimbursement from private insurers for behavioral health services it rendered is
lawful because Act 62 mandates that private insurers pay CBH for those services.  (*Id.*)  The BHRS
claims submitted to Highmark were payable with or without Dr. Nulton or Dr. Kennedy's
identifying information.  (ECF No. 88 at 11.)  Kelly did not use Dr. Nulton or Dr. Kennedy's
identifying information to perpetrate a fraud upon Highmark by making otherwise unpayable
claims payable.  (*Id.* at 10.)  Highmark explained that it does not require that a licensed
psychologist be present to render the BHRS services and Highmark would not disallow claims
for treatment plans that are not developed by a psychologist.  (*Id.* at 11.)  Because Kelly did not
use the identifying information for an unlawful purpose, the identity theft claims fail.  (*Id.*)

Finally, Kelly asserts that the Settlement Agreement bars Peerstar, Dr. Nulton, and Dr.
Kennedy's identity theft claims because the parties agreed to mutual release of all claims which
accrued as of the date of the Settlement Agreement.  (ECF No. 81 at 15.)

Peerstar, Dr. Nulton, and Dr. Kennedy respond that they are entitled to summary
judgment on their identity theft claims because there is no dispute that they can meet all elements
of their claims.  (ECF No. 79 at 31.)  First, Kelly admitted that he possessed and used Dr. Nulton
and Dr. Kennedy's identifying information on Highmark credentialing applications for CBH and
ReDCo and caused that information to be possessed and used on 60,000 claims submitted to
Highmark.  (*Id.*)  Kelly is therefore liable for all these instances of identity theft.  (*Id.*)

Second, Dr. Nulton and Dr. Kennedy did not consent to Kelly's use of their identities and
they did not sign the Assignment Account Request forms.  (*Id.* at 32.)  Therefore, no reasonable

jury could find that Kelly did not knowingly use Dr. Nulton and Dr. Kennedy's identifying information without their consent. (*Id.* at 35.)

Third, Kelly used Dr. Nulton and Dr. Kennedy's identifying information for an unlawful purpose, namely receiving payment for services that did not comply with Act 62 or Highmark's terms and conditions. (*Id.* at 37.) Kelly was not entitled to receive payment on these claims without stealing Dr. Nulton and Dr. Kennedy's identifying information. (*Id.*) Using this identifying information to obtain reimbursement that would not have been processed and paid by Highmark without that information is akin to insurance fraud, an unlawful purpose. (ECF No. 89 at 17.)

Finally, Peerstar, Dr. Nulton, and Dr. Kennedy assert that the release contained in the Settlement Agreement is unenforceable because the entire Settlement Agreement is null and void. (*Id.* at 28.)

## 2. A Reasonable Jury Could Conclude that Kelly Committed Identity Theft

Pennsylvania provides a private right of action for victims of identity theft. 42 Pa. Cons. Stat. § 8315. A person commits identity theft if he: (1) possesses or uses, through any means, identifying information of another person; (2) without the consent of that other person; (3) to further any unlawful purpose. 18 Pa. Cons. Stat. § 4120(a). "Identifying information" is defined as "any fact used to establish identity," which includes, for example, identification numbers. § 4120(f). The parties agree that Dr. Nulton and Dr. Kennedy's names, social security numbers, and NPI numbers are identifying information. (ECF No. 79 at 31; ECF No. 81 at 26.) The Court examines the remaining elements of the identity theft claims in turn.

a. **A Reasonable Jury Could Find that Kelly Used Dr. Nulton and Dr. Kennedy's Identifying Information Without Their Consent**

For Kelly to be liable for identity theft, Peerstar, Dr. Nulton, and Dr. Kennedy must show that Kelly either possessed or used their identifying information without their consent. 18 Pa. Cons. Stat. § 4120(a). When a civil cause of action is premised on a criminal statute, the individual is liable to the extent he would be culpable under the criminal culpability statute. *Congini v. Portersville Valve Co.*, 470 A.2d 515, 517–18 (Pa. 1983). A person is culpable if he commits an offense by his own conduct or by the conduct of another person for which he is legally accountable. 18 Pa. Cons. Stat. § 306(a). A person is "legally accountable" for the conduct of another person when, "acting with the kind of culpability that is sufficient for the commission of the offense, he causes an innocent or irresponsible person to engage in such conduct." § 306(b). A person is also "legally accountable" for "any conduct he performs or causes to be performed in the name of a corporation or an unincorporated association or in its behalf to the same extent as if it were performed in his own name or behalf." § 307(e).

The Court holds that Kelly can be held liable for the actions of CBH and ReDCo employees who utilized Dr. Nulton and Dr. Kennedy's identifying information when submitting claim reimbursements to Highmark. A reasonable jury could find that Kelly submitted the two Assignment of Account forms to Highmark with Dr. Nulton and Dr. Kennedy's identifying information filled in and that Kelly did so knowing that he did not have their consent to do so. Because a jury could find that Kelly acted with the requisite culpability for committing identity theft, he can be held accountable for the actions of CBH and ReDCo employees because Kelly made it possible for them to submit the claim reimbursements. Without Kelly's alleged

involvement, CBH and ReDCo could not have submitted these claims for reimbursement. However, because Kelly denies that he used Dr. Nulton and Dr. Kennedy's identifying information without their consent, a jury question remains as to whether Kelly committed identity theft and caused CBH and ReDCo to use their identifying information without their consent.

Accordingly, a reasonable jury could find that Kelly used Dr. Nulton and Dr. Kennedy's identifying information without their consent.

> **b. A Reasonable Jury Could Find that Kelly's Alleged Use of Dr. Nulton and Dr. Kennedy's Identities Was for an Unlawful Purpose**

To succeed on their identity theft claims, Peerstar, Dr. Nulton, and Dr. Kennedy must next show that Kelly used Dr. Nulton and Dr. Kennedy's identifying information to further an "unlawful purpose." 18 Pa. Cons. Stat. § 4120(a). "Unlawful purpose" is not defined in the statute. To determine the meaning of terms used in a statute, courts look to the ordinary meaning of the words used, which can often be discerned through legal dictionaries. *Geiser*, 527 F.3d 294. An "unlawful purpose" is a purpose that violates a civil or criminal law. *See* Unlawful Act, Black's Law Dictionary (11th ed. 2019). This definition means that the purpose for which an individual uses another's identifying information cannot be merely unscrupulous, it must be unlawful. *Eagle v. Morgan*, No. 11-cv-4303, 2013 WL 943350, at *9 (E.D. Pa. Mar. 12, 2013). For example, a newspaper cannot be liable for identity theft for using someone's mugshot in an article, even though it was used without that person's consent, because the use of the photo was not to further an illegal purpose. *Wallace v. MediaNews Grp., Inc.*, No. 1:12-cv-0872, 2013 WL 214632, at *6 (M.D. Pa. Jan. 18, 2013), *aff'd in relevant part*, 568 F. App'x 121 (3d Cir. 2014).

Courts have only rarely interpreted the identity theft statute. Civil conspiracy law may be useful in interpreting the identity statute because, to be found liable for civil conspiracy, the plaintiff must prove that the defendant engaged in an unlawful act. *See Rice v. Diocese of Altoona-Johnstown*, 212 A.3d 1055, 1075 (Pa. Super. Ct. 2019) (noting that a "civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose"). Civil conspiracy's unlawful act requirement is similar to the unlawful purpose element of an identity theft claim. Because conspiracy claims are predicated on an unlawful act, civil conspiracy claims rise and fall with the underlying unlawful conduct. *See GMH Assocs., Inc. v. Prudential Realty Grp.*, 752 A.2d 889, 905 (Pa. Super. Ct. 2000) (dismissing civil conspiracy claim predicated on fraud after concluding that no fraud was committed). Accordingly, for Peerstar, Dr. Nulton, and Dr. Kennedy to succeed on their identity theft claims, they must show that Kelly, by using their information, committed an unlawful act. If Kelly did not commit an unlawful act, the Court must dismiss the identity theft claims.

Peerstar, Dr. Nulton, and Dr. Kennedy allege that Kelly committed insurance fraud by receiving benefits that he was not entitled to. (ECF No. 89 at 17.) A person commits insurance fraud by knowingly and with an intent to defraud presenting false, incomplete, or misleading statements to the insurer which are material to an insurance claim. *Am. Builders Ins. Co. v. Custom Installations Contracting Servs., Inc.*, No. 3:15-cv-295, 2019 WL 3414451, at *5 (W.D. Pa. July 29, 2019) (citing 18 Pa. Cons. Stat. § 4117(a)(2)). Generally, a misrepresentation on an insurance form is material if the information would "influence the decision" of the insurance company or if the insurance company "in determining its course of action, would attach importance to the fact misrepresented." *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 417 F. Supp. 3d 531, 564

(E.D. Pa. 2019); *Westport Ins. Corp. v. Hippo Fleming & Pertile Law Offices*, 349 F. Supp. 3d 468, 485 (W.D. Pa. 2018).

The Court holds that a reasonable jury could conclude that Kelly committed insurance fraud because a reasonable jury could conclude that Kelly's alleged use of Dr. Nulton and Dr. Kennedy's identifying information on the forms and claims submitted to Highmark was a material misrepresentation which induced Highmark to pay the claims. Without a credentialed psychologist listed on the forms and claims as the "rendering provider," Highmark could not have processed and paid the claims submitted by CBH and ReDCo. To comply with Act 62, licensed psychologists must (1) evaluate a patient to determine whether he can be diagnosed with ASD; (2) develop a treatment plan for a patient with ASD; and (3) provide treatment or supervise treatment pursuant to the treatment plan. 40 Pa. Cons. Stat. § 764h(f)(2), (5), (15).

A reasonable jury could find that, by listing Dr. Nulton or Dr. Kennedy as the "rendering provider," CBH and ReDCo represented to Highmark that these psychologists developed the treatment plan for the patients, rendered services pursuant to the treatment plan, or supervised therapists who rendered services pursuant to the treatment plan. The jury could find that by doing so, CBH and ReDCo misrepresented to Highmark that their billed services complied with Act 62, even though Dr. Nulton and Dr. Kennedy never developed the treatment plan for the patients, rendered services pursuant to the treatment plan, or supervised therapists who rendered services pursuant to the treatment plan. Although Highmark investigated the claims and concluded that these claims were not fraudulent, this conclusion does not shield Kelly from a finding that CBH and ReDCo committed insurance fraud. The jury must decide whether Highmark's investigation and conclusion is credible in light of evidence which can show that the

claims submitted to Highmark did not comply with the mandates of Act 62. Because a jury must decide whether Kelly committed insurance fraud, and there is evidence in the record to support a conclusion either way, neither party is entitled to judgment as a matter of law on the identity theft claims.

Accordingly, a reasonable jury could find that Kelly used Dr. Nulton and Dr. Kennedy's identifying information for an unlawful purpose.

### c. The Settlement Agreement Bars Peerstar and Dr. Nulton's Identity Theft Claims that Arose Prior to the Execution of the Settlement Agreement in September 2016

The Court holds that the Settlement Agreement bars all identity theft claims by Peerstar and Dr. Nulton which arose prior to the execution of that agreement in September 2016.[3] Under Pennsylvania law, general releases are interpreted by the rules of contract construction. *Evans v. Marks*, 218 A.2d 802, 806 (Pa. 1966). A release that bars unknown claims will be enforced, even if a party claims that it was unaware of the matter at the time the release was executed, but claims which have not accrued as of the date of the release will not be barred. *Restifo v. McDonald*, 230 A.2d 199, 201 (Pa. 1967); *Bickings v. Bethlehem Lukens Plate*, 82 F. Supp. 2d 402, 406 (E.D. Pa. 2000).

As discussed *infra* Sections VI.D, VI.F, the Settlement Agreement is an enforceable contract. Accordingly, the portion the Settlement Agreement relating to the mutual release of claims is enforceable. In the Settlement Agreement, Kelly, Peerstar, and Dr. Nulton agreed to release each other from all known and unknown claims against each other that they had as of the date of the Settlement Agreement. This agreement means that Peerstar and Dr. Nulton agreed to

---

[3] Because Dr. Kennedy was not a party to the Settlement Agreement, his identity theft claims are unaffected by the release in the Settlement Agreement.

release Kelly from any claims that he stole their identities from 2009 until the execution of that agreement in September 2016. If Peerstar and Dr. Nulton allege that Kelly used Dr. Nulton's identifying information without his consent after they executed the Settlement Agreement, they may still assert those claims at trial.

Accordingly, the Court denies Kelly's Motion for Summary Judgment and denies Peerstar, Dr. Nulton, and Dr. Kennedy's Motion for Summary Judgment on Count I of Peerstar and Dr. Nulton's Counterclaim and Count I of Dr. Kennedy's Complaint.

### B. The Court Grants Kelly's Motion for Summary Judgment on Peerstar, Dr. Nulton, and Dr. Kennedy's Misappropriation Claims

#### 1. The Parties' Arguments

Kelly asserts that he is entitled to summary judgment on Peerstar, Dr. Nulton, and Dr. Kennedy's misappropriation claims because the enactment of Section 8316 extinguished the common law claim for misappropriation. (ECF No. 81 at 29.) Even if there was a recognized claim for misappropriation, the claim fails because Kelly did not benefit from any alleged misappropriation of Dr. Nulton and Dr. Kennedy's reputation and prestige because Kelly did not hold their names and reputations out publicly. (*Id.* at 31.) Any alleged misappropriation Kelly made only occurred on two documents which were used only in an internal insurance billing system. (*Id.*) These documents were not for public viewing and never would have been accessible to the public, meaning that Kelly obtained no benefit by allegedly using Dr. Nulton and Dr. Kennedy's identities. (*Id.*)

Peerstar, Dr. Nulton, and Dr. Kennedy respond that the Court should not dismiss their misappropriation claims because Pennsylvania recognizes a common law claim for the invasion

of privacy by appropriation of name or likeness. (ECF No. 79 at 38.) They are not required to show that Kelly used Dr. Nulton and Dr. Kennedy's identities publicly because publicity is not an element of a misappropriation claim. (ECF No. 89 at 31.) All that Peerstar, Dr. Nulton, and Dr. Kennedy need to show for a claim of misappropriation is that Kelly used their identities for his own benefit. (ECF No. 79 at 39.) Because there is no dispute that Kelly misappropriated Dr. Nulton and Dr. Kennedy's identities for Kelly's own benefit, Peerstar, Dr. Nulton, and Dr. Kennedy are entitled to summary judgment on their misappropriation claims. (*Id.*)

### 2. Section 8316 Abrogated Pennsylvania's Common Law Claim for Misappropriation of Name or Likeness

In order to abrogate a common-law principle, the statute must "speak directly" to the question addressed by the common law. *United States v. Texas*, 507 U.S. 529, 534 (1993). Where the legislature expressly provides a comprehensive legislative scheme, these provisions supersede the prior common law principles dealing with the same subject matter. *Sternlicht v. Sternlicht*, 876 A.2d 904, 912 (Pa. 2005). A common law doctrine may not, after a statutory pronouncement on the same subject, continue to develop in a manner inconsistent with the statute. *Id.*

The Court holds that Section 8316 abrogated any Pennsylvania common law claim for misappropriation of name or likeness. Both Section 8316 and common law misappropriation claims involve the same subject matter—unauthorized use of a person's name or likeness. There are three elements to a Section 8316 claim: (1) that a natural person's name or likeness has commercial value; (2) that a party made an unauthorized use of that name or likeness; and (3) that the use is for commercial or advertising purposes. *Cornette v. Graver*, No. 3:19-cv-219, 2020

WL 1643370, at *12 (W.D. Pa. Apr. 2, 2020) (citing 42 Pa. Cons. Stat. § 8316(a)). By contrast, the common law misappropriation claim "is not limited to commercial appropriation" and includes claims where a party uses another individual's name or likeness "for his own purposes and benefit, even though the use is not a commercial one, and even though the benefit sought to be obtained is not a pecuniary one." *AFL Philadelphia LLC v. Krause*, 639 F. Supp. 2d 512, 531 (E.D. Pa. 2009) (citing Restatement (Second) of Torts § 652C cmt. b). Section 8316 effectively modified the common law misappropriation scheme by narrowing it to only recognizing misappropriation that is done for a commercial or advertising purpose. Common law misappropriation, therefore, is inconsistent with Section 8316's legislative scheme. Because the Pennsylvania Legislature has enacted a comprehensive legislative scheme on the unauthorized use of a person's name or likeness that is different than the common law scheme, the Legislature abrogated the Pennsylvania common law claim for misappropriation of name or likeness. *See also Facenda v. N.F.L. Films, Inc.,* 488 F. Supp. 2d 491, 513 (E.D. Pa. 2007) (recognizing this abrogation). Continuing to recognize this common law claim would allow litigants to evade the Legislature's statutory scheme set forth in Section 8316.

Accordingly, the Court grants Kelly's Motion for Summary Judgment and denies Peerstar, Dr. Nulton, and Dr. Kennedy's Motion for Summary Judgment on Count II of Peerstar and Dr. Nulton's Counterclaim and Count II of Dr. Kennedy's Complaint.

### C. The Court Grants Kelly's Motion for Summary Judgment on Peerstar, Dr. Nulton, and Dr. Kennedy's Section 8316 Claims

#### 1. The Parties' Arguments

Kelly asserts that he is entitled to summary judgment on Peerstar, Dr. Nulton, and Dr. Kennedy's Section 8316 claims because the alleged forgery and inclusion of Dr. Nulton and Dr. Kennedy's names on the Assignment of Account forms for CBH and ReDCo was not for commercial or advertising purposes. (ECF No. 88 at 17.) Including a name on a confidential billing document was not an offer to sell CBH or ReDCo's services, was not an attempt to obtain public attention of CBH or ReDCo's services, and was not to fundraise for CBH or ReDCo. (*Id.* at 17–18.)

Peerstar, Dr. Nulton, and Dr. Kennedy respond that the Court should not dismiss their Section 8316 claims because Kelly used Dr. Nulton and Dr. Kennedy's names for commercial or advertising purposes. (ECF No. 89 at 31.) Kelly's use of Dr. Nulton and Dr. Kennedy's names in order to obtain reimbursements from Highmark is equivalent to holding them out for the purpose of offering services, insofar as Kelly represented that they were the providers who rendered services to BHRS patients. (*Id.*) Licensed psychologists' identifying information has commercial value because that information allowed Kelly to get paid for services that CBH and ReDCo billed to Highmark. (ECF No. 79 at 40.) Because Kelly admits that he never obtained Dr. Nulton and Dr. Kennedy's consent to use their names to bill Highmark for Act 62 services, Peerstar, Dr. Nulton, and Dr. Kennedy are entitled to summary judgment on their Section 8316 claims. (*Id.* at 41.)

### 2. Kelly Did Not Use Dr. Nulton and Dr. Kennedy's Names for Commercial or Advertising Purposes

There are three elements to a Section 8316 claim: (1) that a natural person's name or likeness has commercial value; (2) that a party made an unauthorized use of that name or likeness;

and (3) that the use is for commercial or advertising purposes. *Cornette*, 2020 WL 1643370, at *12 (citing 42 Pa. Cons. Stat. § 8316(a)). A "commercial or advertising purpose" includes the public use or holding out of a person's name or likeness: (1) in connection with the sale of a product or service; (2) to promote or advertise products or services; or (3) for fundraising purposes. 42 Pa. Cons. Stat. § 8316(e)(1).

The Court holds that no reasonable jury could conclude that Kelly used Dr. Nulton and Dr. Kennedy's names for commercial or advertising purposes. First, Kelly never held their names out publicly, which Section 8316 requires. The names were used on private Assignment of Account forms that were never shown to the public. Second, Kelly did not use the names in connection with the sale of a service because credentialing with Highmark is not a sale. Third, Kelly did not use Dr. Nulton and Dr. Kennedy's names for advertising because only Highmark employees saw the forms and the forms were not advertisements to Highmark. Fourth, Kelly did not use the names for fundraising because credentialing is not fundraising. Peerstar, Dr. Nulton, and Dr. Kennedy cannot show that Kelly used Dr. Nulton and Dr. Kennedy's names for a commercial or advertising purpose as defined in Section 8316.

Accordingly, the Court grants Kelly's Motion for Summary Judgment and denies Peerstar, Dr. Nulton, and Dr. Kennedy's Motion for Summary Judgment on Count III of Peerstar and Dr. Nulton's Counterclaim and Count III of Dr. Kennedy's Complaint.

### D. The Court Grants Kelly's Motion for Summary Judgment on Peerstar and Dr. Nulton's Fraud-in-the-Inducement Claims

#### 1. The Parties' Arguments

Kelly asserts that he is entitled to summary judgment on Peerstar and Dr. Nulton's claims for fraudulent inducement on the Operating Agreement, 2014 Amendment, and Settlement Agreement because the parol evidence rule bars the evidence necessary to support these claims. (ECF No. 88 at 21.) When contracts are fully integrated, a party to that contract may not use parol evidence to show fraud-in-the-inducement. (*Id.*) All of the agreements between Kelly, Peerstar, and Dr. Nulton are fully integrated and therefore Peerstar and Dr. Nulton may not use parol evidence to support their fraud-in-the-inducement claims. (*Id.* at 22.) Moreover, even if the parol evidence rule does not apply, the alleged misrepresentations are not material because they are too remote to form a causal connection to Peerstar and Dr. Nulton's assent to the agreements. (*Id.*)

Peerstar and Dr. Nulton respond that Kelly fraudulently induced them into entering into the Operating Agreement, 2014 Amendment, and Settlement Agreement, and into paying Kelly profit distributions and compensation. (ECF No. 79 at 41.) Kelly's failure to disclose his theft and unauthorized use of Dr. Nulton and Dr. Kennedy's identities was a material omission upon which Dr. Nulton reasonably relied in contracting with Kelly. (*Id.* at 42.) Had Dr. Nulton known that Kelly had stolen and used his and Dr. Kennedy's names, he would not have agreed to make Kelly a 25 percent owner of Peerstar. (*Id.*) The Court should therefore declare the Operating Agreement null and void. (*Id.*) After joining Peerstar, Kelly continued his identity theft scheme and deception by failing to disclose and affirmatively concealing his conduct from Peerstar and Dr.

Nulton. (*Id.*) Peerstar and Dr. Nulton would not have agreed to pay Kelly profit distributions or compensation, or increase Kelly's ownership share following Kimmel's exit from Peerstar had they known what Kelly was doing. (*Id.* at 42–43.) The Court should therefore declare the 2014 Amendment null and void. (*Id.* at 43.) Peerstar and Dr. Nulton also reasonably relied on Kelly's material omissions and affirmative deceptions and would not have entered into the Settlement Agreement with Kelly had they known of Kelly's misconduct. (*Id.*) The Court should therefore declare the Settlement Agreement null and void. (*Id.*) Peerstar and Dr. Nulton also assert that the parol evidence rule does not bar any of their fraud-in-the-inducement claims. (ECF No. 89 at 27.)

2. **The Parol Evidence Rule Bars Peerstar and Dr. Nulton's Fraud-in-the-Inducement Claims**

The party asserting a fraud-in-the-inducement claim must establish the following by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999).

The parol evidence rule precludes the introduction of prior or contemporaneous oral representations to vary or contradict what is written in a written contract that is meant to be the entire agreement between the parties. *Toy*, 928 A.2d at 204. An integration clause which states that a writing is meant to represent the parties' entire agreement is a "clear sign" that the writing is meant to be an expression of all of the parties' agreements prior to its execution. *Id.*

A party cannot introduce parol evidence for a fraud-in-the-inducement claim to show that an opposing party made false representations that induced the complaining party to agree to the contract.[4]  *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 204–05 (Pa. 2007).  The rationale for applying the parol evidence rule to fraud-in-the-inducement claims is that a party cannot justifiably rely upon prior representations and then sign a contract that does not include, or refutes, those prior representations.  *Hart v. Arnold*, 884 A.2d 316, 340 (Pa. Super. Ct. 2005).  If evidence of fraud is parol evidence, it cannot be material to or justifiably relied upon in an integrated contract because it is not included in the written contract.  *Id.*

*Goldstein v. Murland* provides an illustration of the parol evidence rule in an analogous case.  No. 02-cv-247, 2002 WL 1371747 (E.D. Pa. June 24, 2002).  In *Goldstein*, the plaintiff was a former partner at the defendant's law firm; when the plaintiff left the firm, the parties executed a separation and stock purchase agreement under which the plaintiff was to receive monthly payments from the defendant.  *Id.* at *1.  When the defendant stopped making the payments, the plaintiff sued for breach of contract; the defendant filed counterclaims, alleging fraudulent inducement of the separation and stock purchase agreement.  *Id.*  The defendant alleged that the plaintiff omitted numerous material facts and made numerous misrepresentations of material fact in his discussions and communications with the defendant prior to executing the agreement.  *Id.*  The defendant alleged that he relied on these misrepresentations and omissions to his detriment by executing the agreement.  *Id.*  The court held that these alleged misrepresentations fell within the parol evidence rule because they were not contained within the written contract.

---

[4] Conversely, parol evidence may be introduced in fraud-in-the-execution claims to show that a term was fraudulently omitted from the contract.  *Toy*, 928 A.2d at 205.

*Id.* at *2.  The court next held that the parol evidence rule barred the introduction of these alleged misrepresentations because the separation and stock purchase agreement was a fully integrated written agreement.  *Id.* at *3.   The integration clause at issue stated: "This Agreement encompasses the entire agreement between the parties hereto with respect to the subject matter covered hereby and there are no other agreements, oral or written, not set forth herein."  *Id.* Because the contract contained no provisions relating to the alleged representations made by the plaintiff to the defendant, the parol evidence rule precluded introduction of the alleged omissions and statements and the court dismissed the fraud in the inducement claims.  *Id.*

The Court holds that Peerstar and Dr. Nulton's fraud-in-the-inducement claims fail because the parol evidence to support their claims is barred by the parol evidence rule. Peerstar and Dr. Nulton allege that Kelly, by remaining silent during the execution of the Operating Agreement, 2014 Amendment, and Settlement Agreement, made an oral representation[5] to Peerstar and Dr. Nulton that he was not using Dr. Nulton and Dr. Kennedy's identities on Highmark claims.  Because this is an oral representation and there are written agreements between the parties, the parol evidence rule bars introduction of this evidence for the fraud-in-the-inducement claims if these agreements are fully integrated.

The Operating Agreement, 2014 Amendment, and Settlement Agreement are all fully integrated agreements and contain almost identical integration clauses to the one in *Goldstein*.

---

[5] The Court notes that Kelly's silence may not even be a representation upon which Peerstar and Dr. Nulton could rely because silence cannot amount to a fraudulent representation in the absence of a duty to speak. *V-Tech Servs., Inc. v. Street*, 72 A.3d 270, 276 (Pa. Super. Ct. 2013).  This duty to speak does not normally arise unless there is a confidential or fiduciary relationship between the parties. *Drapeau v. Joy Techs., Inc.*, 670 A.2d 165, 171 (Pa. 1996) (Beck, J., concurring).  For simplicity, the Court assumes that Kelly had a duty to disclose and that his failure to disclose was a representation to Peerstar and Dr. Nulton.

(*See* ECF No. 78-32 at 38; ECF No. 78-40 at 42; ECF No. 78-42 at 5–6.)  Accordingly, the parol evidence rule applies to these three agreements.  Like the omissions and misrepresentations that the defendant sought to use to support his fraud-in-the-inducement claim in *Goldstein*, the parol evidence here cannot be used to prove Peerstar and Dr. Nulton's fraud-in-the-inducement claims.  If Kelly, through his silence, represented to Peerstar and Dr. Nulton that he was not using Dr. Nulton and Dr. Kennedy's identities on Highmark claims, and that representation was a material inducement to the Operating Agreement, 2014 Amendment, or Settlement Agreement, then that representation must have been included in the written agreements for Peerstar and Dr. Nulton to have justifiably relied upon it.  *Hart*, 884 A.2d at 340.  These alleged misrepresentations were not included in any of these three written agreements, meaning that the representations cannot be a material inducement to the agreements pursuant to the parol evidence rule.  Because Peerstar and Dr. Nulton rely only on parol evidence as the basis for their fraud-in-the-inducement claims and that parol evidence is inadmissible, the claims fail and must be dismissed.

Accordingly, the Court grants Kelly's Motion for Summary Judgment and denies Peerstar, Dr. Nulton, and Dr. Kennedy's Motion for Summary Judgment on Count IV, V, and VI of Peerstar and Dr. Nulton's Counterclaim.

### E.  The Court Grants Kelly's Motion for Summary Judgment on Peerstar and Dr. Nulton's Breach of Fiduciary Duty Claims

#### 1.  The Parties' Arguments

Kelly asserts that he is entitled to summary judgment on Peerstar and Dr. Nulton's breach of fiduciary duty claims because Kelly did not breach any duties that he owed to Peerstar.  (ECF No. 81 at 37.)  First, Dr. Nulton's claim fails because Kelly owed no fiduciary duties to Dr. Nulton.

(ECF No. 88 at 26.) Second, even if Kelly owed Dr. Nulton fiduciary duties, Dr. Nulton, as a member and manager of Peerstar, cannot pursue a claim for breach of fiduciary duty because the claim can only be brought by the company itself, which is Peerstar. (ECF No. 81 at 37.) Third, Kelly owed no fiduciary duty to Peerstar that is relevant to the allegations made against Kelly. (*Id.* at 38.) Kelly's alleged actions do not amount to a failure to act in good faith in accordance with Peerstar's best interests because the identity theft allegations have nothing to do with Peerstar or its interests, only Dr. Nulton's interests. (*Id.*) Kelly caused no harm to Peerstar because Peerstar cannot show any financial, reputational, or other harm suffered as a result of his alleged actions. (*Id.*) Nor can Peerstar show that Kelly was unjustly enriched through the alleged identity theft because all claims submitted to Highmark were payable. (ECF No. 88 at 27.)

Peerstar and Dr. Nulton respond that they are entitled to summary judgment on their breach of fiduciary duty claims because Kelly breached his fiduciary duties by engaging in his fraud and identity theft scheme. (ECF No. 79 at 44.) As a manager of Peerstar, Kelly stood in a fiduciary relation to Peerstar and owed it a duty of loyalty and a duty to act in good faith in the best interests of the Peerstar and Dr. Nulton. (*Id.* at 45.) As a member of Peerstar's Board of Managers, Kelly owed a fiduciary duty to Dr. Nulton individually. (ECF No. 89 at 32.) Kelly's unauthorized use of Dr. Nulton's identity placed Dr. Nulton at risk of disciplinary action from the Pennsylvania Board of Psychology. (*Id.*) Kelly's concealment of his misconduct breached his duties to act solely in Peerstar's best interests within the scope of his responsibilities as a member and manager of Peerstar. (*Id.*) Kelly placed his and CBH's interests above those of Peerstar, placing Peerstar's reputation and good will at risk by causing fraudulent claims to be submitted.

(*Id.* at 32–33.)   By concealing his misconduct from Peerstar and Dr. Nulton, Kelly unjustly enriched himself of millions of dollars in salary and profit distributions.  (*Id.* at 33.)

### 2.  Dr. Nulton Does Not Have Standing to Assert a Breach of Fiduciary Duty Claim

Pennsylvania law provides a limitation on standing for breach of fiduciary claims, stating that a manager's fiduciary duty "is solely to the business corporation" and may be enforced directly by the company or indirectly by a member on behalf of the company but may not be enforced directly by a member or by any other person or group on their own behalf.   15 Pa. Cons. Stat. § 1717.   To have standing to sue individually, a member must: (1) allege a direct, personal injury that is independent of any injury to the company; and (2) be entitled to receive the benefit of any recovery.  *Hill v. Ofalt*, 85 A.3d 540, 548 (Pa. Super. Ct. 2014).  Dr. Nulton alleges that his injury that is separate from Peerstar's injuries was that Kelly's unauthorized use of Dr. Nulton's identity placed Dr. Nulton at risk of disciplinary action from the Pennsylvania Board of Psychology.  (ECF No. 89 at 32.)

An injury requires a showing of a harm or other detrimental effect.  *Simmons v. Pacor, Inc.*, 674 A.2d 232, 236–37 (Pa. 1996) (citing Restatement (Second) of Torts § 7 (1965)).  The "risk of future harm" is not a cognizable or recoverable injury because the harm is too speculative. *Reilly v. Ceridian Corp.*, 664 F.3d 38, 43 (3d Cir. 2011) (holding that an increased risk of identity theft is not an injury because there was no evidence that the data has been, or ever will be, misused).

The Court holds that Dr. Nulton's alleged injury is not a cognizable injury because it is too speculative.   There is no evidence in the record that shows that Dr. Nulton received

disciplinary action from the Pennsylvania Board of Psychology.  Nor is there any evidence that the Board even considered imposing discipline on Dr. Nulton.  Because this alleged injury is not a cognizable injury, Dr. Nulton does not allege an injury that is separate from Peerstar's alleged injuries.  Accordingly, without a separate injury, Dr. Nulton does not have standing to assert a breach of fiduciary claim and the Court dismisses his claim.

### 3.   Kelly Did Not Breach Any Fiduciary Duties He Owed to Peerstar

To prevail on a breach of fiduciary duty claim, a company must show: (1) the existence of a fiduciary relationship; (2) that the fiduciary negligently or intentionally failed to act in good faith and solely for the company's benefit; and (3) that the company suffered an injury caused by the manager's breach of fiduciary duty. *Snyder v. Crusader Servicing Corp.*, 2020 PA Super 67.  The parties do not dispute that Kelly, as Peerstar's COO, had a fiduciary relationship with Peerstar. (ECF No. 79 at 45; ECF No. 88 at 26.)

The Operating Agreement states that Peerstar is managed by the Board of Managers. (ECF No. 78-32 at 13–14.)  If an LLC is manager-managed, Section 8943 imposes duties on managers of the company.  15 Pa. Cons. Stat. § 8943(b).[6]  A manager of an LLC who stands in a fiduciary relation to the LLC shall perform his duties as manager "in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar

---

[6] The applicable statute for Peerstar and Dr. Nulton's breach of fiduciary duty claims is the Limited Liability Company Law of 1994, 15 Pa. Cons. Stat. §§ 8901–8993, rather than the Pennsylvania Uniform Limited Liability Company Act of 2016, 15 Pa. Cons. Stat. §§ 8811–8898, because the conduct at issue here occurred prior to enactment of the 2016 statute, which repealed and replaced the 1994 statute. *Retina Assocs. of Greater Phila., Ltd. v. Retinovitreous Assocs., Ltd.*, 176 A.3d 263, 271 (Pa. Super. Ct. 2017) (citing 15 Pa. Cons. Stat. § 8811(b), (c)).

circumstances." 15 Pa. Cons. Stat. § 1712. Stated differently, a manager's fiduciary obligation includes both a duty of care and a duty of loyalty. *Anchel v. Shea*, 762 A.2d 346, 357 (Pa. Super. Ct. 2000).

A manager breaches his duty of care to the company by "mismanaging a corporation to its detriment." *In re Lampe*, 665 F.3d 506, 516 (3d Cir. 2011) (citing *Selheimer v. Manganese Corp. of Am.*, 224 A.2d 634, 647 (Pa. 1966)). A manager breaches his duty of loyalty when he utilizes his position in the company to engage in "self-dealing" to unjustly realize profits or other benefits. *Id.* at 518–20 (citing *Seaboard Indus., Inc. v. Monaco*, 276 A.2d 305, 309 (Pa. 1971); *Weissman v. A. Weissman, Inc.*, 114 A.2d 797, 799 (Pa. 1955)); *see also Anchel*, 762 A.2d at 357.

The Court holds that no reasonable jury could conclude that Kelly breached his duties of care or loyalty to Peerstar. As to Kelly's duty of care, there is no evidence in the record that could show that Kelly mismanaged Peerstar as its COO. The conduct Peerstar alleges Kelly engaged in—using Dr. Nulton's identifying information without his consent—did not violate his duty of care relating to his position as COO. There is no evidence in the record which can show that Kelly harmed Peerstar financially by using Dr. Nulton and Dr. Kennedy's identifying information on the Highmark forms. Although Peerstar alleges that Kelly injured Peerstar by placing Peerstar's reputation and good will at risk, there is no evidence in the record that can show that Kelly's actions actually harmed Peerstar's reputation. A mere increase in a risk of future harm is not a recoverable injury. *Reilly*, 664 F.3d at 43; *Simmons*, 674 A.2d at 236–37. Because there is no evidence which can show that Kelly mismanaged or otherwise harmed Peerstar, no reasonable jury could find that Kelly breached his duty of care.

As to Kelly's duty of loyalty, there is no evidence in the record that could show that Kelly engaged in self-dealing as Peerstar's COO.  Kelly did not use his position of COO to unjustly realize profits because he did not receive reimbursement for services CBH or ReDCo performed that he was not entitled to.  Nor did Kelly use his position as COO to obtain the NPI numbers of Dr. Nulton and Dr. Kennedy because NPI numbers are public information.  Because there is no evidence that can show that Kelly used his position at Peerstar to unjustly realize profits or benefits, no reasonable jury could find that Kelly breached his duty of loyalty.

Accordingly, the Court grants Kelly's Motion for Summary Judgment and denies Peerstar, Dr. Nulton, and Dr. Kennedy's Motion for Summary Judgment on Count VII of Peerstar and Dr. Nulton's Counterclaim.

### F. The Court Grants Kelly's Motion for Summary Judgment on His Breach of Contract Claim

#### 1. The Parties' Arguments

Kelly asserts that he is entitled to summary judgment on his breach of contract claim because the Settlement Agreement is a valid, binding contract and Peerstar and Dr. Nulton are without excuse for breaching the contract. (ECF No. 81 at 11.) Kelly and Peerstar and Dr. Nulton entered into the Settlement Agreement with a mutual understanding and full awareness of the terms contained in the Settlement Agreement. (*Id.* at 12.) The parties to the Settlement Agreement intended for the agreement to be legally binding and received valuable consideration for entering into the agreement. (*Id.*)  The terms in the Settlement Agreement are unambiguous and state what each party's duties and obligations are under the Settlement Agreement. (*Id.* at 12–13.) Peerstar and Dr. Nulton breached the Settlement Agreement by refusing to continue make

payments to Kelly, which they were obligated to do under the agreement. (*Id.* at 13.) As a result of the breach, Kelly suffered damages, which are the payments that Peerstar and Dr. Nulton did not make under the Settlement Agreement. (*Id.* at 14.)

Peerstar and Dr. Nulton respond that the Court should dismiss Kelly's breach of contract claim because the Settlement Agreement is not a valid, binding contract. (ECF No. 89 at 28.) The Settlement Agreement is null and void because Peerstar and Dr. Nulton were fraudulently induced to execute. (*Id.*) Peerstar and Dr. Nulton, therefore, are not obligated to make any payments under the Settlement Agreement. (*Id.*)

### 2.   Peerstar and Dr. Nulton Breached the Settlement Agreement

Under Pennsylvania law, to succeed on a breach of contract claim, the plaintiff must establish three elements: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). The Court holds that no reasonable jury could find that Kelly has failed to establish all three elements of his breach of contract claim.

First, the Settlement Agreement is a valid, binding contract. A contract is formed when the parties to it: (1) reach a mutual understanding; (2) exchange consideration; and (3) delineate the terms of their bargain with sufficient clarity. *Weavertown Transp. Leasing, Inc. v. Moran*, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003). The written terms in the Settlement Agreement are unambiguous and show that the parties to the agreement reached a mutual understanding as to the contents of the agreement. Both parties to the Settlement Agreement exchanged consideration, specifically dismissal of their rights and claims in the 2016 lawsuit, Kelly's resignation from Peerstar, and the payments from Peerstar and Dr. Nulton to Kelly.

Second, Peerstar and Dr. Nulton breached the Settlement Agreement. When performance of a duty under a contract is due, any nonperformance of that duty is a breach. *True R.R. Assocs., L.P. v. Ames True Temper, Inc.*, 152 A.3d 324, 340 (Pa. Super. Ct. 2016). Peerstar and Dr. Nulton had a duty under the Settlement Agreement to make sixty payments to Kelly. They stopped making payments on May 1, 2018, owing 41 more payments. Peerstar and Dr. Nulton's failure to make scheduled payments to Kelly was a nonperformance of their duty to pay and therefore was a breach of the Settlement Agreement.

Third, Kelly suffered damages as a result of Peerstar and Dr. Nulton's breach of the Settlement Agreement. For a breach of contract claim, an aggrieved party is entitled to damages that would put him in as good of a position as he would have been had the contract been fully performed. *Trosky v. Civil Serv. Comm'n*, 652 A.2d 813, 817 (Pa. 1995). For damages to be recoverable, the existence of damages must be capable of proof to a reasonable certainty. *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 662 (Pa. 2009). Kelly has demonstrated his damages with reasonable certainty. Had the contract been performed, Kelly would have received all of the payments owed to him, which totaled $4.3 million. Kelly received 19 payments amounting to $1,504,629.79, meaning that Peerstar and Dr. Nulton owe Kelly $3,246,632.64. This unpaid amount is Kelly's damages.

Accordingly, the Court grants Kelly's Motion for Summary Judgment and denies Peerstar, Dr. Nulton, and Dr. Kennedy's Motion for Summary Judgment on Count I of Kelly's Amended Complaint.

**VII.    Conclusion**

For the forgoing reasons, the Court grants Kelly's Motion and denies Peerstar, Dr. Nulton, and Dr. Kennedy's Motion.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GEORGE V. KELLY, | ) | Case No. 3:18-cv-126 |
| | ) | |
| | ) | JUDGE KIM R. GIBSON |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PEERSTAR LLC and LARRY J. NULTON, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

**AND NOW**, this 26th day of August, 2020, upon consideration of George V. Kelly's Motion for Summary Judgment (ECF No. 80) and Peerstar LLC, Larry J. Nulton, and Charles J. Kennedy's Motion for Summary Judgment (ECF No. 78), and for the reasons set forth in the accompanying Memorandum Opinion, it is **HEREBY ORDERED** that Kelly's Motion is **GRANTED IN PART** and Peerstar, Dr. Nulton, and Dr. Kennedy's Motion is **DENIED**. Counts II–VIII of Peerstar and Dr. Nulton's Counterclaims and Counts II and III of Dr. Kennedy's Complaint are dismissed.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE