IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GEORGE V. KELLY, | ) | Case No. 3:18-cv-126 |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| PEERSTAR LLC AND LARRY J. NULTON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Before the Court is Non-Parties Highmark Health ("Highmark"), Megan Kent ("Kent"), and Barbel Snider's ("Snider) (collectively the "Moving Parties") Amended Motion to Quash or Modify Subpoenas or for a Protective Order. (ECF No. 149). Counterclaim-Plaintiffs Peerstar LLC ("Peerstar") and Dr. Larry J. Nulton ("Dr. Nulton") and Plaintiff Dr. Charles J. Kennedy ("Kennedy") filed a response in opposition. (ECF No. 142). The Motion is fully briefed (*see* ECF Nos. 136, 142, 149) and is ripe for disposition. For the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** Highmark, Kent, and Snider's Motion. (ECF No. 149).

I. Background

   A. Factual Background [1]

The remaining claims at issue in this case, which is scheduled to go to trial on September 27, 2021 (ECF No. 128), revolve around the identity theft that George V. Kelly ("Kelly") allegedly

---

[1] The Court derives the facts in this subsection from the Court's Memorandum Order on the parties' motions for summary judgment. (*See* ECF No. 102.)

1

committed against Dr. Nulton and Dr. Kennedy. (*See* ECF No. 102.) The Court will begin by providing a brief overview of the factual basis underlying Dr. Nulton and Dr. Kennedy's claims.

Dr. Nulton and Dr. Kennedy both worked as consultants for Children's Behavioral Health ("CBH") and The ReDCo Group ("ReDCo"). (*Id.* at 2–3.) CBH provided behavioral health rehabilitation services ("BHRS") for children, including children with autism, and ReDCo also provided mental health services. (*Id.*) After Pennsylvania passed the Autism Insurance Act ("Act 62") in 2009, CBH and ReDCo became eligible to bill private insurers for their services. (*Id.* at 4.) CBH and ReDCo contracted with Highmark to bill Highmark for the BHRS services that CBH and ReDCo provided. (*Id.*)

When submitting claims for patient treatment to Highmark, CBH and ReDCo provided the individual National Provider Identifier ("NPI") number of the person that provided care to the patient. (*Id.*) As licensed psychologists, Dr. Nulton and Dr. Kennedy each had a unique 10-digit NPI number. (*Id.* at 4–5.) Therefore, in 2009, Kelly instructed Michelle Hershberger, a CBH employee, to complete the appropriate Highmark Request for Assignment Account form, as well as the other forms that were necessary to affiliate Dr. Nulton and Dr. Kennedy with CBH for reimbursement from Highmark. (*Id.* at 5.) Although Kelly sent Hershberger the completed Assignment Account Request form for CBH with what purported to be the signatures of Dr. Nulton and Dr. Kennedy, Dr. Nulton and Dr. Kennedy assert that they never saw the Assignment Account Request form, did not sign it, and did not authorize anyone to sign it for them. (*Id.*)

In like fashion, Kelly sent ReDCo a form containing Dr. Nulton's identifying information and bearing what purported to be Dr. Nulton's signature. (*Id.* at 6.) However, Dr. Nulton asserts that he was never consulted about this form, and he further asserts that he did not give permission

for his identifying information to be used on it. (*Id.*) Between July 2009 and November 2017, CBH and ReDCo submitted thousands of insurance claims to Highmark with Dr. Nulton and Dr. Kennedy listed as the rendering provider. (*Id.*)

After Dr. Nulton discovered that his name was being used for CBH and ReDCo billing in late 2017, he reported it to Highmark's fraud unit. (*Id.* at 8.) Highmark's office of Financial Investigations and Provider Review ("FIPR") performed an investigation into the CBH and ReDCo claims that were submitted to Highmark and that included the names and NPI numbers of Dr. Nulton and Dr. Kennedy. (*Id.*) Ultimately, FIPR's investigation concluded that the claims submitted by CBH and ReDCo were payable because the services Highmark paid for had been performed by CBH or ReDCo. (*Id.*) FIPR then closed its investigation into these claims. (*Id.*)

### B. Peerstar, Dr. Nulton, and Dr. Kennedy Subpoena Five Current and Former Employees of Highmark

In preparation for the upcoming trial, Peerstar, Dr. Nulton, and Dr. Kennedy subpoenaed the following five individuals, among others, to require their presence at trial for the purpose of testifying: Barbel Snider ("Snider"), Mandi Berg ("Berg"), Earl Bock ("Bock"), Megan Kent ("Kent"), and Joanne Kramer ("Kramer"). (ECF No. 149 at 1–2.) Three of these individuals—Brock, Kramer, and Berg—are current employees of Highmark, and two of these individuals—Snider and Kent—are former employees of Highmark. (*Id.* at 2.)

Peerstar, Dr. Nulton, and Dr. Kennedy intend to call Berg, Bock, and Kent due to their involvement with "Highmark's review of CBH and ReDCo's fraudulent use of Dr. Nulton and

3

Dr. Kennedy's name and identifying information." (ECF No. 135 at 9.)[2] Specifically, they expect Berg to testify that she was the "lead investigator assigned to review the allegations that CBH and ReDCo were fraudulently using Dr. Nulton and Dr. Kennedy's identifying information." (*Id.*) Berg will also testify about "Highmark's policies and Highmark's requirement that treatment plans be developed by a licensed psychologist or physician for service coverage." (*Id.*)

Peerstar, Dr. Nulton, and Dr. Kennedy expect Bock to testify "regarding Highmark's review of CBH and ReDCo's fraudulent use of Dr. Nulton's and Dr. Kennedy's names and identifying information." (*Id.* at 10.) Bock will testify about certain actions that he took and information that he gleaned in the course of his investigation. (*Id.*) Specifically, he will testify that "Highmark's fraud hotline received a call from the office of Dr. Nulton reporting that he believed CBH was listing his name as the performing provider on claims submitted to Highmark when Dr. Nulton, in fact, did not serve as performing provider for those claims." (*Id.*)

Finally, Peerstar, Dr. Nulton, and Dr. Kennedy expect Kent, who was Highmark's corporate designee on issues related to all investigations and reviews conducted by Highmark, to testify about the "Highmark review of the fraudulent use of Dr. Nulton and Dr. Kennedy's names and Highmark's policies and procedures for investigating such potential fraud." (*Id.* at 12.) Highmark also identified Kent as its corporate designee for (1) topics related to the Highmark claim runs that have produced claims with which Dr. Nulton and Dr. Kennedy were associated, (2) Highmark policies and procedures with which CBH and ReDCo needed to comply to submit

---

[2] The Court does not set forth an exhaustive list of the expected content of each individual's testimony. Rather, it relays an overview of what Peerstar, Dr. Nulton, and Dr. Kennedy have stated in terms of their primary purpose for offering each of these five witnesses to testify.

claims, and (3) the use of Dr. Nulton and Dr. Kennedy's names and other identifying information on forms that CBH and ReDCo submitted to Highmark. (*Id.*)

The other two witnesses that Peerstar, Dr. Nulton, and Dr. Kennedy subpoenaed are Snider and Kramer. According to Peerstar, Dr. Nulton, and Dr. Kennedy, they expect Snider to testify about the billing process for Highmark. (*Id.* at 7.) Specifically, Snider is expected to testify regarding the "process by which Highmark received, reviewed, and approved applications or requests from CBH or ReDCo for billing Highmark and its affiliates for BHRS under Act 62." (*Id.*) Moreover, she will "authenticate and testify regarding the purposes and meanings of various Highmark documents." (*Id.*) And she will testify that she "never told CBH or ReDCo to put Dr. Nulton and Dr. Kennedy's names or identifying information on any Highmark forms." (*Id.*)

Finally, Peerstar, Dr. Nulton, and Dr. Kennedy state that Kramer "is a provider relations employee at Highmark. Kramer is expected to testify about the process for approving and credentialing CBH and ReDCo under Act 62." (*Id.* at 13.)

C. **Highmark, Snider, and Kent Move to Quash or Modify the Subpoenas**

Highmark, acting on behalf of its three current employees, and Snider and Kent, acting in their individual capacities, argue that Peerstar, Dr. Nulton, and Dr. Kennedy's actions in subpoenaing all five individuals and requiring their attendance at trial are "overbroad, unduly burdensome, cumulative and/or redundant." (ECF No. 149 at 3.) As far as Highmark is concerned, compliance with all five subpoenas would inconvenience the five witnesses and would "impose an unreasonable and undue burden and expense on Highmark, who must prepare those five (5) witnesses for trial testimony as well as any required uncompensated travel expenses and

accommodations." (*Id.*) Further, the Moving Parties contend that much of the testimony of the five witnesses would be duplicative. (*Id.*)

With respect to the witnesses and the burden that testifying would place upon them as individuals, all five current and former employees live approximately two hours from this Court. (*Id.* at 2.) Further, Kent now has a new employer and is the mother of three-year-old twins. (*Id.*) Finally, Berg recently broke her foot, could have surgery within the next week, and will struggle to travel during her recovery. (*Id.* at 3.)

In the alternative, the Moving Parties ask this Court to either allow the witnesses to testify remotely pursuant to Federal Rule of Civil Procedure 43(a), or to enter a Protective Order pursuant to Federal Rule of Civil Procedure 26(c), limiting the number of subpoenas that Peerstar, Dr. Kennedy, and Dr. Nulton may issue. (*Id.* at 6.)

In response, Peerstar, Dr. Kennedy, and Dr. Nulton argue that all five witnesses are within the subpoena power of this Court, all witnesses have been provided with witness fee checks, and the Moving Parties' remaining arguments do not entitle them to an order from this Court quashing or modifying the subpoenas. (*See* ECF No. 142.) With respect to Rule 43(a), Peerstar, Dr. Kennedy, and Dr. Nulton note that this Court has indicated that all witnesses will testify in person at the upcoming trial. (*Id.* at 1.)

## II. Legal Standard

### A. Motions to Quash

Federal Rule of Civil Procedure 45 provides that a district court must quash or modify a subpoena that (1) fails to allow a reasonable time to comply; (2) requires a person to comply beyond the geographical limits specified in Rule 45(c); (3) requires disclosure of privileged or

other protected matter, if no exception or waiver applies; or (4) subjects a person to undue burden. FED. R. CIV. P. 45(d)(3)(A); *see also* FED. R. CRIM. P. 17(c)(2) ("On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.").

Here, the Moving Parties seek to quash the subpoenas on the ground that they subject the five potential witnesses to an undue burden. FED. R. CIV. P. 45(d)(3)(A)(iv). A court:

> "[B]alancing undue hardship against need for the requested information may consider multiple factors, including the (1) relevance of the requested materials, (2) the party's need for the [testimony], (3) the breadth of the request, (4) the time period covered by the request, (5) the particularity with which the [likely testimony is] described, (6) the burden imposed, and (7) the recipient's status as a non-party."

*In re Schaefer*, 331 F.R.D. 603, 608–09 (W.D. Pa. 2019 (quoting *Pennsylvania v. Think Fin., LLC,* No. 14-7139, 2018 WL 4635750, at *2 (E.D. Pa. Sept. 26, 2018)).

### III. Analysis

#### A. The Court Will Grant Highmark's Motion to Grant the Subpoena Directed to Mandi Berg

The Court will first address the Moving Parties' motion to quash Berg's testimony. On the one hand, Berg's testimony is certainly relevant to Peerstar, Dr. Nulton, and Dr. Kennedy's claims. Berg would testify to her experiences and actions as an investigator with Highmark, and specifically to her review of the allegations that CBH and ReDCo were fraudulently using Dr. Nulton and Dr. Kennedy's identifying information. (ECF No. 135 at 9.) This testimony is closely related to Kelly's alleged identity theft because Dr. Nulton and Dr. Kennedy contend that Kelly used their information on CBH and ReDCo's forms without their permission. Berg's testimony has a tendency to make it more or less likely that Kelly committed identity theft.

On the other hand, Peerstar, Dr. Nulton, and Dr. Kennedy note that like Berg, Bock and Kent were also involved in Highmark's review of CBH and ReDCo's alleged fraudulent use of Dr. Nulton and Dr. Kennedy's names and information. (*Id.*) Therefore, Berg's testimony, at least at a general level, is similar to that of two other witnesses. Further, Peerstar, Dr. Nulton, and Dr. Kennedy indicated that their need for Berg's testimony is not incredibly significant when they wrote that they "were willing to consider dismissing her before Highmark cutoff negotiations" between the parties by filing its motion to quash. (ECF No. 142 at 5.) Accordingly, the Court finds that Peerstar, Dr. Nulton, and Dr. Kennedy's need for Berg's testimony is not high.

Further, the burden that testifying would place upon Berg is significant. As noted earlier, she is scheduled to have surgery on her foot soon (if it has not already occurred), and she will have a difficult time making the roughly two-hour journey from her home to this Court after her surgery takes place. (ECF No. 149 at 2–3.)

Finally, the fact that Highmark and Berg are not parties to this lawsuit also weighs in favor of granting Highmark's motion to quash the subpoena mandating that Berg come to this Court and testify for trial.

In short, while Berg's testimony is relevant to Peerstar, Dr. Nulton, and Dr. Kennedy's claims, it is somewhat similar to that of Bock and Kent; Peerstar, Dr. Nulton, and Dr. Kennedy have indicated that their need for her testimony is not high; and requiring Berg, a non-party, to come to this Court to testify would place a high burden upon her due to her recent or upcoming medical procedure. For all of these reasons, the Court will grant Highmark's motion to quash the subpoena mandating that Berg testify at trial.

### B. The Court Will Deny the Motion to Quash the Remaining Subpoenas

#### 1. The Testimony of Earl Bock and Megan Kent

The Court will next evaluate the testimony of Bock and Kent, the other two individuals involved with Highmark's investigation of CBH and ReDCo's submissions.

Just as with Berg, Bock and Kent's testimony would be relevant because it would revolve around Highmark's investigation of CBH and ReDCo's use of Dr. Nulton and Dr. Kennedy's names, which is closely related to Kelly's alleged identity theft. Indeed, Bock and Kent's testimony has a tendency to make it more or less likely that Kelly committed the identity theft that he is accused of committing.

Turning to Peerstar, Dr. Nulton, and Dr. Kennedy's need for Bock and Kent's testimony, unlike with Berg, they do not state that they were recently prepared to dismiss Bock or Kent from testifying. Further, while both Bock and Kent would generally testify to Highmark's investigation of CBH and ReDCo's submissions, their testimony would also differ in certain respects, which leads this Court to conclude that their testimony would not be entirely duplicative. For example, Bock would testify to a phone call that Highmark's fraud hotline received from Dr. Nulton's office regarding Dr. Nulton's belief that CBH was listing him as a provider for certain submissions when he had not actually served as a provider for those claims. (ECF No. 135 at 10.) Bock reviewed this initial complaint and had conversations with Dr. Nulton about his allegations. (*Id.*) Neither Peerstar, Dr. Kennedy, and Dr. Nulton, in their witness list, nor the Moving Parties, in their motion to quash the subpoenas directed to Bock, directly state that Kent, or any other witness, is able to testify with respect to Bock's review of the original complaint and later conversations with Dr. Nulton. (*See* ECF Nos. 135, 149.)

Similarly, Highmark designated Kent as its corporate designee with respect to "all investigations and reviews conducted by Highmark including the review of the unauthorized use of the personal identifying information of Dr. Nulton and Dr. Kennedy," as well as for "topics related to the Highmark claim runs that have been produced by Highmark that identifies claims with which Drs. Nulton and Kennedy have been associated," among other things. (ECF No. 135 at 12.) The fact that Highmark selected Kent as its corporate designee indicates that she possesses highly important, and potentially unique information that Peerstar, Dr. Nulton, and Dr. Kennedy may well need in their efforts to prove their claims.

Finally, while the Court does not doubt that requiring Bock and Kent to testify would place a degree of hardship upon Highmark and Bock and Kent as individuals, the Court finds that none of the Moving Parties' listed hardships demonstrate the heavy burden necessary to establish that compliance with the subpoena would be "'unreasonable and oppressive.'" *Frank Brunckhorst Co. v. Ihm*, No. 12-0217, 2012 WL 5250399, at *4 (E.D. Pa. Oct. 23, 2012) (quoting *McConnell v. Canadian Pac. Realty Co.*, 280 F.R.D. 188, 193 (M.D. Pa. 2011)). Therefore, the Court will deny Highmark and Kent's motions to quash the subpoenas directed to Bock and Kent.

2. **The Testimony of Barbel Snider and Joanne Kramer**

Once again, both Snider and Kramer's testimony is relevant to Peerstar, Dr. Nulton, and Dr. Kennedy's claims for identity theft. Generally speaking, both individuals would testify to Highmark's procedures in approving CBH and ReDCo to be reimbursed by Highmark for the treatment that they provided. (ECF No. 135 at 7, 13.) Because Peerstar, Dr. Nulton, and Dr. Kennedy allege that Kelly committed identity theft in the course of CBH and ReDCo interactions

with Highmark, Snider and Kramer's testimony about CBH and ReDCo's submissions has a tendency to make it more or less likely that Kelly did in fact commit identity theft.

Turning to Peerstar, Dr. Nulton, and Dr. Kennedy's need for Snider and Kramer's testimony, like Bock, Snider would testify to several things to which no other witness would testify. For example, Snider will "authenticate and testify regarding the purposes and meanings of various Highmark documents," and she will also "testify that she never told CBH or ReDCo to put Dr. Nulton or Dr. Kennedy's names or identifying information on any Highmark forms." (*Id.* at 7.) The fact that Snider's testimony is both highly relevant and unique weighs against quashing the subpoena procuring her testimony.

With respect to Kramer, her testimony is similar to Snider's insofar as both would testify about the approval and credentialing of CBH and ReDCo under Act 62. However, because Kramer is a current employee of Highmark where Snider is not, it is possible that she will have additional knowledge regarding Highmark's procedures that Snider does not have. Further, once again, because Kramer's testimony is relevant, it is Highmark that bears the heavy burden of demonstrating that this Court should quash the subpoena mandating that Kramer attend trial. *Frank Brunckhorst Co. v. Ihm,* 2012 WL 5250399, at *4 (quoting *McConnell,* 280 F.R.D. at 193). Highmark has not met that heavy burden here. Indeed, while Snider and Kramer would experience difficulty as a result of coming to this Court to testify, neither Snider nor Highmark, as Kramer's employer, have shown that the burden they would experience is an undue one.

Therefore, the Court will also deny Snider and Highmark's motion to quash the subpoena requiring Snider and Kramer to testify.

### C. The Court Will Deny the Moving Parties' Motions Under Rule 43(a) and Rule 26(c)

For similar reasons as those that the Court outlined above, the Court also finds that good cause does not exist to allow Snider, Bock, Kent, and Kramer to testify remotely. FED. R. CIV. P. 43(a); *see Guardant Health, Inc. v. Foundation Medicine, Inc.,* No. 17-1616-LPS-CJB, 2020 WL 6120186, at *2 (noting that the most persuasive showings of good cause are likely to arise when a witness is unable to attend trial for unexpected reasons like an accident or illness, but is still able to testify remotely). Accordingly, the Court denies the Moving Parties' motion to allow Snider, Bock, Kent, and Kramer to testify remotely.

Further, regarding the Moving Parties' motion under Rule 26(c), the Third Circuit has explained that the "Federal Rule governing subpoenas is Rule 45, and not Rule 26." *R.J. Reynolds Tobacco v. Philip Morris, Inc.,* 29 F. App'x 880, 882 (3d Cir. 2002). Further, Rule 26 governs discovery, not trial. *See* FED. R. CIV. P. 26. Therefore, because Kelly, Dr. Nulton, and Dr. Kennedy have subpoenaed these five witnesses to testify at trial, not for purposes of testifying via deposition, the Court will also deny the Moving Parties' motion for a protective order.

## IV. Conclusion

For the reasons explained above, the Court will **GRANT IN PART** and **DENY IN PART** the Moving Parties' motion. The Court finds that Highmark has met its heavy burden with respect to the subpoena requiring Mandi Berg to testify at trial. Therefore, the Court will quash the subpoena requiring her to attend trial. However, Highmark, Kent, and Snider have not met their heavy burden with respect to the remaining subpoenas, they have not shown that good cause exists to allow Snider, Bock, Kent, and Kramer to testify remotely, and they have not shown that they are entitled to a protective order. Accordingly, the Court will not quash or

modify the subpoenas mandating that Barbel Snider, Earl Bock, Megan Kent, and Joanne Kramer attend trial and testify. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GEORGE V. Kelly, | ) | Case No. 3:18cv-126 |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| PEERSTAR LLC and LARRY J. NULTON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### ORDER

**NOW**, this 22nd day of September, 2021, upon consideration of the Moving Parties' Amended Motion to Quash or Modify Subpoenas Pursuant to F.R.C.P. 45(d)(3) or For a Protective Order (ECF No. 149) and for the reasons set forth in the Memorandum Opinion accompanying this Order, it is **HEREBY ORDERED** that the Motion is **GRANTED IN PART** and **DENIED IN PART**. The Court **ORDERS** that the subpoena requiring that Mandi Berg appear at trial and testify is quashed. The Court **FURTHER ORDERS** that the remaining subpoenas are not quashed and remain in effect.

BY THE COURT:

_____
KIM R. GIBSON
UNITED STATES DISTRICT JUDGE

14