IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GEORGE V. KELLY,                          )        CONSOLIDATED CASES
                                          )
                                          )
        Plaintiff/Counterclaim            )
        Defendant,                        )
                                          )        Case No. 3:18-cv-126
                                          )              &
                                          )        Case No. 3:18-cv-187
                                          )
    v.                                    )
                                          )
PEERSTAR LLC, and                         )
LARRY J. NULTON,                          )        JUDGE KIM R. GIBSON
                                          )
        Defendants/                       )
        Counterclaim Plaintiffs,          )
                                          )
    And                                   )
                                          )
CHARLES J. KENNEDY,                       )
                                          )
        Plaintiff                         )
    v.                                    )
                                          )
GEORGE V. KELLY,                          )
                                          )
        Defendant.                        )

## MEMORANDUM OPINION AND ORDER

### I.   Introduction

This matter comes before the Court following a bench trial held from September 27, 2021, until October 1, 2021. (ECF Nos. 156, 157, 159, 160, 161). The parties filed their Proposed Findings of Fact and Conclusions of Law and briefs in support on January 11, 2022, (ECF Nos. 171–74), and they filed their Responses in Opposition on January 25, 2022. (ECF Nos. 175, 176). The matter is now ripe for disposition. For the reasons explained below, the Court: (1) denies

Plaintiff Dr. Larry J. Nulton's ("Dr. Nulton") request for relief, (2) denies Plaintiff Dr. Charles J. Kennedy's ("Dr. Kennedy") request for relief, and (3) enters judgment in favor of Defendant George V. Kelly ("Mr. Kelly").

## II.     Jurisdiction and Venue

The Court has subject-matter jurisdiction over this case because the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). Venue is proper because a substantial part of the events giving rise to the parties' claims occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391(b)(2).

## III.    Procedural Background

On June 13, 2018, Mr. Kelly filed a single-count complaint against Dr. Nulton and Peerstar, LLC ("Peerstar") for Breach of Contract, alleging that Dr. Nulton and Peerstar had breached a Settlement Agreement between the parties. (*See* ECF No. 1). On August 15, 2018, Mr. Kelly filed an Amended Complaint against Dr. Nulton and Peerstar, again asserting a single claim for Breach of Contract. (*See* ECF No. 15).

On September 14, 2018, Dr. Nulton and Peerstar filed an Answer to Mr. Kelly's Amended Complaint. (ECF No. 16). Including in the Answer were the following eight counterclaims by Dr. Nulton and Peerstar against Mr. Kelly: (1) Identity Theft (Count I); (2) Misappropriation (Count II); (3) Unauthorized Use of Name or Likeness (Count III); (4) Fraudulent Inducement of the Peerstar Operating Agreement, Profit Distributions and Compensation (Count IV); (5) Fraudulent Inducement of 2014 Amendment of the Peerstar Operating Agreement, Profit Distributions and Compensation (Count V); (6) Fraudulent

Inducement of the 2016 Settlement Agreement (Count VI); (7) Breach of Fiduciary Duty (Count VII); and (8) a claim for Declaratory Relief (Count VIII). (*Id.* at 29–39).

On September 20, 2018, in a separately docketed action, Dr. Kennedy filed a Complaint against Mr. Kelly, asserting claims for: (1) Identity Theft (Count I); (2) Misappropriation (Count II); and Unauthorized Use of Name or Likeness (Count III). Complaint at 8–12, Kennedy v. Kelly, No. 3:18-CV-187 (W.D. Pa. Sep. 20, 2018), ECF No. 1.

On October 30, 2018, Mr. Kelly filed a Motion to Consolidate the two actions. (ECF No. 25). On November 28, 2018, the Court issued an order directing that the two actions be consolidated, and that the consolidated case be listed under Case No. 3:18-cv-126. (ECF No. 37).

On November 22, 2019, Dr. Nulton, Dr. Kennedy, and Peerstar filed a Motion for Summary Judgment, asking the Court to: (1) enter summary judgment in favor of Dr. Nulton and Peerstar with respect to Mr. Kelly's claim against them, (2) enter summary judgment in favor of Dr. Nulton and Peerstar with respect to Dr. Nulton and Peerstar's eight counterclaims against Mr. Kelly, and (3) enter summary judgment in favor of Dr. Kennedy with respect to his three claims against Mr. Kelly. (ECF No. 78). On that same day, Mr. Kelly filed his own Motion for Summary Judgment, seeking judgment in his favor with respect to his claim against Dr. Nulton and Peerstar, as well as the claims brought against him by Dr. Nulton, Dr. Kennedy, and Peerstar. (ECF No. 80).

On August 26, 2020, the Court issued its decision on the parties' motions for summary judgment. (ECF No. 102). The Court granted Mr. Kelly's Motion in part and denied Dr. Nulton, Dr. Kennedy, and Peerstar's Motion. (*Id.* at 37). Specifically, the Court dismissed Counts II–VIII of Peerstar and Dr. Nulton's counterclaims, as well as Counts II and III of Dr. Kennedy's

Complaint. (*Id.*). Further, the Court found that Dr. Nulton and Peerstar owe Mr. Kelly $3,246,632.64 for their breach of the Settlement Agreement. (*Id.* at 35).

In short, following the Court's summary judgment decision, Dr. Nulton and Peerstar owe Mr. Kelly $3,246,632.64, and Dr. Nulton and Dr. Kennedy each still have one operative claim (for identity theft) against Mr. Kelly. (*See* ECF No. 102). Dr. Nulton and Dr. Kennedy's identity theft claims went to trial in September 2021, and it is those claims that this Court now resolves.[1]

## IV.     Legal Standard

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court may enter judgment following a trial without a jury. *See* FED. R. CIV. P. 52(a). In making a decision following a bench trial, "the court must find the facts specially and state its conclusions of law separately." *Id.*; *see also In re Frescati Shipping Co., Ltd.*, 718 F. 3d 184, 196 (3d Cir. 2013). Accordingly, the Court will discuss its factual findings and then proceed to its conclusions of law.

## V.     Findings of Fact

The Court makes findings of fact with regard to the remaining issue in this case: whether Defendant Mr. Kelly is liable to Plaintiffs Dr. Nulton and Dr. Kennedy for identity theft.

### A.     Background on the Relevant Individuals and Entities

---

[1] Because the only claims that the Court is presently tasked with resolving are Dr. Nulton and Dr. Kennedy's claims against Mr. Kelly for identity theft, the Court will refer to Dr. Nulton and Dr. Kennedy as Plaintiff(s) throughout the remainder of this opinion, and the Court will refer to Mr. Kelly as Defendant.

1.   Dr. Nulton, His Relationship with Mr. Kelly, and the Formation of Children's Behavioral Health

Dr. Nulton is a licensed psychologist who works in Johnstown, Pennsylvania. (Tr. Vol. I, Nulton, 134:2–10). His company is called Nulton Diagnostic and Treatment Center ("NDTC"). (*Id.* at 134:13–14).

Dr. Nulton started NDTC in 1994, and it was incorporated in 1995. (*Id.* at 144:20–23). When NDTC first began, it provided "diagnostic evals, outpatient therapy, individual therapy … kind of the—normal gambit of psychology service or mental health in an outpatient clinic." (*Id.* at 145:20–25). As NDTC grew throughout the 1990s, it began providing Behavioral Health Rehabilitation Services, ("BHRS"), which were previously known as "[w]rap-around" services. (*Id.* at 149:5–19; 157:3–7).  NDTC provided BHRS to individuals through Children's Behavioral Health ("CBH"), an entity that Dr. Nulton described as a "d/b/a … underneath the Nulton entity." (*Id.* at 159:13–23).

In the mid-1990s, while Dr. Nulton was building his own practice at NDTC, he was also working at an entity that was known as Northwestern Human Services. (*Id.* at 143:7–144:3). It was during his time at Northwestern Human Services that Dr. Nulton met Mr. Kelly. (*Id.* at 163:20–164:2). Dr. Nulton observed that Mr. Kelly was a very hard worker, and the pair developed a professional relationship that eventually become a friendship. (*Id.* at 164:14–165:5).

In or around 1997, Dr. Nulton hired Mr. Kelly into his private practice as a case manager. (*Id.* at 165:6–25). When Dr. Nulton hired Mr. Kelly, Mr. Kelly was a part-time employee at NDTC. (*Id.* at 166:1–2). However, the CBH portion of NDTC began to grow drastically after Mr. Kelly joined the company. (*Id.* at 167:11–18). In 1997 or 1998, Dr. Nulton

began to pay Mr. Kelly five percent of the gross receivables from the BHRS program offered by NDTC/CBH, and Dr. Nulton continued to pay Mr. Kelly that amount until 2005. (*Id.* at 167:5–21). Dr. Nulton testified that Mr. Kelly effectively became the Chief Operating Officer ("COO") of the BHRS programs offered by NDTC/CBH. (*Id.* at 167:25–168:4).

In 2005, a representative of Providence Service Corporation ("Providence") approached Dr. Nulton about purchasing NDTC. (*Id.* at 171:2–5). Dr. Nulton informed Providence that he was not interested in selling the entirety of NDTC, but he was interested in selling the portion that provided the BHRS program—CBH. (*Id.* at 171:3–13). Accordingly, Dr. Nulton incorporated CBH, and he sold that portion of his business to Providence for $14.5 million. (*Id.* at 171:14–21). When Dr. Nulton sold CBH to Providence, Mr. Kelly did not own any equity interest in the business. (*Id.* at 171:22–172:1). Nonetheless, when Dr. Nulton sold CBH, he paid Mr. Kelly $1 million, because, in his words, he "just thought that [Mr. Kelly] had worked hard, earned it, and it just seemed like the right thing to do." (*Id.* at 172:2–11). In short, Dr. Nulton was grateful for the work that Mr. Kelly had put in to grow the business. (*Id.* at 172:12–14).

### 2.  Dr. Kennedy and His Work at NDTC

Dr. Nulton hired Dr. Kennedy to work at NDTC in 2001, and Dr. Kennedy has worked there ever since. (Tr. Vol. I, Kennedy, 41:7–16; 43:11–13). When Dr. Kennedy began working at NDTC in 2001, he had finished his Ph.D., but he needed to get post-doctorate supervision. (*Id.* at 41:11–16). After completing that supervision, Dr. Kennedy became a licensed psychologist on December 5, 2005. (*Id.* at 42:13–15).

### 3.  Mr. Kelly and His Involvement with CBH and ReDCo

When Dr. Nulton sold CBH to Providence in 2005, Mr. Kelly went along with CBH. (Tr. Vol. IV, Kelly, 183:1–8). Following the sale, Mr. Kelly was the CEO of CBH; however, his title eventually changed to COO. (*Id.* at 183:7–11). Mr. Kelly testified that as the COO of CBH, he is "responsible for most of the day-to-day operations. Of course, we're large. We're in 18 counties. So I have a great many people that assist me." (*Id.* at 184:2–6). Mr. Kelly was still employed as the COO of CBH as of September 30, 2021. (*Id.* at 183:12–13).

Shortly after Dr. Nulton sold CBH to Providence, Frank Milewski ("Mr. Milewski"), the state director of Providence, approached Mr. Kelly about serving as the COO of what is now known as Pathways Service Corporation ("PCS"). (*Id.* at 185:6–21). Mr. Kelly explained that PCS is a division of the ReDCo Group, and PCS provides BHRS services, just as CBH does. (*Id.* at 185:6–15). Mr. Kelly accepted the position and was introduced as the COO of PCS in August 2005. (*Id.* at 185:19–21). As of September 30, 2021, Mr. Kelly was still employed as the COO of PCS, although his compensation comes from CBH. (*Id.* at 186:1–3).

**B.      The Provision of BHRS by CBH and ReDCo**

The Court now turns to overviewing the process by which an individual receives BHRS treatment from CBH and ReDCo.[2] In doing so, the Court reviews the testimony of Dr. Kennedy, Dr. Nulton, and Melissa Woznicki ("Ms. Woznicki").[3]

**1.   Dr. Kennedy's Testimony Regarding BHRS**

---

[2] The Court is specifically concerned with how Dr. Kennedy, Dr. Nulton, CBH, and ReDCo were involved in the process of individuals receiving BHRS treatment at CBH and ReDCo. The Court stresses that its discussion on this subject is limited to the context of the testimony that was produced at trial and the legal issues now before this Court. The Court does not imply that what follows is an overview of how BHRS treatment is prescribed and provided in all circumstances.

[3] At the time of the trial in this case, Ms. Woznicki was the state clinical director of PCS, overseeing ReDCo and CBH, among other entities. (Tr. Vol. IV, Woznicki, 102:3–7).

a.   The Initial Diagnosis of ASD, the Prescription for BHRS Treatment, and the Provision of BHRS Treatment

In order to explain how CBH and ReDCo provided BHRS to individuals, the Court must first define autism spectrum disorder ("ASD"). To do so, the Court reviews Dr. Kennedy's definition of ASD.

According to Dr. Kennedy, ASD is "a diagnosis recognized by the American Psychological Association—the American Psychiatric Association. It—the word 'spectrum' is purposeful. It's a whole range of behaviors. As a disorder, it's a range of dysfunctional behaviors identified." (Tr. Vol. I, Kennedy, 47:9–16). ASD is "most recently defined … on three levels, at level three, two[,] and one, which describes the whole array of impairment." (*Id.* at 47:19–22).

An individual with a level one impairment is "likely the individual who would benefit most from BHRS services." (*Id.* at 48:7–8). Such an individual is "less rigid. They have … social communication skills. They want communication skills. They want interaction, but they—but they have … the most recent and accepted hypothesis is that there's a social dimension in our brain that with an individual with an autism, that part is not developed." (*Id.* at 48:8–14). These individuals can do things like go to school, but they often struggle to relate to classmates and others around them. (*Id.* at 48:15–49:4). BHRS is one way of helping these individuals to "accept who they are and do the best that they can with their talents and skills." (*Id.* at 49:2–11).

In terms of how a child with ASD receives BHRS treatment, the process can begin with an evaluation by a licensed psychologist. (*Id.* at 49–50). When a licensed psychologist evaluates a child for ASD, the psychologist gathers information about the child, and then uses that

information to arrive at a diagnosis. (*Id.* at 50:8–15). With that diagnosis, the psychologist offers to the "person treatment options … [the psychologist] educates the parent a bit … about ASD. [The psychologist] would … try to help support them and assure them … there is treatment available. And to date, the best treatment would be [BHRS]." (*Id.* at 50:16–22).

A psychologist then writes a "prescription" for an individual with ASD to receive BHRS treatment. (*Id.* at 50:23–51:1). Dr. Kennedy testified that the prescription itself is "a number of hours, units that you guess would be an appropriate level of quantity of treatment." (*Id.* at 51:1–3). The psychologist's prescription for BHRS specifies the number of hours for which the individual is to receive BHRS treatment, as well as the location where the individual is to receive those hours of BHRS treatment (whether at school, in the community, or at home). (*Id.* at 51:1–18). However, the psychologist's prescription does not describe what actually happens during the hours that BHRS treatment is being provided to the individual. (*Id.* at 51:19–21). The BHRS provider is the one who decides what happens during the hours of time in which the individual receives BHRS treatment. (*Id.* at 51:24–52:4).

In order to determine exactly what happens during the period of time in which the individual receives BHRS treatment, the BHRS provider develops a treatment plan. (*Id.* at 51–54). To develop a treatment plan, the BHRS provider performs a functional behavioral analysis ("FBA"), which calls for examining what causes an individual with ASD to act in a given way. (*Id.* at 52:21–53:3). The BHRS provider then sets up a "treatment plan targeting behaviors one at a time … applying them, then looking at what happened, what didn't happen, and then reassessing whether that was the appropriate intervention to apply." (*Id.* at 53:17–21).

In sum, Dr. Kennedy testified that the BHRS process begins when a licensed psychologist diagnoses an individual with ASD. Particularly if an individual has level one ASD, the psychologist will often write a prescription for that individual to receive BHRS treatment for a certain number of hours and at a certain location. After the individual has the prescription, the individual goes to a BHRS provider. The BHRS provider performs an FBA and develops a treatment plan, which specifies exactly how the provider will target the various behaviors of the individual with ASD.

> **b.**    **The Reevaluation of Individuals Receiving BHRS Treatment**

The Court now turns to the process by which individuals receiving BHRS treatment are reevaluated.

Given the state of the law as of the date of the trial in this matter, when a psychologist evaluates an individual for ASD, that evaluation is good for one year. (*Id.* at 57:4–6). After one year, the psychologist reevaluates the individual. (*Id.* at 57:4–9). At the reevaluation, the "family comes back [to the psychologist] and … talk[s] about progress or lack of progress." (*Id.* at 57:10—11).

Moreover, the BHRS provider gives the psychologist performing the reevaluation information to assist the psychologist in determining whether a further prescription for BHRS is appropriate. (*Id.* at 100:1–4). Specifically, the BHRS provider gives the psychologist "a progress report of what was working, [and] what wasn't working" in terms of the treatment being provided. (*Id.* at 100:7–16). In reviewing the progress reports that CBH and ReDCo submitted to him, Dr. Kennedy has never seen any indication that a psychologist was involved in working on the treatment of a patient. (*Id.* at 106:15–18).

Finally, after the psychologist screens the patient and hears from the family regarding the problems that the patient is still having, the psychologist makes a decision "as to whether the [BHRS] should continue and at what level [it] should continue, meaning how many hours would be prescribed." (*Id.* at 57:12–18). Based on all of the foregoing, the psychologist writes a second prescription. (*Id.* at 57:19–21).

Just as with the initial prescription, the individual takes the second prescription to a provider of BHRS, and the provider develops and implements a treatment plan for the individual. (*Id.* at 58:6–13). Dr. Kennedy testified that he has never reviewed treatment plans for CBH, and he has never required that a particular point or thing be removed from a treatment plan at CBH. (*Id.* at 58:14–59:7).

c.    **Dr. Kennedy's Supervisory Responsibilities**

As a licensed psychologist in Pennsylvania, Dr. Kennedy is legally permitted to supervise three individuals, and he does in fact supervise three individuals who work at NDTC. (*Id.* at 45:6–9, 46:16–20). The individuals whom Dr. Kennedy supervises are called evaluators. (*Id.* at 45:10–13). Dr. Kennedy's evaluators speak for him, and they "have training, but they know that in [Pennsylvania, Dr. Kennedy] … must co-sign everything that they do[,] and the responsibility of their work is [Dr. Kennedy's] responsibility." (*Id.* at 45:13–16).

Dr. Kennedy stated that in 2006, after Dr. Nulton sold CBH to Providence, Mr. Kelly asked Dr. Kennedy to be "the director of something [at CBH], part of—one part of his programming." (*Id.* at 60:22–61:8). Specifically, Dr. Kennedy testified that Mr. Kelly wanted him to be involved in supervision at CBH. (*Id.* at 61:19–24). Dr. Kennedy declined because he was already supervising three individuals and was therefore not legally permitted to fill that role.

(*Id.* at 61:8–9). However, Dr. Kennedy did agree to serve as a consultant for CBH, a position that he held for approximately thirteen months. (*Id.* at 61–63).

### 2. Dr. Nulton's Testimony Regarding BHRS

#### a. The Initial Diagnosis of ASD, the Prescription for BHRS Treatment, and the Provision of BHRS Treatment

Like Dr. Kennedy, Dr. Nulton testified that in order for BHRS treatment to begin, there needs to be an evaluation performed by a licensed psychologist or a physician. (Tr. Vol. I, Nulton, 150:7–12). Dr. Nulton described the evaluation process as "doing a patient examination through assessment, interviewing, screening, working with the family … trying to say what diagnosis does the person have so we can assess. And then once we do that, we would prescribe a level of care or a particular service, once we have the proper diagnosis." (*Id.* at 150:13–24).

As part of the evaluation process, the individual performing the evaluation writes prescriptions. (*Id.* at 151:24–152:1). The prescription is "just what it sounds like when you're doing meds, except [the psychologist or physician is] doing them with services. So [the psychologist or physician is really] … prescribe[ing] exactly what [he or she] want[s] … [i]t could be a service like a partial program, it could be BHRS[.]" (*Id.* at 152:2–8). The patient then takes the prescription to the BHRS provider, just like a patient might take a doctor's prescription for a certain medication to a pharmacy. (*Id.* at 152:10–13). The psychologist or physician who writes the prescription does not control how the BHRS treatment is provided—it is up to the BHRS provider to determine the delivery of the BHRS services. (*Id.* at 152:10–15).

With respect to the treatment plan, Dr. Nulton stated that it is "a pretty extensive document that oftentimes … will follow [an FBA], as Dr. Kennedy mentioned." (*Id.* at 153:22–

25). The FBA is a "direct observation by the treatment provider and staffs therein, the psychologist. They would do a complete observation, start to analyze what—as Dr. Kennedy said, the antecedents, what's triggering the behavior." (*Id.* at 153:24–154:4). Based on their observation of the patient, the BHRS providers then "use all of that data and start to develop a treatment plan, which would have goals, objectives, interventions, outcomes; and it can be quite extensive." (*Id.* at 154:4–7). Like Dr. Kennedy, Dr. Nulton testified that it is the BHRS provider, not the evaluating/prescribing psychologist, who completes the treatment plan. (*Id.* at 154:13–18).

In sum, Dr. Nulton's testimony regarding the origins of BHRS treatment is highly similar to Dr. Kennedy's. Both men testified that a psychologist can be the one to evaluate an individual, diagnose that person with ASD or a similar disorder, and then prescribe BHRS as a method of treating that disorder. Once the individual has the prescription for BHRS treatment, he or she takes that prescription to a BHRS provider, and the provider develops a treatment plan and carries out treatment.

### b.    Dr. Nulton's Supervisory Responsibilities

Like Dr. Kennedy, as a licensed psychologist in Pennsylvania, Dr. Nuton is permitted to supervise three full-time equivalents ("FTEs"). (*Id.* at 146:25–147:2). Dr. Nulton described supervising an FTE as "assuming all of the care of the [FTE's] patient. It's under your name, license, when you're supervising. So you're assuming that liability and responsibility, but also you're to review the records, review the patient care, face-to-face supervision on a regular and periodic basis." (*Id.* at 147:12–19).

Dr. Nulton stated that over the years, Mr. Kelly asked him many times about supervising employees. (*Id.* at 196:12–15). However, Dr. Nulton always declined to do so. (*Id.* at 196:16–17). By way of example, Dr. Nulton entered into a consultation agreement with ReDCo. (*Id.* at 221:25–222:1). The agreement initially contained language indicating that Dr. Nulton would provide supervision to individuals working at ReDCo, but Dr. Nulton had that language removed from the agreement. (*Id.* at 222:1–9).

On this issue, Mr. Kelly testified that *he* never asked Dr. Nulton to provide any kind of supervision. (Tr. Vol. V, Kelly, 62:3–10). Rather, Mr. Kelly believed it was "[Ms.] Schenk" who asked Dr. Nulton to provide supervision on one occasion. (*Id.* at 62:3–6). Ultimately, as Dr. Nulton stated, Ms. Schenk's request was "corrected" and was not part of the final consulting agreement. (*Id.* at 62:3–6).

Dr. Nulton also had an agreement with CBH to provide clinical consultation. (Tr. Vol. II, Nulton, 3:24–4:11). Dr. Nulton was available to discuss "theoretical or hypothetical cases … academically." (*Id.* at 4:21–23).

### 3.  Ms. Woznicki's Testimony Regarding BHRS

#### a. Ms. Woznicki's Career at PCS

Ms. Woznicki has been closely involved in the provision of BHRS treatments at PCS and its predecessor companies for several years. (Tr. Vol. IV, Woznicki, 103–10). Before outlining her career history with PCS and its predecessors, the Court first overviews her educational background.

With respect to Ms. Woznicki's educational background, she: (1) holds a Bachelor of Arts degree in psychology, (2) holds a Bachelor of Science degree in applied behavior analysis,

(3) is a board-certified behavior analyst, (4) is a licensed behavior specialist, and (5) holds a master's degree in applied behavior analysis. (*Id.* at 102:8–22).

Ms. Woznicki began working for PCS as a Therapeutic Staff Support ("TSS") in 2002, a role that she held until 2007. (*Id.* at 103:5–9; 110:3–5). While working as a TSS, she followed "behavior intervention plans, treatment plans; so [she] worked one-on-one with the child or adolescent. [She] supported them behaviorally with whatever was identified in their individualized treatment plan." (*Id.* at 103:19–23).

Around 2007, Ms. Woznicki transitioned into a role as a Case Manager. (*Id.* at 104:7–10; 110:4–5). This role, which was "more administrative in nature[,]" involved Ms. Woznicki helping with the service authorization process. (*Id.* at 104:9–14). In that capacity, Ms. Woznicki: (1) helped new clients schedule psychological evaluations; (2) facilitated the interagency meeting where everyone who was working with the child would be present to discuss the issues that the child was having; and (3) talked with the relevant parties about the treatment plan. (*Id.* at 104:13–105:9).

After her time as a Case Manager, Ms. Woznicki became the Assistant Regional Director. (*Id.* at 106:8–12). In that role, she directly supervised Case Managers. (*Id.* at 106:12–13).

In 2010, Ms. Woznicki transitioned into a role as Vice President of CBH and PCS. (*Id.* at 107:3–5). In that position, she handled situations that would "be escalated from a [C]ase [M]anager or a [R]egional [D]irector. [She] also worked directly with … [P]rogram [C]oordinators on … various best practice improvements … throughout the years." (*Id.* at 107:18–22).

Ms. Woznicki later applied for and became the Vice President of Operations for PCS of Pennsylvania. (*Id.* at 108:10–13). In that capacity, she continued to work with the BHRS program, and she also began working with PCS's outpatient program. (*Id.* at 108:13–17).

Finally, in 2018, Ms. Woznicki became the Clinical Director of PCS of Pennsylvania. (*Id.* at 109:10–12; 110:7–8). In that position, she continues to work with PCS's clinical companies. (*Id.* at 109:14–16).

**b.    Ms. Woznicki Describes the Provision of BHRS Treatment at CBH and ReDCo**

Like Drs. Kennedy and Nulton, Ms. Woznicki testified that the BHRS process begins with a psychological evaluation. (*Id.* at 115–16). At that evaluation, the "child comes in, they are assessed, their needs, strengths, what is happening, there's a diagnosis that the psychologist will give. And then they will determine what [are] the medically necessary services that are being recommended. If BHRS is being recommended, that then leads to the treatment plan." (*Id.* at 116:10–15).

Regarding the interplay between the psychiatrist or physician's prescription and the treatment plan, the prescription "goes verbatim into the treatment plan[,]" meaning that if the psychiatrist or physician recommends "behavioral specialist consultant at a certain number of hours per week, that goes right into the treatment plan. If it's mobile therapy for a certain number of hours per week, again all of that prescription information goes immediately into the treatment plan." (*Id.* at 118:10–17).

With respect to how treatment plans have been crafted at CBH and ReDCo during Ms. Woznicki's time with PCS, she testified that "master's level clinicians … develop the treatment

plan in collaboration with the team." (*Id.* at 117–19).  Ms. Woznicki further testified that in her time with CBH and ReDCo, she has seen thousands of treatment plans, and she has never seen a single plan that was prepared by the psychologist or psychiatrist who had performed the psychological evaluation. (*Id.* at 124:10–17).

Finally, Ms. Woznicki testified that Patricia Kerns ("Ms. Kerns"), who is supervised by Dr. Kennedy and employed by NDTC, is a prescriber for PCS in Schuylkill County. (*Id.* at 120:11–121:5; 168:14–16). In terms of the collaboration between NDTC on the one hand and CBH/ReDCo on the other, Ms. Woznicki testified that Ms. Kerns would "sit in on" CBH and ReDCo's interagency meetings, and those meetings constituted the time during which treatment plans were developed. (*Id.* at 167–69). Contradicting this testimony, Dr. Kennedy stated that neither he nor anyone that he supervised (1) attended the interagency meetings held by BHRS providers or (2) developed a treatment plan for any child receiving BHRS at CBH. (Tr. Vol. I, Kennedy, 56:2–20).

## C.    The Advent of Act 62

The passage of Pennsylvania's Act 62 has significant bearing on Dr. Nulton and Dr. Kennedy's identity theft claims. Therefore, the Court now outlines the Act and its impact on NDTC, CBH, and ReDCo.

### 1.  Dr. Nulton and Ms. Woznicki's Testimony Regarding Act 62 and How it Impacted NDTC, CBH, and ReDCo

#### a.    Dr. Nulton's Testimony

Pennsylvania's Act 62 went into effect in July 2009. (Tr. Vol. I, Nulton, 183:4–5). According to Dr. Nulton, at least as of 2009, Act 62 required commercial insurance companies to

pay the first $36,000 for the provision of BHRS services each year. (*Id.* at 181:1–17). After a commercial insurance company paid that first $36,000, the rest of the expenses for BHRS services defaulted to Medicaid. (*Id.* at 181:15–17).

Dr. Nulton further testified that because he was a prescriber of BHRS services, BHRS providers would approach him at different points and request certain information for billing purposes. (*Id.* at 184:25–185:11). Often, providers for Highmark would ask Dr. Nulton for "ordering, rendering and prescribing information." (*Id.* at 185:9–11). Specifically, BHRS providers would request Dr. Nulton's CAQH or NPI number, his "information," his license number, his Highmark number, and his Medicaid number, and the providers would then use that information to list Dr. Nulton as the prescriber on an HCFA-1500 form. (*Id.* at 185:12–19). When Dr. Nulton gave this information to BHRS providers, it enabled them to "bill for their own services, but under [his] prescription." (Tr. Vol. II, Nulton, 6:18–24). Finally, whenever BHRS providers sought this information from Dr. Nulton, he typically would not have to sign any documentation in conjunction with giving the information to the BHRS providers. (Tr. Vol. I, Nulton, 186:2–4).

Act 62 did not change Dr. Nulton's role as a prescriber. (*Id.* at 185:3–5). Under Act 62, when NDTC performed an evaluation on an individual, that individual's insurance company would reimburse NDTC at a rate of approximately $152 per evaluation. (*Id.* at 181:18–24).

### b.   Ms. Woznicki's Testimony

Ms. Woznicki testified that prior to Act 62 going into effect in 2009, all of the BHRS programs that BHRS providers offered were paid for by Medicaid. (Tr. Vol IV, Woznicki, 111:14–17). After Act 62 went into effect, BHRS providers had to bill commercial insurance

companies for the provision of autism services. (*Id.* at 111:21–23). Like Dr. Nulton, Ms. Woznicki testified that as of 2009, BHRS providers billed commercial insurance companies for the first $36,000 of BHRS services that they performed. (*Id.* at 111:21–25).

When asked whether the passage of Act 62 changed the manner in which ReDCo and CBH provided BHRS services, Ms. Woznicki stated that that it did not change either company's "process[.]" (*Id.* at 115:15–21). Specifically, she stated that CBH and ReDCo's "flow of treatment, our requesting pre-authorization, the process that we followed did not change pre or post Act 62. We brought clients in, they would have a psychological evaluation, we would have an interagency meeting. That psychological evaluation drove treatment." (*Id.* at 115:15–24).

Finally, the Court notes that CBH and ReDCo had a relationship with NDTC. (Tr. Vol. IV, Bolinsky, 61). Specifically, when a child would be referred to CBH or ReDCo, those two companies would, in turn, refer the child to Dr. Nulton or someone in his group to "perform the psychological evaluation and essentially prescribe what he (Dr. Nulton) believed was needed by the child in terms of treatment." (*Id.* at 61:8–17). After the evaluation was completed, many of the children whom NDTC evaluated went to CBH or ReDCo for BHRS treatments, although NDTC did not decide where their patients went for treatment—each patient had to make that choice. (Tr. Vol. II, Nulton, 59).

### 2. The Confusion Surrounding Act 62

Throughout trial, numerous individuals testified regarding the confusion surrounding the implementation of Act 62, and how that confusion impacted CBH and ReDCo as they worked with insurers like Highmark. The Court now offers an overview of that testimony.

#### a. Michelle Hershberger's Testimony on This Issue

Michelle Hershberger ("Ms. Hershberger") worked at CBH from the time that Dr. Nulton sold the company in 2005 until late 2017 or early 2018. (Tr. Vol. II, Hershberger, 146:24–147:12). Ms. Hershberger was the Director of Billing for CBH. (*Id.* at 147:2–5).

Ms. Hershberger testified that after Act 62 took effect, it was a challenge to get CBH credentialed[4] with insurance companies so that CBH could bill those companies for the BHRS services it was providing. (*Id.* at 213). Ms. Hershberger also stated that insurance companies were "scrambling" to work out their systems to accept claims from BHRS providers like CBH. (*Id.* at 213:12–19). Finally, Ms. Hershberger testified that she had a disagreement with Highmark over the role that psychologists played in the provision of BHRS services at CBH. (*Id.* at 214:5–10).

### b.   Mary Kay Symons's Testimony on This Issue

As of the date of trial in this matter, Mary Kay Symons ("Ms. Symons") had worked for the ReDCo Group, and more specifically PCS, for almost thirty-nine years. (Tr. Vol. III, Symons, 8). Specifically, Ms. Symons was a Billing Supervisor at PCS/ReDCo from approximately 2001 until 2016. (*Id.* at 9:1–6).

Like Ms. Hershberger at CBH, Ms. Symons was responsible for getting ReDCo credentialed with Highmark so that ReDCo could bill Highmark for the BHRS services that it provided. (*Id.* at 57:1–9). When asked how she would describe the process of getting ReDCo credentialed with Highmark in the first half of 2009, Ms. Symons stated that she felt like it "was a very confusing process. We weren't quite sure where we needed to be with them." (*Id.* at

---

[4] According to Dr. Nulton, credentialing means making sure that you "meet all the qualifications in your staff to be able to be a provider within the managed care or the insurance company." (Tr. Vol. I, Nulton, 161:14–21). In short, it is a process that a company completes in order to be reimbursed by insurance companies. (*Id.* at 161:22–24).

57:10–14). Ms. Symons further testified that Highmark's directions were confusing and contradictory at times. (*Id.* at 57:15–19). In fact, as of June 17, 2009, just weeks before Act 62 went into effect, Ms. Symons did not have clear direction from Highmark regarding how to complete the credentialing process. (*Id.* at 64:21–24).

However, Ms. Symons also testified that by the time she actually submitted the paperwork so that ReDCo could be credentialed with Highmark, her previous confusion as to how to complete the credentialing process had been resolved. (*Id.* at 80:1–8).

### c.   Ms. Woznicki's Testimony on This Issue

Ms. Woznicki offered the following testimony regarding what it was like to become credentialed with commercial insurance companies around the time that Act 62 went into effect: "for the most part the insurance companies really were clueless. It was chaos. And so they didn't understand who we were." (Tr. Vol. IV, Woznicki, 113:11–18). Further, Ms. Woznicki testified that even as of the date of trial in this matter, there is still confusion among some of the insurance companies regarding how to handle Act 62. (*Id.* at 128:3–12). However, things are much better than they were in 2009. (*Id.* at 129:2–3).

### d.   Barbel Snider's Testimony on This Issue

Barbel Snider ("Ms. Snider") worked for Highmark from 1998 until December 1, 2020. (Tr. Vol. III, Snider, 100:13–18). In 2009, Ms. Snider was a Provider Relations Representative at Highmark. (*Id.* at 101:14–17). As is relevant to this case, Ms. Snider was involved in the process of getting ReDCo added to Highmark's network so that ReDCo could seek reimbursement from Highmark for the provision of BHRS services. (*Id.* at 149–51).

Ms. Snider testified that in 2009, Highmark did not have application forms that were specifically designed or tailored for Act 62. (*Id.* at 152:16–18). Moreover, Highmark had difficulties because "the mobile therapist[s], the behavioral health consultants, and the technical support system therapists could not be credentialed individually in [Highmark's] database." (*Id.* at 153:1–6). These were the types of individuals who were employed at ReDCo. (*Id.* at 153:7–10). Therefore, at the time when Act 62 was passed: (1) there were individuals working at ReDCo who could bill for BHRS services, (2) Ms. Snider was under the impression that Highmark was required to reimburse for those individuals' services under Act 62, and (3) Highmark's system did not have the capacity to process the billing for their services. (*Id.* at 153:11–18).

However, Ms. Snider also testified that by late 2009 or 2010, Highmark's system "was equipped to handle claims submitted by entities like ReDCo for services which were performed by nonmedical professionals." (*Id.* at 155:16–22).

### 3. Highmark's Requirements Regarding Reimbursements for BHRS Services

Because Mr. Kelly's actions relative to Highmark form the focal point of Dr. Nulton and Dr. Kennedy's identity theft allegations in this case, the Court now examines Highmark's policies with respect to reimbursing BHRS providers like CBH and ReDCo for the provision of BHRS services under Act 62.

One of the exhibits admitted into evidence in this case is a document entitled "Highmark Medical Policy for Treatment of Autism Spectrum Disorders" ("Highmark Policy"). (ECF No. 162 at 2; P-64). As its name implies, the Highmark Policy is a "medical policy for treatment of autism spectrum disorder." (Tr. Vol. III, Snider, 111:11–17).

The Highmark Policy states that in "accordance with Act 62, Highmark will provide coverage for ASD-related care based on the member's benefit plan." (P-64 at 1). Further, the Highmark Policy provides that the "[t]reatment of ASD must be identified in a treatment plan and includes any medically necessary pharmacy care, psychiatric care, psychological care, rehabilitative care (including applied behavioral analysis) and therapeutic care" that is prescribed, ordered, or provided by certain professionals or entities. (*Id.*). Finally, the Highmark Policy states that the "treatment plan must be developed by a physician or psychologist, following a comprehensive evaluation consistent with the most recent clinical report or recommendations of the American Academy of Pediatrics." (*Id.*).

In this vein, Highmark identified Megan Kent ("Ms. Kent"), an individual who worked in Highmark's Financial Investigation and Provider Review Department ("FIPR"), as a corporate representative to speak about certain topics relevant to this case. (Tr. Vol. II, Kent, 226–27). At trial, Ms. Kent testified regarding the meaning of a Highmark policy from 2015 regarding treatment of ASD. (*Id.* at 290; D-59). Critically, the 2015 policy contains language regarding treatment of ASD and the development of treatment plans that is highly similar to the language in the Highmark Policy. (ECF No. 162 at 3; D-59 at 1–2).[5]

When asked about Highmark's requirements regarding who develops the treatment plan, Ms. Kent testified that the "clinical components" of that plan must be developed by a

---

[5] Regarding the treatment of ASD, the 2015 policy provides the following: "[t]reatment of ASD must be identified in a treatment plan and should include any medically necessary pharmacy care, psychiatric care, psychological care, rehabilitative care, including applied behavioral analysis, and therapeutic care that is" prescribed, ordered, or provided by certain enumerated professionals or entities. (D-59 at 1). Further, regarding the development of treatment plans, the 2015 policy provides that the "treatment plan must be developed by a physician or psychologist, following a comprehensive evaluation consistent with the most recent clinical report or recommendations of the American Academy of Pediatrics." (*Id.* at 2).

licensed psychologist or a physician. (Tr. Vol. II, Kent, 292:5–13). Specifically, the "clinical diagnosis of autism and autism spectrum disorder … is defined in Act 62[,]" and that portion of the treatment plan is what must be developed by a licensed psychologist or a physician. (*Id.* at 292:5–13). However, she also testified that there "are nonclinical components (of the treatment plan), like wrap-around services, that do not require a clinician or a psychologist—a physician or a psychologist." (*Id.* at 292:9–13).

Moreover, Ms. Kent confirmed that a woman named Rachel Jones ("Ms. Jones") was one of her bosses at Highmark. (*Id.* at 311:16–18). In an email she authored, Ms. Jones stated the following regarding Highmark's position on the reimbursement for BHRS treatment under Act 62:

> Highmark recognizes that the standard of practice in Pennsylvania is that the psychologist evaluates the patient, issues a prescription for the services recommended and the servicing provider takes the prescription for services and creates a treatment plan with the child and family. The treatment plan is created by the licensed behavioral specialist serving as the BSC using the result of the evaluation. The psychologist would have the opportunity to incorporate the contents of [the] treatment plan and progress toward the identified goals in subsequent reevaluations and recommendations/prescriptions for ongoing care. Highmark will not disallow claims for treatment plans that are not developed by a psychologist.

(*Id.* at 313–15; ECF No. 162 at 2; D-127 at 2).

### D.  CBH Submits the "Request for Assignment Account" Form to Highmark

In the process of CBH becoming credentialed with Highmark, CBH submitted a document entitled "Request for Assignment Account" (the "CBH Form") to Highmark. (Tr. Vol. II, Hershberger, 162–64). Because the CBH Form is very much at the center of Dr. Nulton and Dr. Kennedy's identity theft allegations, the Court now overviews the process by which CBH

submitted that form to Highmark. In doing so, the Court will: (1) first, outline the contents of the CBH Form that CBH submitted to Highmark; (2) second, review Ms. Hershberger's testimony regarding the completion of the CBH Form; (3) third, overview Dr. Nulton and Dr. Kennedy's testimony regarding the CBH Form; (4) fourth, outline Mr. Kelly's testimony regarding the completion of the CBH Form; and (5) finally, overview Mr. Kelly's responsibilities (or lack thereof) with respect to billing and credentialing at CBH and ReDCo.

### 1. The CBH Form Itself

The completed CBH Form is a two-page document. (ECF No. 162 at 2; D-21). From the top of the first page down through the middle of that page, there is certain information regarding CBH that is not highly relevant to the disposition of Dr. Nulton and Dr. Kennedy's claims. (D-21 at 1). Toward the bottom of page one, there is a heading that reads "Name(s) of Providers in Assignment Account ..." (*Id.*). Beneath that heading, there is a sub-heading that reads "Provider Name[.]" (*Id.*). Under that sub-heading are the names of Dr. Nulton and Dr. Kennedy. (*Id.*). Moving to the right across the form, the following information is listed for both doctors: (1) Highmark provider number, (2) Social Security number, (3) individual NPI number (type 1), (4) specialty, and (5) purported signature. (*Id.*). Finally, at the very bottom of the page, there is an indication that each "provider" (i.e., Dr. Nulton and Dr. Kennedy) agreed to abide by certain terms listed on the reverse side of the CBH Form. (*Id.*)

Turning to the reverse side of the form, which is page two in the exhibit that was admitted into evidence in this case, the following terms are listed, among others: (1) "we agree that every 1500 claim form submitted to Highmark Blue Shield will include the provider number of the individual provider who actually performed the service (place in Block 24K of

the claim form)[,]" (2) "[w]e agree that the account and each individual provider member will be jointly and severally liable for any overpayment that the account receives[,]" and (3) "[w]e have carefully reviewed the forms and applications associated with the establishment of this Assignment Account and each member has verified the accuracy and completeness of all information provided." (*Id.* at 2).

Finally, at the bottom of page two, Mr. Kelly signed the CBH Form as the "Authorized Representative of [the] Group[,]" and in his capacity as COO of CBH. (*Id.*; Tr. Vol. V, Kelly, 24–25). In signing the form, Mr. Kelly "verif[ied] that all providers ha[d] reviewed the Assignment Account Requirements, agree[d] upon their responsibility, and recognize[d] that as the authorized representative, [he] ha[d] the authority to bind the individual providers and sign on their behalf." (D-21 at 2).

### 2.  Ms. Hershberger's Testimony Regarding the CBH Form

Turning to Ms. Hershberger's testimony regarding the CBH Form, the Court will overview the following: (1) Ms. Hershberger's career history, (2) the relationship between Ms. Hershberger and Mr. Kelly, and (3) Ms. Hershberger's testimony regarding the specific process by which the CBH Form was completed.

### a.  Ms. Hershberger's Career History

From approximately 1995 until 1999, Ms. Hershberger worked as an administrative assistant at Highmark Blue Cross Blue Shield. (Tr. Vol. II, Hershberger, 141–43). After leaving Highmark, Ms. Hershberger went to work for NDTC. (*Id.* at 143:4–7). When Ms. Hershberger started at NDTC, she was a Practice Manager, and she eventually became the Director of Billing

for the company. (*Id.* at 143:8–14). In her capacity as director of billing, Ms. Hershberger had

approximately two to five people that reported to her. (*Id.* at 143:15–19).

When Dr. Nulton sold CBH in 2005, Ms. Hershberger went along with the company. (*Id.*

at 144–47). After the sale, Ms. Hershberger remained the director of billing for CBH, and she

stayed with the company until late 2017 or early 2018. (*Id.* at 147:2–8). She was also responsible

for credentialing at CBH. (*Id.* at 149:16–150:16).

### b.      The Relationship Between Ms. Hershberger and Mr. Kelly

Ms. Hershberger testified that she and Mr. Kelly always had a "rocky relationship." (*Id.*

at 151:21–22). Indeed, sometime after Dr. Nulton sold CBH in 2005, Ms. Hershberger and Mr.

Kelly had a "verbal altercation." (*Id.* at 152–54). The beginnings of the "verbal altercation" came

after Ms. Hershberger worked to change CBH's billing software to a more advanced system. (*Id.*

at 154:3–9). As Ms. Hershberger completed this change, she discovered that "authorizations

were not being obtained by the operations/clinical side of the company, which was resulting in

[CBH] losing money." (*Id.* at 154:3–12). Ms. Hershberger reported this finding to the chief

financial officer of the company, which led Mr. Kelly to come "down to [Ms. Hershberger's]

office, clos[e] the door, and [scream] at [Ms. Hershberger.]" (*Id.* at 154:13–21). Following this

verbal altercation, Ms. Hershberger informed her superiors of what had happened and began

reporting to a different individual within the company. (*Id.* at 154:22–155:6).

### c.      Ms. Hershberger's Testimony Regarding the Completion of the CBH Form

The Court now shifts its focus to Ms. Hershberger's testimony regarding exactly how

CBH went about completing the CBH Form.

###### i.    Billing and Credentialing at CBH

Ms. Hershberger testified that she was involved in the process of getting CBH credentialed with Highmark. (*Id.* at 156:2–7). Ms. Hershberger further testified that Mr. Kelly was also involved in the credentialing process. (*Id.* at 156:11–12). With respect to the credentialing process in general, Ms. Hershberger stated that Mr. Kelly "would have been the one that received the application. He would have been the one to forward it to me. We would have had to have conversations over how it needed to be completed, what all we were being credentialed for." (*Id.* at 156:13–17). When asked whether Mr. Kelly would have given her instructions in terms of how to complete the credentialing process with Highmark under Act 62, Ms. Hershberger responded: "[t]hat it needed to be done, yes." (*Id.* at 156:20–22).

However, Ms. Hershberger also testified that Mr. Kelly had to trust her to ensure that the billing and credentialing at CBH were being done properly. (*Id.* at 204:14–22). Indeed, as the COO of CBH, Mr. Kelly would not have been as familiar with the intricacies of billing and credentialing as Ms. Hershberger. (*Id.* at 205:5–9).

###### ii.    Highmark's Requirements for Credentialing

Turning to Highmark and its requirements for credentialing, Ms. Hershberger testified that "they were requiring that we had a psychologist or a psychiatrist as part of our provider profile with them." (*Id.* at 158:7–14). Ms. Hershberger stated that when she told Mr. Kelly that CBH needed to have a psychologist as part of its provider to be credentialed with Highmark, the pair "would have had a conversation back and forth over it … and then that's when it would have been brought out. We would have discussed that Dr. Nulton or [NDTC] still does like all of our psychological evaluations, they're still right down the hall, they're doing clinical

supervision." (*Id.* at 158:22–159:7). Specifically, according to Ms. Hershberger, Mr. Kelly told her that there was an agreement whereby Dr. Nulton was providing supervision to CBH's behavioral health specialists. (*Id.* at 159:9–160:3). Ms. Hershberger then relayed that information to Highmark. (*Id.* at 160:23–24).

However, as of the trial in this matter, Ms. Hershberger had never seen a written contract between Dr. Nulton and CBH indicating that Dr. Nulton was providing supervision to individuals working at CBH, she was unaware of anyone else that Mr. Kelly had informed of the existence of this contract, and she could not point to a written document in which Mr. Kelly mentioned the agreement to her. (*Id.* at 206:22–207:20).

### iii.   The Completion of the CBH Form

Turning to the completion of the CBH Form, Ms. Hershberger testified that the form would have come to CBH through the mail, CBH's secretary would have given it to Mr. Kelly, and Mr. Kelly would have given it to Ms. Hershberger. (*Id.* at 162–64). Ms. Hershberger stated that she would have listed Dr. Nulton and Dr. Kennedy as "provider[s]" on the form after her discussions with Mr. Kelly. (*Id.* at 164:25–165:15).

However, Ms. Hershberger did not personally place Dr. Nulton or Dr. Kennedy's Highmark provider numbers, Social Security numbers, NPI numbers, or purported signatures on the CBH Form. (*Id.* at 165:16–166:19). Rather, Ms. Hershberger stated that she gave the form to Mr. Kelly so that Mr. Kelly could obtain Dr. Nulton and Dr. Kennedy's Highmark provider numbers, Social Security numbers, NPI numbers, and signatures. (*Id.* at 166:12–167:1). Ms. Hershberger gave the form to Mr. Kelly because she was under the impression that Drs. Nulton and Kennedy "were prescribing the psychopaths, and they were providing supervision to our

BCSs, clinical supervision[,]"which Ms. Hershberger was aware of because Mr. Kelly had told her about the agreement between Dr. Nulton and CBH. (*Id.* at 168:6–17). Indeed, Ms. Hershberger testified that Drs. Nulton and Kennedy were on the CBH Form as providers as a result of the fact that they provided supervision. (*Id.* at 189:10–19).

Ms. Hershberger testified that she ultimately received the form back from Mr. Kelly, and that when she did, it contained Dr. Nulton and Dr. Kennedy's signatures. (*Id.* at 169:3–18). Regarding what purports to be Dr. Nulton's signature on the CBH Form, Ms. Hershberger stated that: (1) she did not see Mr. Kelly sign the form, (2) she did not see who signed the form, (3) the signature looks like Dr. Nulton's signature, and (4) she can conclusively say that the signature is not Dr. Nulton's. (*Id.* at 216:11–217:3).

After receiving the completed form back from Mr. Kelly, Ms. Hershberger would have "made copies of it, and then [she] would have kept a copy for my file[,] and [she] would have put the other in the mail back to Highmark." (*Id.* at 169:11–15). Once CBH became credentialed with Highmark and CBH began to bill Highmark for BHRS services, CBH would have listed either Dr. Nulton or Dr. Kennedy as the supervisor when it billed Highmark. (*Id.* at 177:21–178:3). However, CBH never billed Highmark for any work done by Dr. Nulton or Dr. Kennedy. (*Id.* at 221:15–20).

Ms. Hershberger also testified regarding a 2014 email conversation that is highly relevant to the completion of the CBH Form. (*Id.* at 186–89). The conversation began on July 18, 2014, when Dr. Nulton sent the following email to Mr. Kelly:

> [Mr. Kelly],
> Could you please provide me with written assurance that CBH/Providence or any related entity is NOT billing for any services under my personal provider ID

or agency ID ([NDTC]) and receiving payment? This would include BHRS, Psychological Evaluations or any "Incident To" services.

(ECF No. 162 at 3; D-58 at 3).

Mr. Kelly then forwarded Dr. Nulton's email to Ms. Hershberger, along with the following message:

> [Ms. Hershberger],
> Please read below. [Dr. Nulton]/NDTC is apparently being audited by Blue Cross. Please respond to my email then I will forward your response back to him.
> I told him I felt positive we are not billing/receiving any type of payment using his number but he needs it in writing.

(D-58 at 2–3).

In response to Mr. Kelly's email, Ms. Hershberger wrote the following:

> Good morning [Mr. Kelly],
> We do not use Dr. Nulton's personal number for billing purposes. *Dr. Nulton and Dr. Kennedy are set up as part of the group with [CBH] and PCS as referring provider[s] only.* All services are billed and payments received are under [CBH] or [ReDCo].

(*Id.*) (emphasis added).[6]

---

[6] In the course of Ms. Hershberger's testimony regarding the HCFA-1500 form, which she used in billing insurance companies, Ms. Hershberger defined a *rendering* provider as someone who is providing services or supervising the provision of care. (Tr. Vol. II, Hershberger, 179–85). Further, at least with respect to the HCFA-1500 form, Ms. Hershberger defined a *referring* provider as the individual "who is making the referral, so that would have been who did the evaluation." (*Id.* at 186:17–19).

The Court outlines this testimony because it demonstrates that, at least in the context of the HCFA-1500 form, Ms. Hershberger understood the distinction between a rendering provider, which could be someone providing supervision to the individuals providing care to clients, and a referring provider, which is the individual who performed the evaluation. Given Ms. Hershberger's understanding of this distinction, if Mr. Kelly did in fact tell Ms. Hershberger that Dr. Nulton was providing supervision to individuals at CBH in 2009, and if Ms. Hershberger did in fact submit the CBH Form to Highmark based in part on her discussions with Mr. Kelly, the Court cannot understand why Ms. Hershberger told Mr. Kelly that Dr. Nulton and Dr. Kennedy are "set up as part of the group with [CBH] and PCS as *referring provider[s] only*" in her 2014 email. (D-58 at 2) (emphasis added).

When Ms. Hershberger was asked what she meant by her response to Mr. Kelly, she stated that she "meant that we were not billing under Dr. Nulton's numbers, that we were receiving payment under [CBH], their tax ID, our NPI, and that it was not going against either of their income." (Tr. Vol. II, Hershberger, 189:4–9). She further stated that Drs. Nulton and Kennedy were only listed as providers on the *application* (i.e., the CBH Form). (*Id.* at 189:10–19).

In 2017, Ms. Hershberger learned that the agreement that Mr. Kelly had told her about between Dr. Nulton and CBH had been terminated. (*Id.* at 190:9–12). Once Ms. Hershberger learned that the agreement had been terminated, she became concerned because Dr. Nulton could no longer be listed on CBH's Highmark provider file. (*Id.* at 190:21–191:1). Ms. Hershberger did not believe that there was any way for CBH to continue to bill Highmark once the agreement had been terminated. (*Id.* at 191:12–14). A few weeks after Ms. Hershberger gained this knowledge, she left CBH. (*Id.* at 191:15–23).

### 3.  Dr. Nulton and Dr. Kennedy's Testimony Regarding the CBH Form

#### a.  Dr. Nulton's Testimony

Dr. Nulton confirmed that the Highmark provider number, Social Security number, NPI number, and specialty listed beside his name on the CBH Form are all correct. (Tr. Vol. I, Nulton, 188–90). However, Dr. Nulton stated that he did not sign the CBH Form. (*Id.* at 190:25–191:1). Dr. Nulton testified that neither Ms. Hershberger nor Mr. Kelly asked him to sign the CBH Form. (*Id.* at 195:14–196:1). In fact, Dr. Nulton stated that the first time he saw the document was in January 2018. (*Id.* at 191:9–12).

Further, Dr. Nulton testified that he is very familiar with Mr. Kelly's handwriting, and Dr. Nulton's Social Security number on the CBH Form appears to have been written in by Mr.

Kelly. (*Id.* at 191:13–192:4). However, Dr. Nulton is not a handwriting expert, and he did not observe anyone forging his signature on the CBH Form. (Tr. Vol. II, Nulton, 80–82).

Finally, Dr. Nulton has never assigned his rights to payment to CBH. (Tr. Vol. I, Nulton, 192:5–11). He has also never agreed to be jointly and severally liable for overpayments to the CBH account. (*Id.* at 193:24–194:4). And Dr. Nulton never gave Mr. Kelly authority to sign anything on his behalf. (*Id.* at 194:21–195:4).

### b.   Dr. Kennedy's Testimony

Like Dr. Nulton, Dr. Kennedy testified that he believes that the Highmark provider number, Social Security number, NPI number, and specialty listed beside his name on the CBH Form are correct. (Tr. Vol. I, Kennedy, 67–68). However, Dr. Kennedy did not sign the CBH Form. (*Id.* at 68:10–11). While Dr. Kennedy testified that he did not sign the form, he did not see anyone else, including Mr. Kelly, sign the document. (*Id.* at 111:3–112:1).

Further, with respect to the terms on page two of the CBH Form, Dr. Kennedy did not (1) agree to assign any fees to the CBH group account, (2) agree to be jointly and severally liable for any overpayment that the CBH account received, or (3) give Mr. Kelly the authority to bind him as an individual provider. (*Id.* at 69–73).

Finally, like Dr. Nulton, Dr. Kennedy saw the CBH Form for the first time in January 2018. (*Id.* at 66:2–12).

### 4.  Mr. Kelly's Testimony Regarding the Completion of the CBH Form

Regarding page one of the CBH Form, Mr. Kelly testified that he: (1) was not asked to obtain either Dr. Nulton or Dr. Kennedy's signature for the CBH Form, (2) did not forge Dr.

Nulton or Dr. Kennedy's name on the CBH Form, and (3) did not provide the document to Dr. Nulton or Dr. Kennedy to sign. (Tr. Vol. V, Kelly, 22:17–23:2).

As a corollary, Mr. Kelly stated that Ms. Hershberger was "not accurate" in her statement that she gave the CBH Form to Mr. Kelly to present to Dr. Nulton and Dr. Kennedy to sign. (*Id.* at 23:3–7). Mr. Kelly also did not direct anyone else at CBH or ReDCo to steal or misrepresent Dr. Nulton or Dr. Kennedy's identities in any way. (*Id.* at 23:20–24:1). In fact, Mr. Kelly testified that he recognizes the signature beside Dr. Nulton's name on the CBH Form as Dr. Nulton's signature. (*Id.* at 23:8–19).

Regarding page two of the CBH Form, Mr. Kelly stated that he did sign that page as the COO of CBH. (*Id.* at 24:21–25:1). Mr. Kelly further testified that he initially obtained the CBH Form when Ms. Hershberger presented the completed document, which she was responsible for preparing, to him. (*Id.* at 21–25). Mr. Kelly trusted Ms. Hershberger to complete the form appropriately, and he did not question the accuracy of what she presented to him. (*Id.* at 26–27).

In short, the only pieces of information that Mr. Kelly placed on the entirety of the CBH Form were the following: (1) his own signature, (2) his title at CBH (COO), (3) the date, and (4) his phone number. (*Id.* at 21–26).

However, on cross examination, Mr. Kelly did state that certain of the representations on page two of the CBH Form were incorrect, including the following: (1) that Dr. Nulton and Dr. Kennedy had agreed to be liable for overpayments to CBH, (2) that Dr. Nulton and Dr. Kennedy had verified the accuracy of the information on the form, and (3) that Mr. Kelly had verified that Dr. Nulton and Dr. Kennedy had agreed to be bound by the terms of the agreement. (*Id.* at 106–18).

5.  **Mr. Kelly's Responsibilities (or Lack Thereof) With Respect to Billing and Credentialing at CBH and ReDCo**

The Court concludes its overview of the CBH Form by outlining the testimony of Mr. Kelly, Ms. Woznicki, and Leonard Bolinsky ("Mr. Bolinsky"), as well as an email that Mr. Kelly sent to Mr. Bolinsky, regarding Mr. Kelly's responsibilities (or lack thereof) with respect to billing and credentialing at CBH and ReDCo.

a.    **Mr. Kelly's Testimony**

Mr. Kelly testified that as the COO of CBH, he has never been responsible for credentialing CBH with insurance companies. (Tr. Vol. IV, Kelly, 212:23–213:1). Further, as the COO of CBH, he has no responsibility for the billing that occurs on behalf of CBH to insurance companies. (*Id.* at 213:7–10).

In like fashion, as the COO of PCS, Mr. Kelly has never been responsible for credentialing PCS with insurance companies. (*Id.* at 213:4–6). Moreover, as the COO of PCS/ReDCo, he has no responsibility for the billing that occurs on behalf of PCS/ReDCo to insurance companies. (*Id.* at 213:7–12).

Finally, Mr. Kelly stated that he never instructed anyone at CBH or ReDCo what, if anything, they should indicate to Highmark with respect to Dr. Nulton or Dr. Kennedy. (Tr. Vol. V, Kelly, 4:25–5:3).

b.    **Ms. Woznicki's Testimony**

For her part, Ms. Woznicki testified that the individual at CBH who was responsible for credentialing was Ms. Hershberger. (Tr. Vol. IV, Woznicki, 113:6–10). At ReDCo, Ms. Symons was the individual who was responsible for the credentialing. (*Id.* at 113:11–18). With respect to

Mr. Kelly's role in credentialing, Ms. Woznicki stated that he did not play a "direct role. So when it came to ... I would update [Mr. Kelly] on what I would learn. I was—we were trying to stay on top of everything, but he did not play an active role in credentialing." (*Id.* at 113:19– 114:1).

### c.   Mr. Bolinsky's Testimony

As of 2009, Mr. Bolinsky was the Chief Financial Officer ("CFO") of PCS. (Tr. Vol. IV, Bolinsky, 4:14–21).[7] Mr. Bolinsky testified that at CBH and ReDCo, at least for a portion of time, Ms. Symons from ReDCo reported to Ms. Hershberger at CBH. (*Id.* at 6:8–23). The companies utilized this system because it "made more sense to keep the revenue cycle and/or the billing department as one unit." (*Id.* at 7:2–4).

Having outlined this system, Mr. Bolinsky stated that Mr. Kelly "had no intimate involvement in [credentialing with respect to Act 62] other than to make sure the billing department got credentialing completed." (*Id.* at 10:12–15). Indeed, as of 2009, Ms. Hershberger and her team were responsible for credentialing at CBH, and Ms. Symons and her team were responsible for credentialing at ReDCo. (*Id.* at 55:23–56:4).

Finally, Mr. Bolinsky testified that Mr. Kelly had no responsibilities related to billing for the services that were provided by CBH and ReDCo. (*Id.* at 56:19–22). The billing for CBH and ReDCo would have been handled by Ms. Hershberger and Ms. Symons. (*Id.* at 56:23–24). Specifically, Mr. Bolinsky stated that after Act 62 went into effect, Ms. Hershberger was the one

---

[7] The Court notes that it is slightly unclear whether Mr. Bolinsky was the CFO of PCS or ReDCo as of 2009. (Tr. Vol. IV, Bolinsky, 4:14–21). The Court's best interpretation of the testimony is that Mr. Bolinsky was the CFO of PCS. The Court therefore proceeds with the understanding, but does not affirmatively decide, that Mr. Bolinsky was the CFO of PCS. In doing so, the Court notes that whether Mr. Bolinsky was technically the CFO of PCS or ReDCo has very little bearing on the outcome of this case.

at CBH who was responsible for sending out the bills under the Act, and Ms. Symons was the one at RedCo who was responsible for sending out the bills under the Act. (*Id.* at 62:24–63:4).

### d.   Mr. Kelly's Email

On April 20, 2009, Mr. Milewski, the regional president of Providence, emailed Mr. Kelly about Act 62. (ECF No. 162 at 2; P-8). Mr. Milewski wrote the following to Mr. Kelly:

> [Mr. Kelly], I need to follow up on the Act 62 issue and how we will garner our approval to bill for services with each of the private insurers … This is an issue we need to look at since the July 1 timeframe is rapidly approaching. I don't want to get caught with the approval to participate, but not being approved to submit bills since we don't conform to their respective formats under which they approve invoices. We may need to modify our software to meet their requirements.

(P-8 at 2).

Mr. Kelly then responded with a lengthy email, explaining that he had a three-phase process in place to address Act 62, which he outlined in detail. (*Id.* at 1). At the end of his email, Mr. Kelly stated that he could "serve as the point person once the information is compiled." (*Id.*).[8]

---

[8] The following is the entirety of the email that Mr. Kelly sent to Mr. Milewski. "Morning [Mr. Milewski], We have divided this 'process' into three phases. The first phase was to identify ALL current clients with a primary diagnosis of 299. Once that number was compiled, we checked the EVS on EVERY client to determine if the client in question had a primary insurance other than Medicaid (the 158 clients were listed on the spreadsheets I forwarded you last week). The first phase has been completed. The list compiled contains the names of 158 clients in the State (CBH and PCS combined). The second phase of the process requires us to contact every parent on the list and ask four questions. The answers to the four questions determine if the client will be either eligible or not eligible for Act 62. We are currently in the middle of Phase Two. I can tell you from the information back thus far (Erie and Johnstown counties) every client in both of those counties has been disqualified based on the answers the parents provided. In other words, even though the clients have an Axis I diagnosis of 299 and even though the parents have a primary insurance other than Medicaid, the clients are not eligible for Act 62. So, the updated number of clients affected by Act 62 has decreased to 151. The third phase of this process will be to contact each and every insurance company once we determine which clients are actually eligible for Act 62. There are currently 41 private insurance companies in PA who we could possibly be dealing with. It serves no purpose to contact all 41 companies now when we know we will not be dealing with all 41. When this

With respect to his statement that he would be the "point person," Mr. Kelly stated that he was "offering to be that one person that [Mr. Milewski could] go to for updates on Act 62." (Tr. Vol. V, Kelly, 13:12–17). Mr. Kelly testified that he was "talking to [Ms. Hershberger], [he was] talking to [Mr. Bolinsky], [he was] talking to [Ms. Woznicki], [he was] talking to others; and [he could] be the single point of contact for [Mr. Milewski] to go to as the COO to update him on CBH." (*Id.* at 13:12–20).

Ms. Woznicki also testified regarding Mr. Kelly's statement that he would be the "point person." (Tr. Vol. IV, Woznicki, 157–60). After reading Mr. Kelly's email, Ms. Woznicki stated that what "I was doing as far as Act 62 was working with [Ms.] Hershberger, working with [Ms.] Symons. So—and I would update [Mr. Kelly], but I would not characterize him in this scenario as the point person based on my recollection." (*Id.* at 156–60).

### E.    ReDCo Submits the "Assignment of Account Form" to Highmark

phase hits, I must be honest, no one on my staff has experience with credentialing. The Billers have always billed. The Operations folks are way too busy dealing with operational issues. HR is busy with HR issues. When Phase Three happens, I would sincerely appreciate if you could assign someone from Back Office to help us with the credentialing process. Again, to assign someone out here who has no experience will not serve us well. We should have Phase Tree wrapped up in two weeks. You must appreciate it takes some time to contact 158 families and ask them the qualifying questions over the phone or in person. As I mentioned last week, I have scheduled a meeting with Highmark Blue Cross next week in my office (we picked Blue Cross because Michelle has some experience with them from the Nulton days and many of the clients on the list have Blue Cross listed—even though they still might be qualified after the questions are answered). When this meeting was scheduled a few weeks ago, the representative told Michelle that they have NOT yet developed a process for claim submission, credentialing, or packet submission. I attended a meeting last week with VBH officials. Act 62 was on the agenda. VBH spent approximately 2 minutes on the subject. They passed out a packet we have had for over a month and said they know nothing more. I am getting the impression the State is in the dark. Now, I wish I could provide answers to your questions below. I can not at this point. Once we get all of the information compiled, I intend to start contacting the insurance companies in question and going from there. However, like I said above, I am hoping the Back Office can provide us some assistance because we are certainly out of our element when it comes to dealing with insurance companies other than Medicaid. I can serve as the point person once the information is compiled. I will be back to you once I have the final numbers and am able to see first hand the list of insurance companies we will be dealing with. [Mr. Kelly.]" (P-8 at 1).

In the process of ReDCo becoming credentialed with Highmark, ReDCo submitted a document entitled "Request for Assignment Account" (the "ReDCo Form") to Highmark. (Tr. Vol. III, Symons, 38–40). Like the CBH Form, the ReDCo Form is very much at the center of Dr. Nulton's identity theft allegations. Therefore, the Court now overviews the process by which ReDCo submitted that form to Highmark. In doing so, the Court will: (1) first, outline the contents of the ReDCo Form; (2) second, review Ms. Snider's testimony regarding the ReDCo Form; (3) third, review Ms. Symons's testimony regarding the completion of the ReDCo Form; (4) fourth, overview Dr. Nulton's testimony regarding the ReDCo Form; (5) and, finally, outline Mr. Kelly's testimony regarding the completion of the ReDCo Form.

### 1. The Contents of the ReDCo Form

The ReDCo Form that ReDCo submitted to Highmark was admitted into evidence in this case. (ECF No. 162 at 1; P-20). The exhibit is seven pages long, and it constitutes a fax that Ms. Symons, a Billing Supervisor at PCS/ReDCo from approximately 2001 until 2016, (Tr. Vol. III, Symons, 9:1–6), submitted to Highmark. (*Id.* at 38–40; P-20). Two pages out of the seven constitute the "Request for Addition/Deletion to Existing Account" form that Dr. Nulton purportedly signed. (P-20 at 4). Moving forward, the Court will refer to these two pages as the ReDCo Form.[9]

The top of the first page of the ReDCo Form contains information that pertains to ReDCo and that is not highly relevant to the disposition of Dr. Nulton's claim. (*Id.*). Approximately halfway down the page, there is a heading that calls for the "Provider Name" to be listed on the form. (*Id.*). Under that heading, the name "[Dr.] Nulton" is written in. (*Id.*). To the right of Dr.

---

[9] The Court refers to these two pages as the ReDCo Form because they are the two pages within the seven-page document that are especially relevant to the disposition of Dr. Nulton's identity theft claim.

Nulton's name are his: (1) Provider Number, (2) Social Security number, (3) NPI number, (4) purported signature, and (5) Provider specialty. (*Id.*). Beneath this information, there is a statement indicating that if Dr. Nulton did in fact sign this form, he was agreeing "to abide by the requirements listed on the reverse side of this form." (*Id.*).

Turning to the reverse side of the ReDCo Form, three of the requirements to which Dr. Nulton ostensibly agreed are the following: (1) "every claim submitted to Highmark Blue Shield will include the provider number of the individual provider who actually performed the service, unless otherwise directed in writing by Highmark Blue Shield (place in Block 24K of the claim [form),]" (2) "the account and each individual provider member will be jointly and severally liable for any overpayment that the account receives[,]" and (3) a verification that Dr. Nulton had "carefully reviewed the forms and applications associated with the establishment of this assignment account, and each member has verified the accuracy and completeness of all information provided." (*Id.* at 5).

At the bottom of the page, an individual named John Sabol ("Mr. Sabol") signed the document as the "Authorized Representative of [the] group[.]" (*Id.*). In doing so, he indicated that he was verifying that "all members have reviewed and agreed to all assignment account requirements, all applicable network contracts and regulations." (*Id.*).

### 2. Ms. Snider's Testimony Regarding the ReDCo Form

In outlining Ms. Snider's testimony regarding the ReDCo Form, the Court will focus on four particular aspects of what she discussed: (1) her career history at Highmark, (2) the difficulties that Highmark had in reimbursing BHRS providers after Act 62 took effect, (3) the

specific type of form that ReDCo submitted, and (4) the alternative fashion in which ReDCo is now credentialed within Highmark's system.

### a.    Ms. Snider's Career History at Highmark

As the Court noted earlier, Ms. Snider worked for Highmark from 1998 until December 1, 2020. (Tr. Vol. III, Snider, 100:13–18). In 2009, Ms. Snider was a Provider Relations Representative at Highmark. (*Id.* at 101:14–17). As is relevant to this case, Ms. Snider was involved in the process of getting ReDCo added to Highmark's network so that ReDCo could seek reimbursement from Highmark for the provision of BHRS services. (*Id.* at 149–50).

### b.    The Difficulties that Highmark had in Reimbursing BHRS Providers After Act 62 Took Effect

The Court now expounds on testimony that it previously outlined regarding the difficulties that Highmark had in reimbursing BHRS providers after Act 62 took effect. *See supra* Section V.C.2.d. In doing so, the Court first explains Highmark's credentialing process.

Prior to Act 62 taking effect in 2009, an individual psychologist could be credentialed within Highmark's system. (Tr. Vol. III, Snider, 117:1–5). After Act 62 took effect, an individual psychologist who was already credentialed with Highmark did not need to go through a separate credentialing process for BHRS. (*Id.* at 118:24–119:14).

However, in 2009, *BHRS providers*, like CBH and ReDCo, had to go through a separate process in order to become credentialed with Highmark. (*Id.* at 116:10–14). But there was a problem—the individuals who actually provided BHRS services, like TSSs, BSCs, etc., could not be separately credentialed with Highmark as of 2009. (*Id.* at 119:15–25). Indeed, Ms. Snider testified that "the mobile therapist[s], the behavioral health consultants, and the [TSSs] could

not be credentialed individually in our database" as of 2009. (*Id.* at 152:19–153:6). Therefore, at the time when Act 62 was passed: (1) there were individuals working at ReDCo who could bill for BHRS services, (2) Ms. Snider was under the impression that Highmark was required to reimburse for those individuals' services under Act 62, and (3) Highmark's system did not have the capacity to process the billing for their services. (*Id.* at 153:7–18).

By late 2009 or 2010, Highmark's system "was equipped to handle claims submitted by entities like ReDCo for services which were performed by nonmedical professionals." (*Id.* at 155:16–22). Under Highmark's new system, a BHRS provider billing Highmark would have to list a rendering provider on the claim form. (*Id.* at 182:21–183:9). That rendering provider had to be a credentialed "clinician, physician ... social worker, whatever the case might be." (*Id.* at 183:10–13).

### c.    The Type of Form that ReDCo Submitted to Highmark

Because individuals like TSSs could not be credentialed with Highmark when Act 62 first went into effect, part of the credentialing process was working to "enable or set up some system [so] that the BHRS provider could bill for [BHRS services], but not using—not under the name of the TSS[.]" (*Id.* at 119:22–120:5). Specifically, one option for BHRS providers was that if they employed a licensed psychologist or psychiatrist, Highmark could credential the provider as a "medical group." (*Id.* at 120:17–20).

Ms. Snider testified that when ReDCo initially became set up within Highmark's system, ReDCo was designated as a medical group. (*Id.* at 123:14–23). As a medical group, ReDCo needed to have a "supervising practitioner who was a licensed psychologist or psychiatrist to supervise the BHRS employees, TSSes and MTs, et cetera." (*Id.* at 123:20–23).

42

In this context, Ms. Snider testified regarding what a medical group should put into two particular boxes on the HCFA-1500 form for purposes of billing Highmark.[10] (*Id.* at 127–135). In order to explain how a medical group should complete the HCFA-1500 form, Ms. Snider discussed two hypothetical scenarios. (*Id.* at 133–35).

In the first scenario, Ms. Snider discussed the following events occurring: (1) an individual goes to see a pediatrician, (2) that pediatrician refers the child for an evaluation, and (3) the evaluation takes place. (*Id.* at 133:10–134:4). In this scenario, an entity billing Highmark for the process that occurred should list the pediatrician who first saw the child in Box 17 of the HCFA-1500 form as the referring provider and the person who performed the evaluation in Box 24-J as the rendering provider. (*Id.* at 133:10–134:4).

In the second scenario, Ms. Snider discussed the following events occurring: (1) the evaluation *has already occurred*, (2) the evaluating psychologist has written a prescription for BHRS services, and (3) the BHRS provider has treated the patient. (*Id.* at 134:5–19). In this scenario, the entity billing Highmark for the process that occurred should list the evaluating psychologist who wrote the prescription in Box 17 as the referring provider and the individual who supervised the TSSs, etc., in Box 24-J as the rendering provider. (*Id.* at 134:5–135:5).

Finally, Ms. Snider testified that one of the advantages of ReDCo being set up as a medical group was that it was able to get paid more quickly than it otherwise would have been paid. (*Id.* at 178:9–13).

---

[10] The Court notes that there is a disparity in the testimony at trial as to whether this form is called an "HCFA-1500" form or an "HCVA-1500" form. This difference is immaterial to Dr. Nulton and Dr. Kennedy's claims, and the Court will refer to this form as the "HCFA-1500" form throughout this opinion.

### d.   The Alternative Fashion in Which ReDCo is Now Credentialed in Highmark's System

On cross examination, Ms. Snider testified that BHRS providers like ReDCo can be set up within Highmark's system as behavioral health agencies. (*Id.* at 157:6–8). Ms. Snider indicated that if a BHRS provider elects to be a behavioral health agency within Highmark's system, the provider would "bill as a group without having to have a supervising rendering provider." (*Id.* at 157:9–15). It was ReDCo that got to decide whether to bill as a group without having to have a supervising rendering provider. (*Id.* at 157:13–18).

However, Ms. Snider did not offer guidance to entities like ReDCo during the time in which those entities were becoming credentialed with Highmark. (*Id.* at 161:16–24). Specifically, she stated that she "never could tell [providers] how to submit a claim, how to submit an application, how to submit an assignment account. We could tell them what went wrong, but we could not tell them how to correct it." (*Id.* at 161:2–23).

Further, Ms. Snider believed that in May 2018, ReDCo and CBH were re-credentialed with Highmark as behavioral health agencies. (*Id.* at 168:12–18). During this process, Ms. Snider advised someone at ReDCo that they should be re-credentialed as a behavioral health agency. (*Id.* at 169:17–19).

When asked why she did not give ReDCo this same advice in 2009, Ms. Snider responded "I don't know." (*Id.* at 170:13–17). When asked whether she made a mistake in not giving ReDCo this advice, she stated "I don't know." (*Id.* at 170:18–19).

### 3.  Ms. Symons's Testimony Regarding the Completion of the ReDCo Form

The Court now outlines Ms. Symons's testimony regarding the completion of the ReDCo Form. In doing so, the Court overviews: (1) Ms. Symons's career history at ReDCo, (2) her testimony with respect to the completion of the ReDCo Form, (3) her statements about billing Highmark, and (4) her testimony regarding an email exchange that she had with Ms. Snider in August of 2009.

### a.    Ms. Symons's Career History at ReDCo

As the Court noted earlier, as of the date of trial in this matter, Ms. Symons had worked for the ReDCo Group, and more specifically PCS, for almost thirty-nine years. (Tr. Vol. III, Symons, 8). Specifically, Ms. Symons was a Billing Supervisor at PCS/ReDCo from approximately 2001 until 2016. (*Id.* at 9:1–6). Like Ms. Hershberger at CBH, Ms. Symons was responsible for getting ReDCo credentialed with Highmark under Act 62. (*Id.* at 57:1–9).

### b.    Ms. Symons's Testimony With Respect to the Completion of the ReDCo Form

Ms. Symons testified that Highmark provided ReDCo with the credentialing paperwork that ReDCo needed to complete and submit to Highmark in order to be credentialed with Highmark. (*Id.* at 57:22–58:6). Ms. Symons indicated that in completing the credentialing paperwork, one of the insurance companies likely indicated to her that ReDCo needed to have a "psychologist on file." (*Id.* at 17:9–15). Relative to that fact, multiple individuals within ReDCo sent a number of emails that are highly relevant to the claims in this case. The Court now overviews those emails.

On June 30, 2009, Mr. Bolinsky sent Ms. Symons the following email:

[Ms. Symons],

I talked with Mr. Kelly this morning in regards to the psychologist. He said that [Dr.] Nulton currently is credentialed with about 30+ insurances throughout the state. He said that it won't be a problem with [Dr.] Nulton to add to our group. Just send him an email with any necessary information and he will take care of obtaining signature and/or any necessary information.

(ECF No. 162 at 2; P-13).

That same day, Ms. Symons sent the following email to Mr. Kelly:

[Mr. Kelly],

Hi! [Mr.] Bolinsky gave me your name as a contact for setting up the insurances for Act 62[.] I understand that [Dr.] Nulton will be the psychologist on file. I will need his NPI#, SS# and DOB. I will also need a copy of his license and Insurance. I currently have a form that I need him to sign to add him to our group for BC of NE PA. Can I fax it to you for him to sign? I will need your fax number.

(ECF No. 162 at 2; P-15).

On July 1, 2009, Mr. Kelly sent the following response to Ms. Symons:

Hi [Ms. Symons], I was out of the office yesterday. Yes, I spoke with [Mr. Bolinsky] about the situation. You can fax the form to me at [fax number]. I will have [Dr. Nulton] sign and then send back with the additional information. Thanks for your help. In addition, [Ms.] Woznicki can be a huge help to you out there. Please do not hesitate to employ her assistance.

(P-15).

On July 1, 2009, Mr. Kelly sent the following email to an individual named Dianna Stopko ("Ms. Stopko)[11]:

Hi [Ms. Stopko],
I spoke with [Dr. Nulton] yesterday about a situation regarding Act 62 in the Stoudsburg area. I need some information so we can bill under Act 62. Can you please forward me the following information?

NPI#:
SS#:

---

[11] Ms. Stopko was an administrative assistant at NDTC. (Tr. Vol. II, Nulton 7:25–8:1).

DOB
Copy of current license
Thanks in advance!!

(ECF No. 162 at 1; P-18).

Within moments, Dr. Nulton sent an email back to Mr. Kelly in which he provided Mr. Kelly with his: (1) NPI number, (2) Social Security number, (3) date of birth, and (4) a copy of his current license. (P-18). Mr. Kelly then forwarded Dr. Nulton's information to Ms. Symons. (*Id.*). Based on this email exchange, Ms. Symons understood that ReDCo had permission to use the information that Dr. Nulton provided to Mr. Kelly. (Tr. Vol. III, Symons, 65:19–66:2). Specifically, Ms. Symons understood Dr. Nulton to have granted ReDCo permission to use his NPI number for billing purposes. (*Id.* at 72:2–5).

Also on July 1, 2009, Ms. Symons faxed Mr. Kelly the first page of the ReDCo Form. (ECF No. 162 at 2; P-16). The document that Ms. Symons faxed to Mr. Kelly contained: (1) information regarding ReDCo, (2) Dr. Nulton's name under "Provider name[,]" and (3) Dr. Nulton's provider number. (P-16). However, the document that Ms. Symons sent to Mr. Kelly did not contain Dr. Nulton's: (1) Social Security number, (2) NPI number, (3) signature, or (3) Provider specialty. (*Id.* at 2).

Ms. Symons testified that when Mr. Kelly returned the document to her, it contained Dr. Nulton's: (1) NPI number, (2) Social Security number, and (3) purported signature. (Tr. Vol. III, Symons, 34:3–35:2). Ms. Symons then added Dr. Nulton's Provider specialty to the document. (*Id.* at 34:17–35:2). Ms. Symons ultimately submitted the ReDCo Form to Highmark's "Provider File Maintenance" on August 11, 2009. (*Id.* at 39:5–21; P-20).

### c.   Ms. Symons's Statements About Billing Highmark

After ReDCo submitted the ReDCo Form to Highmark, along with other relevant documents, ReDCo was able to bill Highmark for its BHRS services under Act 62. (Tr. Vol. III, Symons, 41:9–15). However, Ms. Symons stated that ReDCo did not *need* Dr. Nulton's signature to bill under Act 62—if ReDCo did not have his signature, it would have "bill[ed] this out of network or some other" way. (*Id.* at 41:20–24).

Further, Ms. Symons testified that she was involved with billing BHRS services to Highmark from approximately 2011 to 2012. (*Id.* at 73:22–74:5). Given her time in billing, Ms. Symons is familiar with an HCFA-1500 form. (*Id.* at 73:22–74:10; 88:14–21). She stated that on an HCFA-1500 form, Block 17 captures the name of the referring provider, which is the psychologist who performs the evaluation of the child. (*Id.* at 89:7–13). Block 24-J asks for the rendering provider's information. (*Id.* at 89:20–22). ReDCo needed the signed ReDCo Form in order to bill out the individuals listed on the form as the rendering providers. (*Id.* at 89:23–90:2).

### d.    Ms. Symons's Email Exchange with Ms. Snider in August of 2009

In August of 2009, Ms. Symons had an email exchange with Ms. Snider. (*Id.* at 42–47).[12] Throughout the exchange, Ms. Symons indicated to Ms. Snider that Dr. Nulton was a performing provider of BHRS services at certain ReDCo locations. (*Id.* at 49–51). However, when Ms. Symons was asked at trial whether she understood that Dr. Nulton was a performing provider at one of ReDCo's locations, she stated that she "actually knew [he was] a prescribing doctor." (*Id.* at 49:8–11).

### 4.    Dr. Nulton's Testimony Regarding the ReDCo Form

### a.    Dr. Nulton's Statements Regarding the Contents of the ReDCo Form

---

[12] The Court notes that Ms. Snider was formerly Ms. Leftault. (Tr. Vol. III, Symons, 47:7–13).

With respect to the ReDCo Form, Dr. Nulton testified that he did not sign the document, and he did not authorize anyone else to sign it. (Tr. Vol. I, Nulton, 205:17–22). But Dr. Nulton did confirm that the NPI number and specialty listed beside his name on the ReDCo Form are correct. (*Id.* at 204–05). Further, the Court notes that at least to the untrained eye, the signature on the ReDCo Form does appear similar to signatures that Dr. Nulton has not disputed placing on other documents over time. (ECF No. 162 at 1, 3; P-1; D-78A).

Indeed, by way of example, at trial, Dr. Nulton testified that he did sign the June 13, 2005, letter indicating his resignation from CBH. (Tr. Vol. II, Nulton, 82:12–19). The following is Dr. Nulton's signature on his resignation letter:



(P-1).

Further, Dr. Nulton offered no indication that he did not sign the Settlement Agreement that was admitted into evidence in this case. (ECF No. 162 at 3; D-78A). The following are Dr. Nulton's signatures on that document:

In his individual capacity:                For Peerstar, LLC:

**Larry J. Nulton**                    **Larry J. Nulton,** President and CEO

Dated: _____       Dated: _____

(D-78A at 6).

Finally, below is what purports to be Dr. Nulton's signature on the ReDCo Form:



(P-20).

Turning to the second page of the ReDCo Form, Dr. Nulton testified that he did not agree to assign his fees to ReDCo's group account. (Tr. Vol. I, Nulton, 206–09). Dr. Nulton stated that he was not affiliated with ReDCo's group in August 2009. (*Id.* at 204:9–10). Finally, Dr. Nulton did not agree to be jointly and severally liable for any overpayment to the ReDCo account. (*Id.* at 209:14–19).

        **b.**        **Dr. Nulton's Testimony Regarding His Email Exchange with Mr. Kelly on July 1, 2009**

Dr. Nulton also testified regarding the email exchange between himself and Mr. Kelly on July 1, 2009. (Tr. Vol. II, Nulton, 7–9). Dr. Nulton stated that he did have a discussion with Mr. Kelly regarding a situation in the Stroudsburg area. (*Id.* at 8:10–13).

Specifically, Dr. Nulton testified that NDTC had an evaluator in the Stroudsburg area, Angela Lambo ("Ms. Lambo"). (*Id.* at 8:15–22). Dr. Nulton and Mr. Kelly discussed getting Dr. Nulton's NPI to "do an information to be able to do prescribing and put it on the Highmark form. It was indicating that they were unable to bill because they didn't have a Highmark prescriber on record. So we said, well, here's our information, we can use that for prescribing." (*Id.* at 8:23–9:3). Indeed, Dr. Nulton gave Mr. Kelly this information voluntarily so that CBH/ReDCo could list him as a prescriber on a Highmark form relative to Act 62. (*Id.* at 89:2–17).

Given the foregoing, Dr. Nulton believed that Mr. Kelly wanted Dr. Nulton's information so that Mr. Kelly could list it on Box 17 of the HCFA-1500 form. (*Id.* at 9:20–23). Box 17 of the HCFA-1500 form calls for the "Referring Provider or Other Source['s]" name and NPI number. (ECF No. 162 at 1; P-62).

When Dr. Nulton was asked why he did not walk down the hall to Mr. Kelly's office to respond to Mr. Kelly's email on July 1, 2009, Dr. Nulton stated that he did not do so because Mr. Kelly "wasn't there." (Tr. Vol. II, Nulton, 90:19–25). Dr. Nulton then indicated that, as of the date of trial in this matter, he recalled walking down the hallway on July 1, 2009, looking in Mr. Kelly's office to see if he was there, going back to his office and filling out his email, and sending his response back to Mr. Kelly. (*Id.* at 91:1–12). When asked if he "specifically recalled" taking those actions, Dr. Nulton stated "I don't recall it specifically." (*Id.* at 91:13–14).

51

### 5.   Mr. Kelly's Testimony Regarding the Completion of the ReDCo Form

Before delving further into Mr. Kelly's testimony on this issue, the Court notes that he testified that he was tasked with getting a signature on one document related to ReDCo becoming credentialed with Highmark under Act 62—the ReDCo Form. (Tr. Vol. V, Kelly, 31:17–23). Aside from that one instance, Mr. Kelly stated that he was never tasked with getting Dr. Nulton's signature on any other document with respect to credentialing for Act 62. (*Id.* at 31:24–32:2).

The Court now turns to Mr. Kelly's testimony regarding the July 1, 2009, email conversation.

### a.   Mr. Kelly's Testimony Regarding the Email Thread on July 1, 2009

Regarding Mr. Kelly's email to Ms. Symons on July 1, 2009, and specifically the portion of Mr. Kelly's email where he stated that he had spoken "with [Mr. Bolinsky] about the situation[,]" Mr. Kelly testified at trial that Mr. Bolinsky told him that ReDCo needed the "prescribing person's information" in order to complete the ReDCo Form. (*Id.* at 32:22–33:6). However, at his deposition on April 15, 2019, Mr. Kelly stated that he did not remember this conversation with Mr. Bolinsky. (*Id.* at 99:2–16).

With respect to Dr. Nulton's email to Mr. Kelly on July 1, 2009, in which Dr. Nulton provided Mr. Kelly with his NPI number, Social Security number, date of birth, and a copy of his license, Mr. Kelly testified that he understood Dr. Nulton to be consenting to ReDCo using that information to indicate that Dr. Nulton was the prescriber. (*Id.* at 36:20–37:4). Further, Mr. Kelly stated that he viewed all of this as a small favor. (*Id.* at 37:16–24). Mr. Kelly viewed it as a small favor because in light of what Highmark was requesting, ReDCo and CBH just needed to

list the "person doing [their] psych evals ... as the prescriber for [their] ... submission" to Highmark. (*Id.* at 37:20–24).

After Dr. Nulton sent his information to Mr. Kelly, Mr. Kelly forwarded the information to Ms. Symons. (*Id.* at 37:5–7). At some point later in time, Ms. Symons gave Mr. Kelly the document that she needed him to get Dr. Nulton to sign. (*Id.* at 37:12–15).

### b. Mr. Kelly's Testimony Regarding the Completion of the ReDCo Form

When Ms. Symons sent Mr. Kelly page one of the ReDCo Form, it was missing Dr. Nulton's provider number, his "type one," and his signature. (*Id.* at 41:11–19). Mr. Kelly testified that he did not complete any portion of page one of the ReDCo Form, and none of the handwriting on the document is his. (*Id.* at 41:20–23). Specifically, he stated that he did not forge Dr. Nulton's signature on the ReDCo Form. (*Id.* at 43:12–14).

In order to get Dr. Nulton's signature on page one of the form, Mr. Kelly testified that he walked the form down to Dr. Nulton's office. (*Id.* at 42:2–4). Once he arrived at Dr. Nulton's office, Mr. Kelly stated that he did not recall if Dr. Nulton "signed it in front of me or if I left it with his assistant." (*Id.* at 42:5–8). Regardless of exactly how it happened, Mr. Kelly understood Dr. Nulton to have signed the document. (*Id.* at 42:11–13). Once Mr. Kelly received the signed version of page one back from Dr. Nulton or his office, he forwarded it to Ms. Symons. (*Id.* at 42:14–17).[13]

---

[13] Given this testimony, the testimony offered by Ms. Symons, and the Court's review of the fax that Ms. Symons sent to Mr. Kelly, (P-16), it appears to the Court that if Mr. Kelly did take a document to Dr. Nulton for signature, it was only page one of the ReDCo Form. Critically, this reality means that Dr. Nulton would not have had before him a document indicating that he was agreeing to be jointly and severally liable for overpayments to the ReDCo group, among other things. However, page one of the ReDCo Form did indicate that if Dr. Nulton signed the document, he was agreeing to "abide by the

With respect to this situation, the Court notes that at Mr. Kelly's deposition, taken on April 15, 2019, Mr. Kelly offered the following testimony regarding obtaining Dr. Nulton's signature on the ReDCo Form:

> **Q:** And what did you do with this document when you received it?
> **A:** I told Veronica at the time, and I don't honestly recollect what I did, but I assume that I went and got [Dr. Nulton] to sign this document.
> **Q:** Would you have asked anyone else to do that?
> **A:** No.
> **Q:** Do you have any recollection either way of actually getting Dr. Nulton to sign this?
> **A:** I do not have a recollection either way.

(*Id.* at 124–27; ECF No. 162 at 1, 5; KD at 170:21–171:6). When asked about this testimony at trial, Mr. Kelly stated that he was indicating that he got Dr. Nulton to sign the ReDCo Form by either having him sign the document in front of him or by leaving it with Dr. Nulton's assistant. (Tr. Vol. V, Kelly, 123–25).

Finally, when Mr. Kelly was asked at trial about his relationship with Dr. Nulton at the time when he allegedly forged Dr. Nulton's signature on the ReDCo Form, Mr. Kelly stated that he and Dr. Nulton had an:

> [E]xcellent relationship. We had … gone … from not seeing each other in late 2008, him starting to introduce this idea about peer support. And in 2009 we were off and running with [a new business venture]. We were seeing each other all the time … We were, quite frankly, making plans to conquer the world again, just like we had done at NDTC.

(*Id.* at 64:13–25). Mr. Kelly stated that Dr. Nulton was his best friend, and he would "never" steal his identity. (*Id.* at 65:1–5). In this vein, the Court notes that Mr. Bolinsky testified at trial that it would not have been "the end of the world" if ReDCo was not credentialed with

---

requirements listed on the reverse side of this form." (P-16). Thus, if he did sign the document, he would have had some indication that he was agreeing to abide by certain unknown terms.

Highmark as of July 1, 2009—ReDCo would have had other options in terms of billing had it not been credentialed with Highmark as of that date. (Tr. Vol. IV, Bolinsky, 71).

>F. **Mr. Kelly's Email, and Mr. Bolinsky, Ms. Woznicki, and Mr. Kelly's Testimony Regarding What CBH and ReDCo Submitted to Highmark Under Act 62**

The Court now overviews an email that Mr. Kelly sent, as well as testimony from Mr. Bolinsky, Ms. Woznicki, and Mr. Kelly regarding what CBH and ReDCo submitted to Highmark under Act 62.

>**1. Mr. Kelly's Email**

On June 30, 2009, Ms. Woznicki sent the following email to Mr. Kelly, Mr. Bolisnky, and Ms. Symons:

> While I know that we should be OK once we get Dr. Nulton's info for PCS, according to ACT 62 we should not need him to bill for the BHRS. These insurance agencies are required to allow the agency to be credentialed and bill independent of any licensed individuals as of 7/1/09. I am getting clarification and hopefully this will speed up the process.

(ECF No. 162 at 1; P-17).

On July 1, 2009, Mr. Kelly sent the following response to Ms. Woznicki, Mr. Bolinsky, and Ms. Symons:

> I had a similar conversation with Highmark out here. All of the billing will go through CBH or ReDCo. However, we need a psychologist on file as the prescriber. The checks will be sent to us (CBH or ReDCo) even though the billing will be attached to the psychologist on record. [Ms.] Hershberger is on board [with] how this will be handled on the billing end.

(P-17).

>**2. Mr. Bolinsky's Testimony on This Issue**

When asked about Mr. Kelly's statement that CBH and ReDCo would need a psychologist on file as the prescriber, Mr. Bolinsky testified that he understood Mr. Kelly to be saying that CBH and ReDCo would "submit the claims for—Act 62 claims and that the psychologist will be on file as prescriber of those services." (Tr. Vol. IV, Bolinsky, 51:20–52:4). Mr. Bolinsky understood that Highmark had informed Mr. Kelly that they needed a psychologist on file as the prescriber. (*Id.* at 52:5–7).

### 3. Ms. Woznicki's Testimony on This Issue

Ms. Woznicki testified at trial regarding the email she sent to Mr. Kelly, Mr. Bolinsky, and Ms. Symons on June 30, 2009. (Tr. Vol. IV, Woznicki, 136). She stated that she sent this email because she and others were "consistently being told by commercial insurance you need to have the NPI of the licensed psychologist. We were being told by Medicaid, by DHS, you can bill as a provider." (*Id.* at 136:12–20). With respect to Mr. Kelly's response and his statement that CBH and ReDCo would need a psychologist on file as the prescriber, Ms. Woznicki testified that that statement was consistent with the feedback that she was receiving, as well as the conferences calls that she had been on. (*Id.* at 137:1–12).

Further, in response to questioning from the Court, Ms. Woznicki testified that when she was involved in getting Dr. Nulton's information to send it to Highmark,[14] she understood CBH

---

[14] The Court notes that Ms. Woznicki testified regarding a time that she personally obtained Dr. Kennedy and Dr. Nulton's CAQH numbers. (Tr. Vol. IV, Woznicki, 163). It is not clear whether Ms. Woznicki's testimony regarding what CBH and ReDCo were conveying to Highmark was in reference to the situation where she personally obtained Dr. Kennedy and Dr. Nulton's CAQH numbers, or whether her testimony was in reference to CBH and ReDCo's interactions with Dr. Nulton in general.

Regardless, given her role at CBH and ReDCo, Ms. Woznicki's testimony is very helpful to the Court in grasping CBH and ReDCo's general understanding of what they needed to submit to Highmark. More importantly, because of Ms. Woznicki's relationship and discussions with Mr. Kelly, which are

and ReDCo to be conveying to Highmark that Dr. Nulton was acting as the prescribing psychologist. (*Id.* at 171:7–19). Indeed, Ms. Woznicki was being told that CBH and ReDCo could be billing as a provider, but at least certain insurance companies were telling CBH and ReDCo that they wanted to know who the prescribing individual was. (*Id.* at 172:12–173:6). Specifically, Ms. Woznicki stated that, for the claims that CBH and ReDCo submitted that were associated with Dr. Nulton's identifying number, her understanding was that he "would have been the prescriber of the service doing the psych evals[s.]" (*Id.* at 175:16–21). However, Ms. Woznicki was not in billing at CBH and ReDCo, and she could not speak to exactly what went out the door. (*Id.* at 173:11–21).

### 4. Mr. Kelly's Testimony on This Issue

Turning to Mr. Kelly's testimony on this issue, because Mr. Kelly was in the courtroom for Ms. Woznicki's testimony, Mr. Kelly was asked whether Ms. Woznicki's testimony and the "explanation she gave about the development of treatment plans both in response to the question[s] by counsel for the parties as well as the questions by the Court" were consistent with his understanding. (Tr. Vol. IV, Kelly, 210:15–21). In response, Mr. Kelly stated that Ms. Woznicki's explanation was a "mirror image" of his own. (*Id.* at 210:15–22).

Further, Mr. Kelly testified regarding a document entitled "Keystone Health Plan West, Inc. KHPW Professional Provider Agreement Cover Page" ("Keystone Form"). (Tr. Vol. V, Kelly, 28). The form listed Drs. Kennedy and Nulton as employed practitioners of CBH. (*Id.* at 28:1–12). Although Mr. Kelly testified that he had no role in listing Drs. Kennedy and Nulton as employed practitioners of CBH on the Keystone Form, he did state that he signed his own name

---

demonstrated by their email exchange on June 30, 2009, and July 1, 2009, Ms. Woznicki's testimony sheds light on Mr. Kelly's understanding of what CBH and ReDCo were submitting to Highmark.

on the document. (*Id.* at 28:13–29:9). Further, Mr. Kelly stated that he had no concern about signing the Keystone Form, even though it indicated that Drs. Kennedy and Nulton were employed practitioners of CBH, because the:

> [R]ight hand didn't know what the left hand was doing at Highmark. There [were] several people working on things. I know there were multiple conversations going on, but the one thing that was consistent, what we were hearing from both the people—the credentialing people at CBH, [Ms. Hershberger] as well as [Ms. Symons], was that we needed to provide Highmark the prescribing doctors' information.

(*Id.* at 30:6–19). Given this reality, Mr. Kelly did not believe that he was misrepresenting anything to Highmark. (*Id.* at 30:20–22).

### G.    Highmark's Fraud Review

The Court concludes its findings of fact by outlining the results of Highmark's fraud review.

#### 1.   Ms. Kent's Testimony Regarding Highmark's Fraud Review

As the Court noted earlier, Ms. Kent worked for Highmark from 2007 until 2021. (Tr. Vol. II, Kent, 226:17–20). At Highmark, Ms. Kent was part of the Financial Investigation and Provider Review Department ("FIPR"), and she later became a Strategy Consultant. (*Id.* at 226:22–227:3).

With respect to FIPR, Ms. Kent testified that the department is an external audit department that has the responsibility of ensuring that Highmark is paying claims appropriately. (*Id.* at 263:6–25). FIPR investigates improper payments, but Highmark does not determine if fraud occurred. (*Id. at* 265:1–3). However, the FIPR department could make a referral to law enforcement if it suspected that fraud had taken place. (*Id.* at 265:19–23).

As is relevant to this case, Ms. Kent served as a Lead Investigator at FIPR for a time, and a member of her team handled Dr. Nulton's complaint that CBH and ReDCo had engaged in certain improprieties. (*Id.* at 266–70). Specifically, Ms. Kent supervised Mandy Berg ("Ms. Berg"), who was the investigator assigned to Dr. Nulton's complaint. (*Id.* at 269:6–9).

Relative to FIPR's investigation of Dr. Nulton's complaint, Ms. Kent testified that it was immaterial to Highmark whether a claim from CBH or ReDCo indicated that Dr. Nulton or Dr. Kennedy performed something because that was not the basis for payment. (*Id.* at 271:19–23). Further, Ms. Kent stated that if CBH or ReDCo submitted a claim to be reimbursed for a service that required supervision, FIPR would have validated that the supervision had occurred and that it was documented in the medical record. (*Id.* at 272:14–273:9). Indeed, if a "service required supervision, and that did not occur, a payment would not have been appropriate." (*Id.* at 287:24–288:6).[15] Finally, Ms. Kent confirmed that Highmark determined that the services that were billed by CBH and ReDCo fit within the Act 62 guidelines—otherwise, Highmark "would have had a recovery." (*Id.* at 273:24–274:7).

---

[15] On this front, the Court notes that Ms. Kent was asked if CBH and ReDCo provided Highmark with some of the information regarding what supervision had taken place. (Tr Vol. II, Kent, 288:7–12). In response, Ms. Kent stated that "the information about what those services were and who performed them was provided by CBH and ReDCo, yes." (*Id.* at 288:10–12).

Ms. Kent was then asked whether CBH and ReDCo identified Dr. Nulton and Dr. Kennedy as two of the individuals who were supervising the services that CBH and ReDCo performed. (*Id.* at 288:17–19). In response, Ms. Kent stated: "No, they (Dr. Nulton and Dr. Kennedy) were identified as the performing provider[s]. That's not necessarily supervision." (*Id.* at 288:17–21).

Given this response, there is evidence that Highmark did not view CBH or ReDCo as having indicated that Dr. Nulton or Dr. Kennedy were supervising BHRS services at CBH or ReDCo. Instead, it appears that Highmark understood Drs. Nulton and Kennedy to be performing providers. Because it was immaterial to Highmark whether Dr. Nulton or Dr. Kennedy performed BHRS treatments at CBH and ReDCo, (*id.* at 271:19–23), and given the Court's previous findings of fact, it is not surprising to the Court that Highmark determined that its payments to CBH and ReDCo were appropriate.

Given all of the foregoing, at the end of Highmark's investigation into Dr. Nulton's allegations, Highmark did not ask for any money back from CBH or ReDCo, and it did not make any referrals to any authorities or other governmental agencies with respect to any alleged misconduct. (*Id.* at 277:13–20). In short, Highmark had no suspicion of fraud—it determined that the reimbursements for CBH and ReDCo's claims were appropriate. (*Id.* at 270:6–11; 284:20–24).

### 2.   Testimony From Other Individuals Regarding Highmark's Fraud Review

Along these lines, Dr. Kennedy testified that no one from Highmark has contacted him and said that the company paid him money improperly. (Tr. Vol. I, Kennedy, 120:20–121:1). In like fashion, Dr. Nulton stated that Highmark has never claimed that it paid any money to NDTC improperly or that NDTC needed to refund money to Highmark. (Tr. Vol. II, Nulton, 131:19–22). Highmark has also never sought to hold Dr. Nulton or NDTC in any way responsible for any money that it paid to CBH or ReDCo. (*Id.* at 131:23–132:1).

Further, Mr. Bolinsky testified that Highmark conducted an audit of CBH and ReDCo, but Highmark did not ask for any money back from either entity. (Tr. Vol. IV, Bolinsky, 73:20–74:3). For the time period from 2009 through 2018, and with respect to all of the services that CBH and ReDCo billed to Highmark during that timeframe, CBH and ReDCo were permitted to keep 100 percent of the money that Highmark reimbursed to CBH and ReDCo. (*Id.* at 74:4–7).

## VI.   Conclusions of Law

After Summary Judgment, one broad issue remains in this case: whether Mr. Kelly is liable to Dr. Nulton and Dr. Kennedy for identity theft. Based on the above findings of fact, the

Court finds that Mr. Kelly is not liable to Dr. Nulton or Dr. Kennedy for identity theft. The Court now outlines its reasons for reaching that conclusion.

**A. Dr. Kennedy Wholly Failed to Prove that Mr. Kelly Used His Identifying Information Without His Consent. Dr. Nulton Failed to Prove that Mr. Kelly is Liable to Him for Identity Theft.**

**1. Pennsylvania's Identity Theft Statute**

As the Court explained at Summary Judgment, Pennsylvania provides a private right of action for victims of identity theft. *Kelly v. Peerstar LLC*, 3:18-CV-126, 2020 WL 5077940, at *6 (W.D. Pa. Aug. 26, 2020) (citing 42 Pa. Cons. Stat. § 8315). A person commits identity theft if he: (1) possesses or uses, through any means, identifying information of another person; (2) without the consent of that other person; (3) to further any unlawful purpose. 18 Pa. Cons. Stat. § 4120(a). "Identifying information" includes "any fact used to establish identity, including, but not limited to, a name, birth date, Social Security number … student identification number, employee or payroll number or electronic signature." § 4120(f).

Dr. Nulton and Dr. Kennedy contend that Mr. Kelly "possessed and used Plaintiffs' names, individual [NPI] numbers, Social Security numbers, and signatures." (ECF No. 174 at 5– 6). Specifically, they contend that Mr. Kelly used this information in the course of submitting or causing CBH and ReDCo to submit the CBH Form and the ReDCo Form to Highmark. (*Id.* at 10–11). Further, Dr. Nulton and Dr. Kennedy contend that Mr. Kelly caused each of CBH and ReDCo's 48,140 requests for reimbursement to Highmark using Dr. Nulton and Dr. Kennedy's identifying information. (*Id.* at 19–20).

In short, in making their case that Mr. Kelly used or possessed their identifying information, Drs. Nulton and Kennedy assert that Mr. Kelly used or possessed: (1) Dr. Nulton

and Dr. Kennedy's identifying information on the CBH Form, (2) Dr. Nulton and Dr. Kennedy's identifying information on CBH's submissions to Highmark requesting reimbursement, (3) Dr. Nulton's identifying information on the ReDCo Form, and (4) Dr. Nulton's identifying information[16] on ReDCo's submissions to Highmark requesting reimbursement.

The Court now examines whether Dr. Nulton and Dr. Kennedy have met their burden of proof[17] with respect to their allegations that Mr. Kelly used their identifying information in these four instances.

---

[16] Having reviewed Dr. Nulton and Dr. Kennedy's submissions to the Court, it does not appear that they allege that Mr. Kelly used Dr. Kennedy's identifying information in ReDCo's submissions to Highmark—they only appear to contend that Mr. Kelly used Dr. Nulton's information with respect to ReDCo's billing. (*See* ECF No. 173 at 21; ECF No. 174-1). However, regardless of the specific arguments advanced, given the evidence in this case, which indicates that Mr. Kelly played no role in billing at ReDCo, and given the lack of any evidence connecting Mr. Kelly to any of Dr. Kennedy's identifying information ReDCo may have used in billing, the Court finds that Dr. Kennedy has not proven that Mr. Kelly used or possessed his identifying information with respect to ReDCo's requests for reimbursement from Highmark under Act 62.

[17] The Court notes that the parties dispute the applicable burden of proof with respect to Dr. Nulton and Dr. Kennedy's identity theft claims. (ECF No. 172 at 56; ECF No. 174 at 8).

For his part, Mr. Kelly notes that this Court recently held that the clear-and-convincing evidence standard applies to claims of insurance fraud, which is the alleged "unlawful purpose" on which Drs. Nulton and Kennedy's identity theft claims are primarily based. (ECF No. 172 at 56) (citing *Am. Nat'l Prop. & Cas. Co. v. Felix*, No. 3:16-CV-147, 2018 WL 10234054, at *3 (W.D. Pa. Nov. 1, 2018)).

In response, Drs. Nulton and Kennedy contend that their burden of proof is a preponderance of the evidence because: (1) Pennsylvania's General Assembly did not specify the burden of proof for a civil identity theft claim, and (2) when the General Assembly does not specify a greater burden of proof, Pennsylvania courts presume that the General Assembly intended the burden of proof to be a preponderance of the evidence. (ECF No. 174 at 8).

The Court need not resolve this issue and determine the applicable burden of proof in this case because even if the Court applies the lower preponderance of the evidence standard, Drs. Nulton and Kennedy have failed to prove that Mr. Kelly is civilly liable for identity theft. Therefore, for purposes of this decision alone, the Court will proceed with the understanding that the burden of proof for an identity theft claim is a preponderance of the evidence.

> **a.    Dr. Nulton and Dr. Kennedy Failed to Prove that Mr. Kelly Used Their Identifying Information Without Their Consent With Respect to the CBH Form**

As the Court outlined earlier, at trial, Mr. Kelly testified that he was not asked to obtain Dr. Nulton or Dr. Kennedy's signature on the CBH Form. (Tr. Vol. V, Kelly, 22:17–19). Further, Mr. Kelly stated that he did not sign Dr. Nulton or Dr. Kennedy's name on the CBH Form, and he did not provide the document to Dr. Nulton or Dr. Kennedy to sign. (*Id.* at 22:20–23:2). Mr. Kelly testified that Ms. Hershberger was "not accurate" in her statement that she gave the CBH Form to him so that he could present it to Drs. Nulton and Kennedy to sign. (*Id.* at 23:3–7). Finally, Mr. Kelly stated that Ms. Hershberger presented the completed CBH Form to him so that he could sign it as the COO of CBH. (*Id.* at 25:3–8). The only pieces of information that Mr. Kelly placed on the entirety of the document were the following: (1) his own signature, (2) his title at CBH (COO), (3) the date, and (4) his phone number. (*Id.* at 26:12–15).

On the other hand, Dr. Nulton and Dr. Kennedy offered three categories of evidence indicating that Mr. Kelly played a significant role in placing their identifying information on the CBH Form: (1) the testimony of Ms. Hershberger, (2) Dr. Nulton's statement that his Social Security number on the CBH Form appeared to be written in Mr. Kelly's handwriting, and (3) Mr. Kelly's statement in his email to Mr. Milewski that he would be the "point person" relative to Act 62.

Given the foregoing, the question of whether Mr. Kelly placed Dr. Nulton and Dr. Kennedy's identifying information on the CBH Form is a credibility determination. On this issue, the Court believes Mr. Kelly over Ms. Hershberger. Indeed, for the following three reasons, the Court finds that Ms. Hershberger's trial testimony was lacking in credibility.

     **i. The Court's First Reason for Finding That Ms. Hershberger's Trial Testimony Lacks Credibility**

The Court's first reason for finding that Ms. Hershberger's trial testimony lacks credibility is that there is a clear contradiction between what she said at trial and what she wrote in her 2014 email. The Court now offers four points of evidence in order to explain this contradiction.

First, Ms. Hershberger testified that Mr. Kelly told her that Dr. Nulton had agreed to provide supervision for CBH's behavioral health specialists. (Tr. Vol. II, Hershberger, 159–60). Ms. Hershberger then relayed that information to Highmark. (*Id.* at 160:23–24). Moreover, Ms. Hershberger specifically stated that Drs. Nulton and Kennedy were listed as providers on the CBH Form as a result of the supervision that they were providing. (*Id.* at 189:10–19).

Second, in the context of the HCFA-1500 form, Ms. Hershberger understood a *rendering* provider to be someone who is providing services or *supervising the provision of care*, and she knew that that individual was to be listed in Box 24-J of the HCFA-1500 form. (*Id.* at 179–85). Conversely, Ms. Hershberger defined a *referring* provider as the individual "who is making the referral, so that would have been who did the evaluation[,]" and she knew that that individual was to be listed in Box 17 of the HCFA-1500 form. (*Id.* at 186:15–19).

Third, by purportedly signing the CBH Form, Dr. Nulton and Dr. Kennedy ostensibly agreed to the following: "every 1500 claim form submitted to Highmark Blue Shield will include the provider number of the individual provider who actually performed the service (place in Block 24K of the claim form)." (D-21 at 2). And indeed, when CBH billed Highmark under Act 62, it would have listed either Dr. Nulton or Dr. Kennedy as the supervisor. (Tr. Vol.

II, Hershberger, 177:21–178:3). Given Ms. Hershberger's understanding of the HCFA-1500 form, the Court has every indication that this means that CBH listed either Dr. Nulton or Dr. Kennedy in Box 24-J of the HCFA-1500 form as the rendering provider when it billed Highmark under Act 62.

When the Court puts these three pieces of evidence together, the following picture of Ms. Hershberger's testimony crystalizes. In light of what Mr. Kelly allegedly told Ms. Hershberger about Dr. Nulton providing supervision to CBH's employees, and because Mr. Kelly allegedly got their signatures on the CBH Form, Ms. Hershberger submitted that document to Highmark, indicating that Dr. Nulton and Dr. Kennedy were providers (of supervision) within CBH's group. As part of CBH's group, Dr. Nulton and Dr. Kennedy would be listed on Box 24-J of the HCFA-1500 form on CBH's submissions to Highmark, indicating that the doctors were rendering providers. Therefore, Ms. Hershberger and the billing department at CBH submitted bills to Highmark listing Dr. Nulton or Dr. Kennedy as the rendering provider in Box 24-J of the HCFA-1500 form. In sum, given Ms. Hershberger's own testimony, she viewed Dr. Nulton and Dr. Kennedy as supervising/rendering providers for purposes of CBH's credentialing with Highmark and CBH's billing of Highmark.

Finally, in light of this evidence, the Court turns to Ms. Hershberger's 2014 email. Her email came after Dr. Nulton asked Mr. Kelly for confirmation that: "CBH/Providence or any related entity [was] NOT billing for any services under [his] personal provider ID or agency ID ([NDTC]) and receiving payment? This would include BHRS, Phycological Evaluations or any 'Incident To' services." (D-58 at 3). After Mr. Kelly forwarded the email to Ms. Hershberger, Ms. Hershberger sent the following reply to Mr. Kelly: "[w]e do not use Dr. Nulton's personal

number for billing purposes. *Dr. Nulton and Dr. Kennedy are set up as part of the group with [CBH] and [PCS] as referring provider[s] only.* All services are billed and payments received are under [CBH] or [ReDCo]." (*Id.* at 2) (emphasis added).

Given the fact that Ms. Hershberger viewed Drs. Nulton and Kennedy as supervising/rendering providers for purposes of the CBH Form and CBH's billing of Highmark under Act 62, the Court cannot understand why Ms. Hershberger told Mr. Kelly that Dr. Nulton and Dr. Kennedy are "set up as part of the group with [CBH] and PCS as *referring provider[s] only*" in her 2014 email. (*Id.*) (emphasis added). Indeed, if (1) Dr. Nulton was providing supervision to employees of CBH, (2) Ms. Hershberger listed Dr. Nulton as a provider on the CBH Form because of that supervision, and (3) Ms. Hershberger listed Dr. Nulton as a rendering provider when billing Highmark, then Dr. Nulton was (at least on the face of the relevant forms) a *rendering* provider in CBH's group.[18] This clear contradiction between Ms.

_____

[18] As the Court noted earlier, Ms. Hershberger explained her response to Mr. Kelly by saying that she meant that CBH was "not billing under Dr. Nulton's numbers, that we were receiving payment under [CBH], their tax ID, our NPI, and that it was not going against either of their income." (Tr. Vol. II, Hershberger, 189:4–9). Ms. Hershberger also noted that Drs. Nulton and Kennedy were listed as providers on the *application* that CBH submitted to Highmark (i.e., the CBH Form). (*Id.* at 189:10–19). In other words, it appears to the Court that Ms. Hershberger attempted to explain her email to Mr. Kelly by indicating that she was only saying that Dr. Nulton was a referring provider for billing purposes—she was not talking about credentialing. However, there are two significant issues with that explanation.

First, once again, Ms. Hershberger testified that when CBH billed Highmark for BHRS services, CBH listed either Dr. Nulton or Dr. Kennedy as the supervisor (i.e., the rendering provider). (*Id.* at 177:21–178:3). Therefore, if Ms. Hershberger's 2014 email to Mr. Kelly was only addressing billing, then by her own testimony at trial, her email was incorrect insofar as she said that Dr. Nulton was a referring provider only.

Second, based on the testimony of Ms. Snider from Highmark, *see supra* Section V.E.2, the Court understands Ms. Hershberger's reference to CBH and PCS's "group" to be in reference to the credentialing process. Insofar as the Court is correct in this understanding, Ms. Hershberger's attempt to make her 2014 email to Mr. Kelly about billing and not credentialing is wholly lacking in credibility.

Hershberger's 2014 email and her testimony at trial lead the Court to disbelieve her insofar as she testified that Mr. Kelly told her that Dr. Nulton was providing supervision to employees of CBH.

In further support of the Court's finding that Ms. Hershberger's testimony on this issue lacks credibility, the Court notes Ms. Hershberger's statements that: (1) she had never seen a written agreement between Dr. Nulton and CBH indicating that Dr. Nulton was providing supervision to individuals working at CBH, (2) she was unaware of anyone else that Mr. Kelly had informed of the existence of this alleged contract, and (3) she could not point to a written document in which Mr. Kelly mentioned the agreement to her. (Tr. Vol. II, Hershberger, at 206:22–207:20).

Therefore, given the clear contradiction between Ms. Hershberger's trial testimony and her 2014 email, coupled with the fact that she offered no hint of any evidence of the supervision agreement she contends Mr. Kelly told her about, the Court finds that Ms. Hershberger's testimony regarding Mr. Kelly telling her that Dr. Nulton was providing supervision is lacking in credibility. Because the Court wholly discredits this testimony, the evidentiary connection between Mr. Kelly and the CBH Form becomes much weaker.

### ii. The Court's Second Reason for Finding that Ms. Hershberger's Trial Testimony Lacks Credibility

The Court's second reason for finding that Ms. Hershberger's trial testimony lacks credibility is that the Court struggles to believe her statements with respect to Dr. Nulton's purported signature on the CBH Form. As the Court noted earlier, Ms. Hershberger testified

---

In short, all signs point the Court to a finding that Ms. Hershberger's testimony on this issue lacked credibility.

that she was familiar with Dr. Nulton's signature. (*Id.* at 216:11–13). She further testified that: (1) the signature on the CBH Form looked like Dr. Nulton's signature, (2) she did not see who signed the CBH Form, and (3) she did not see Mr. Kelly sign the document. (*Id.* at 216:11–24). Yet, in spite of all of this testimony, Ms. Hershberger stated that she could conclusively say that the signature on the CBH Form was not Dr. Nulton's signature. (*Id.* at 216:14–16).

These statements further call Ms. Hershberger's credibility into doubt. Because Ms. Hershberger did not see who signed the CBH Form, and because she testified that Dr. Nulton's purported signature on the form does in fact look like Dr. Nulton's, it is unclear how she could *conclusively* assert that the signature was not actually Dr. Nulton's.

### iii. The Court's Third Reason for Finding that Ms. Hershberger's Trial Testimony Lacks Credibility

The Court's final reason for finding that Ms. Hershberger's trial testimony lacks credibility is the Court's observation of her demeanor at trial. Indeed, having observed her demeanor while testifying, and having reviewed the record of what she said, the Court finds that her testimony lacks credibility.

The Court does not, of course, comment on what may or may not have happened between Ms. Hershberger and Mr. Kelly in the past. However, regardless of what has previously happened between the two individuals, and regardless of the exact reason why, the Court found Ms. Hershberger to be altogether too keen to see a judgment entered against Mr. Kelly, as the foregoing discussion demonstrates.

Therefore, for all of these reasons, the Court discredits Ms. Hershberger's testimony connecting Mr. Kelly to the completion of the CBH Form.

### iv. Given the Remaining Evidence, the Court Finds that Drs. Nulton and Kennedy Failed to Prove Mr. Kelly Used Their Identifying Information on the CBH Form Without Consent

In the absence of Ms. Hershberger's testimony, the only evidence connecting Mr. Kelly to the placing of Dr. Nulton and Dr. Kennedy's identifying information on the CBH Form are the following two things: (1) Dr. Nulton's statement that his Social Security number on the form appeared to be in Mr. Kelly's handwriting, and (2) Mr. Kelly's statement relative to Act 62 that he would be the "point person."

With respect to Dr. Nulton's statement that his Social Security number on the CBH Form appeared to be written in Mr. Kelly's handwriting, (Tr. Vol. I, Nulton, 191:13–192:4), the Court notes that Dr. Nulton is not a handwriting expert (Tr. Vol. II, Nulton, 82:9–11), and Drs. Nulton and Kennedy did not call a handwriting expert to testify at trial that the Social Security number appeared to be in Mr. Kelly's handwriting. In short, although the Court does not completely discredit Dr. Nulton's statement that the Social Security number on the CBH Form appeared to be in Mr. Kelly's handwriting, his testimony certainly does not make it more likely than not that it was Mr. Kelly who placed Dr. Nulton's Social Security number on the form. *Delaware Cty. v. Schaefer ex rel. Philadelphia Inquirer*, 45 A.3d 1149, 1156 (Pa. Commw. Ct. 2012) (noting that the preponderance of the evidence standard is "tantamount to a more likely than not inquiry").

Further, with respect to Mr. Kelly being the "point person" relative to Act 62, the Court believes Mr. Kelly's explanation that in making this statement, he was "offering to be that one person that [Mr. Milewski] can go to for updates on Act 62." (Tr. Vol. V, Kelly, 13:12–17). The Court believes Mr. Kelly on this issue for two reasons.

First, Mr. Kelly was the COO of CBH and PCS. (Tr. Vol. IV, Kelly, 183–86).  Mr. Bolinsky

testified that because Mr. Kelly was the COO of the two companies, outside of making sure that

the billing department got credentialing completed, Mr. Kelly did not have any intimate

involvement with the credentialing processes at CBH or ReDCo relative to Act 62. *See supra*

Section V.D.5.c. Indeed, at CBH, Ms. Hershberger was responsible for credentialing, and at

ReDCo, Ms. Symons was responsible for credentialing. *Id.* Therefore, Mr. Kelly's role at CBH

and PCS cuts against the idea that his "point person" statement meant he would be the one to

get Dr. Nulton and Dr. Kennedy's signatures on the CBH Form.

Second, the Court found Ms. Woznicki's testimony at trial highly credible. Regarding

Mr. Kelly's statement that he would be the "point person," Ms. Woznicki indicated the

following: "as far as Act 62 [I] was working with [Ms.] Hershberger, working with [Ms.]

Symons. So—and I would update [Mr. Kelly], but I would not characterize him in this scenario

as the point person based on my recollection." (Tr. Vol. IV, Woznicki, 156–60). Ms. Woznicki's

testimony may *possibly* indicate that Mr. Kelly overemphasized his role in his email to Mr.

Milewski. But her testimony *certainly* confirms the idea that Mr. Kelly was simply collecting

information from different departments at CBH/PCS/ReDCo relative to Act 62—her testimony

cuts against the suggestion that Mr. Kelly's email indicated his agreement to get signatures and

other information for placement on the CBH Form.

In light of all of the foregoing, the Court finds that Drs. Nulton and Kennedy have

offered very little credible evidence tending to indicate that Mr. Kelly used or possessed their

identifying information without consent relative to the completion of the CBH Form. Further,

they have done very little to discredit Mr. Kelly's testimony that all he did relative to the form

was obtain the completed version from Ms. Hershberger and place his own information on the form.[19] Accordingly, the Court finds Mr. Kelly's testimony on this issue to be credible.

Therefore, with respect to the placing of Dr. Nulton and Dr. Kennedy's identifying information on the CBH Form, the Court finds that Drs. Nulton and Kennedy failed to prove, by a preponderance of the evidence, that Mr. Kelly used or possessed their identifying information without their consent.[20]

---

[19] The Court notes that Drs. Nulton and Kennedy contend that Mr. Kelly testified falsely at trial on several occasions. (ECF No. 173 at 21–24). Although the Court does not overview those alleged falsehoods in detail here, the Court notes that it has reviewed them, and generally speaking, the alleged falsehoods either: (1) have very little to do with Dr. Nulton and Dr. Kennedy's allegations relative to the CBH Form, or (2) deal with relatively minor issues and do not lead the Court to conclude that Mr. Kelly lied when he said he played no role in getting Dr. Nulton and Dr. Kennedy's information placed on the CBH Form. In short, having considered all of the evidence in this case, the Court finds Mr. Kelly credible insofar as he testified that he played no role in completing the CBH Form outside of placing his own information on the document.

[20] At this juncture, the Court notes that Drs. Nulton and Kennedy point out the fact that Mr. Kelly signed the CBH Form as the COO of CBH, and in doing so represented to Highmark that Drs. Nulton and Kennedy agreed to abide by the terms on that form. (ECF No. 173 at 13–14). Based on Mr. Kelly's own testimony at trial, he did in fact sign the CBH Form as the COO of CBH, and some of the things that he represented to Highmark regarding Drs. Nulton and Kennedy were not true. *See supra* Section V.D.4. However, while the Court certainly does not condone Mr. Kelly's failure to confirm that Drs. Nulton and Kennedy agreed to abide by the terms on the CBH Form, the Court finds that Dr. Nulton and Dr. Kennedy have failed to prove that his actions constituted identity theft.

Indeed, even assuming for purposes of argument that Mr. Kelly used or possessed Dr. Nulton and Dr. Kennedy's identifying information by signing the CBH Form in his own name and representing that Drs. Nulton and Kennedy had agreed to the terms on that form, Drs. Nulton and Kennedy failed to show at trial that their identifying information appeared on the CBH Form without their consent. To be sure, the Court is aware that the two doctors testified that they did not place their information on the CBH Form. In light of this testimony and the other evidence in this case, the Court declines to find that Dr. Nulton or Dr. Kennedy signed the form. However, the two doctors have primarily directed the blame at Mr. Kelly for their information allegedly appearing on the CBH Form without their consent, and they have failed to prove that he was the one who placed their information on that document. Therefore, the Court finds that Dr. Nulton and Dr. Kennedy failed to prove that their identifying information was on the CBH Form without their consent. Accordingly, the doctors have not met their burden of proving that Mr. Kelly committed identity theft relative to the CBH Form.

b.   **Dr. Nulton and Dr. Kennedy Failed to Prove That Mr. Kelly Used or Possessed Their Identifying Information Without Their Consent With Respect to CBH's Submissions to Highmark Seeking Reimbursement Under Act 62**

The Court now turns to whether Drs. Nulton and Kennedy have proven that Mr. Kelly used or possessed their identifying information without their consent in the course of CBH requesting reimbursement from Highmark under Act 62.

For two reasons, the Court finds that the doctors have not met their burden of proof on this issue. The first reason is that Drs. Nulton and Kennedy failed to prove that Mr. Kelly used or possessed their identifying information without their consent in the course of CBH completing the CBH Form. The second reason is the highly credible testimony from multiple individuals that Mr. Kelly played no role in billing at CBH. *See supra* Section V.D.5.

Given these realities, the Court cannot find that Mr. Kelly personally used or possessed, or directed CBH employees to use or possess, Dr. Nulton or Dr. Kennedy's identifying information without their consent in the course of CBH's submissions to Highmark under Act 62. Therefore, the Court finds that Drs. Nulton and Kennedy have failed to prove that Mr. Kelly used or possessed their identifying information without their consent in the course of any of CBH's submissions to Highmark under Act 62.

c.   **Dr. Nulton Has Failed to Prove that Mr. Kelly Used or Possessed His Identifying Information Without Consent in the Course of ReDCo Submitting the ReDCo Form to Highmark**

---

Finally, for the same reasons, the Court finds that Drs. Nulton and Kennedy have failed to prove that Mr. Kelly used or possessed their identifying information without consent when he signed the Keystone Form.

The Court now turns to the issue of whether Dr. Nulton has proven that Mr. Kelly used or possessed his identifying information without his consent in the course of ReDCo submitting the ReDCo Form to Highmark.

On this issue, at trial, Mr. Kelly stated that he was asked to obtain Dr. Nulton's signature on the ReDCo Form. (Tr. Vol. V, Kelly, 31:17–23). However, Mr. Kelly also testified to the following: (1) he obtained Dr. Nulton's signature on the form by walking it to Dr. Nulton's office and either having Dr. Nulton sign it in front of him or leaving it with Dr. Nulton's assistant, (2) he did not complete any portion of the ReDCo Form, and (3) he did not forge Dr. Nulton's signature on the document. (*Id.* at 41–43).

For his part, Dr. Nulton testified that he did not sign the ReDCo Form, and he did not authorize anyone else to sign it. (Tr. Vol. I, Nulton, 205:17–22).

In light of this contradictory testimony, the Court must weigh the credibility of Mr. Kelly and Dr. Nulton and decide whether Dr. Nulton has presented sufficient evidence to prove, by a preponderance of the evidence, that Mr. Kelly used or possessed his identifying information without his consent on the ReDCo Form. For the reasons outlined below, the Court finds that Dr. Nulton has failed to meet his burden of proof on this issue.

i. **Evidence Tending to Indicate That Dr. Nulton Did Not Sign or Otherwise Place His Identifying Information on the ReDCo Form**

There are three lines of evidence tending to indicate that Dr. Nulton did not sign or otherwise place his identifying information on the ReDCo Form: (1) Mr. Kelly's statement that he could be the "point person" relative to Act 62, (2) Dr. Nulton's testimony that he did not sign the ReDCo Form, and (3) two additional pieces of evidence tending to indicate that Dr. Nulton

did not place his information on the form. The Court has previously analyzed Mr. Kelly's "point person" statement, and the Court has outlined Dr. Nulton's own testimony on this issue. Accordingly, the Court now turns to the two remaining pieces of evidence that tend to indicate that Dr. Nulton did not place his information on the ReDCo Form.

The first piece of evidence is the fact that Dr. Nulton has a history of avoiding exposure to unwarranted liability, and by signing the ReDCo Form, he would have had an indication that he may have been exposing himself to such liability. In support of the notion that Dr. Nulton has a history of avoiding exposure to unwarranted liability, the Court notes his testimony regarding his consultation agreement with ReDCo. In that testimony, he stated that he was presented with an agreement whereby he would have been providing supervision to employees of ReDCo. (*Id.* at 222). However, prior to signing the document, Dr. Nulton demanded that the language regarding supervision be removed. (*Id.*). It is the Court's understanding that Dr. Nulton could not and did not agree to provide supervision at ReDCo because he was already supervising three FTEs, the maximum number permitted by law. *See supra* Section V.B.2.b.

Turning to the ReDCo Form, it appears to the Court that if Mr. Kelly did present Dr. Nulton with a document for signature, it was only page one of the ReDCo Form. *See supra* Section V.E.5. Therefore, Dr. Nulton would not have had before him a document expressly stating that he was agreeing to be jointly and severally liable for any overpayment to the ReDCo group. (P-16). However, the document before Dr. Nulton would have indicated that he was agreeing "to abide by the requirements listed on the reverse side of [the] form[.]" (*Id.*). Indeed, even page one of the ReDCo Form would have given Dr. Nulton an indication that he might have been exposing himself to unwarranted liability. Accordingly, in light of Dr. Nulton's

history of attempting to avoid unwarranted liability, this line of evidence tends to indicate that he did not sign the ReDCo Form.[21]

The second piece of evidence tending to indicate that Dr. Nulton did not sign or otherwise place his identifying information on the ReDCo Form is the potential inconsistency between Mr. Kelly's deposition testimony and his trial testimony with respect to obtaining Dr. Nulton's signature. As the Court explains in more detail below, while the Court does find Mr. Kelly's deposition testimony and trial testimony to be slightly inconsistent, the Court also finds that the two lines of testimony can be read to generally agree with each other.

As the Court noted earlier, at his deposition, Mr. Kelly testified to the following with respect to obtaining Dr. Nulton's signature:

> **Q:** And what did you do with this document when you received it?
> **A:** I told Veronica at the time, and I don't honestly recollect what I did, but I assume that I went and got [Dr. Nulton] to sign this document.
> **Q:** Would you have asked anyone else to do that?
> **A:** No.
> **Q:** Do you have any recollection either way of actually getting Dr. Nulton to sign this?
> **A:** I do not have a recollection either way.

(KD at 170:21–171:6).

At trial, Mr. Kelly testified without equivocation that he walked the ReDCo Form down the hall to Dr. Nulton's office, and he received a signed document back from Dr. Nulton or his office. (Tr. Vol. V, Kelly, 42). Further, he stated that, given the passage of time, he did "not recall if [Dr. Nulton] signed [the form] in front of me or if I left it with his assistant[.]" (*Id.* at 42:5–10).

---

[21] On the other hand, the Court notes that when a child would be referred to CBH or ReDCo, those two companies would, in turn, refer the child to Dr. Nulton or someone in his group to "perform the psychological evaluation and essentially prescribe what he (Dr. Nulton) believed was needed by the child in terms of treatment." (Tr. Vol. IV, Bolinsky, 61:8–17). Thus, Dr. Nulton did have a beneficial relationship with ReDCo.

In analyzing these two lines of testimony, the Court notes that they appear inconsistent with one another, at least in one sense. Specifically, at his deposition, Mr. Kelly stated that he did not have a recollection of actually getting Dr. Nulton to sign the ReDCo Form. Conversely, at trial, Mr. Kelly testified that he walked the form to Dr. Nulton's office and obtained his signature in one of two ways. To be sure, Mr. Kelly's apparent ability to recall these events more clearly at trial (which occurred over two years after his deposition) does tend to call into question his trial testimony.

However, when the Court examines Mr. Kelly's deposition and trial testimony at a higher level, there appears to be a general consistency between the two. First, regarding Mr. Kelly's deposition testimony, he did indicate that he would have gotten Dr. Nulton to sign the ReDCo Form when he stated: "I assume I went and got [Dr. Nulton] to sign this document." In this respect, Mr. Kelly's deposition testimony is generally consistent with his testimony at trial. Indeed, at trial, Mr. Kelly testified that his deposition statement was an indication that he got Dr. Nulton to sign the ReDCo Form, but he was not sure if he had Dr. Nulton sign the form in front of him, or if he left the form with Dr. Nulton's assistant. (*Id.* at 124–25).

Further, the Court notes that at his deposition, Mr. Kelly was asked whether he had any "*recollection* either way of actually getting Dr. Nulton to sign" the ReDCo Form. Critically, Mr. Kelly was not asked if he remembered either getting Dr. Nulton's signature or forging it. Therefore, Mr. Kelly's negative response is not a potential admission that he forged Dr. Nulton's signature on the ReDCo Form. Rather, the Court finds it to be an honest indication that he did not *recall* actually obtaining Dr. Nulton's signature.

Finally, Mr. Kelly could have fairly understood the question about his recollection to be gauging whether he remembered physically handing the document to Dr. Nulton for his signature. In other words, Mr. Kelly could have understood this question to be asking about the *details* of him obtaining Dr. Nulton's signature. If Mr. Kelly understood this question in that light, then his response that he did not "have a recollection either way" bears a strong resemblance to his trial testimony that he did not recall whether he left the ReDCo Form with Dr. Nulton's assistant or handed it directly to Dr. Nulton for his signature.

Therefore, in spite of Mr. Kelly's apparent ability to better recall the events of 2009 at trial than at his deposition, the Court largely credits his testimony that he obtained Dr. Nulton's signature on the ReDCo Form. The Court credits his testimony because of the general consistency between his deposition and trial testimony, and because of the Court's observations of Mr. Kelly's demeanor at trial.

The Court now turns to the evidence tending to indicate that Mr. Kelly did not use or possess Dr. Nulton's identifying information on the ReDCo Form without Dr. Nulton's consent.

### ii. Evidence Tending to Indicate that Mr. Kelly Did Not Use or Possess Dr. Nulton's Identifying Information on the ReDCo Form Without Dr. Nulton's Consent

At the outset, as the Court noted earlier, Dr. Nulton's purported signature on the ReDCo Form looks similar to signatures that Dr. Nulton did not dispute placing on other documents. *See supra* Section V.E.4.a. To be sure, the goal of a forged signature is to make the signature look legitimate. Further, the Court recognizes that it is not dealing with the original versions of these documents (and therefore the signatures that they contain). Thus, the Court does not use this evidence to conclude that Mr. Kelly clearly did not forge Dr. Nulton's signature. Instead, the

Court simply notes that Dr. Nulton, who bore the burden of proof at trial, offered no expert testimony indicating that the signature on the ReDCo Form is not in fact his signature, or any testimony indicating that such expert testimony would be unhelpful to the Court.[22]

The Court now turns to the two pieces of evidence that tend to indicate that Mr. Kelly did not forge Dr. Nulton's signature or otherwise place his identifying information on the ReDCo Form without his consent.

The first such piece of evidence is that given the situation at ReDCo in 2009, it appears especially unlikely that Mr. Kelly would have subjected himself to potential criminal liability by forging Dr. Nulton's signature. To state the obvious, identity theft is a crime in Pennsylvania. 18 Pa. Cons. Stat. § 4120(a). While the Court can imagine that Mr. Kelly wanted to please his co-workers and bosses at PCS/ReDCo, the Court notes Mr. Bolinsky's testimony that it would not have been "the end of the world" if ReDCo was not credentialed with Highmark as of July 1, 2009—ReDCo would have had other options in terms of billing had it not been credentialed with Highmark as of that date. (Tr. Vol. IV, Bolinsky, 71). Especially in light of this reality, it

---

[22] On this point, Dr. Nulton argues that the "fact that [Mr.] Kelly did not call a handwriting expert [to testify] when he likely has the [ReDCo Form] in his personal possession, or had access to [it] if [it is in ReDCo's possession], supports an inference that handwriting analysis would not be favorable to [Mr.] Kelly." (ECF No. 176 at 12). In support of this argument, Dr. Nulton cites to *United States v. Lentz*, 419 F. Supp. 2d 837 (E.D. Va. 2006). (*Id.*).

In *Lentz*, the district court did permit an adverse inference against the defendant where the defendant refused to provide a handwriting exemplar. 419 F. Supp. 2d at 842–43. However, critically, in *Lentz*, the government was seeking a handwriting exemplar from the defendant to use in making its case against him. *Id.* at 839–40. In other words, in *Lentz*, the party with the burden of proof sought a handwriting exemplar from the defendant to use in attempting to meet its burden, and the defendant refused.

Conversely, here, the Court is without any indication that Dr. Nulton sought a handwriting exemplar from Mr. Kelly, making *Lentz* wholly inapposite. Indeed, any control Mr. Kelly may have had over the ReDCo form does not change the fact that Dr. Nulton bore the burden of proof at trial. In light of the fact that Dr. Nulton bears the burden of proof in this case, the Court simply takes note of the fact that he neither offered a handwriting expert nor explained why one would not have been helpful.

appears that Mr. Kelly would have had very little incentive to have exposed himself to potential criminal liability by placing Dr. Nulton's identifying information on the ReDCo Form without Dr. Nulton's consent.

The second piece of evidence tending to indicate that Mr. Kelly did not forge Dr. Nulton's signature or otherwise place his identifying information on the ReDCo Form without his consent is, to a degree, Dr. Nulton's own testimony on this issue.

As the Court noted earlier, Dr. Nulton testified that he regularly gave BHRS providers certain information so that they could list him on an HCFA-1500 form as a prescriber. (Tr. Vol. I, Nulton, 185).[23] With respect to the information that Dr. Nulton provided to Mr. Kelly on July 1, 2009, Dr. Nulton testified that he believed that Mr. Kelly wanted his information so that Mr. Kelly could list him on Box 17 of the HCFA-1500 form as a prescriber. (Tr. Vol. II, Nulton, 9:20–23). But the Court notes that one of the pieces of information that Dr. Nulton sent to Mr. Kelly was his Social Security number. (P-18). And Box 17 of the HCFA-1500 form only calls for the "Referring Provider or Other Source['s]" name and NPI number—it does not have a location for a Social Security number. (P-62).

Therefore, given Dr. Nulton's apparent habit of providing his information for use in Box 17 of the HCFA-1500 form (which indicates a familiarity with the information listed in Box 17), and given the fact that Box 17 does not call for the prescriber's Social Security number, the

---

[23] Specifically, Dr. Nulton stated that BHRS providers would request his "CAQH or NPI, [his] information, license number, Highmark number, Medicad number" so that they could list him on the HCFA-1500 form as the prescriber. (Tr. Vol. I, Nulton, 185:6–17). Although the Court is not sure exactly what Dr. Nulton meant by his "information," the Court notes that he did not explicitly mention his Social Security number when discussing the information he would send to BHRS providers. Indeed, if BHRS providers did ask for Dr. Nulton's Social Security number, it is unclear why Dr. Nulton would have willingly provided that information to them given that Box 17 of the HCFA-1500 form does not call for the prescriber's Social Security number. (P-62).

Court cannot see why Dr. Nulton sent Mr. Kelly his Social Security number on July 1, 2009. Indeed, the Court does not believe that individuals are in the habit of sharing their Social Security numbers without good cause, and Dr. Nulton has not explained what that good cause would have been in this instance.

Moreover, Dr. Nulton's testimony regarding whether Mr. Kelly was in the office on July 1, 2009, indicates that like Mr. Kelly, Dr. Nulton may have been too keen to purportedly remember details for purposes of testifying at trial. Specifically, when Dr. Nulton was asked why he did not walk down the hall to Mr. Kelly's office to respond to Mr. Kelly's email on July 1, 2009, Dr. Nulton stated that he did not do so because Mr. Kelly "wasn't there." (Tr. Vol. II, Nulton, 90:19–25). Dr. Nulton then indicated that, as of the fall of 2021, he recalled walking down the hallway on July 1, 2009, looking in Mr. Kelly's office to see if he was there, going back to his office and filling out his email, and sending his response back to Mr. Kelly. (*Id.* at 91:1–12). When asked if he "specifically recalled" taking those actions, Dr. Nulton stated "I don't recall it specifically." (*Id.* at 91:13–14).

The Court's point regarding Dr. Nulton's testimony is not that it was riddled with inconsistencies. Rather, the Court's point is that just as Mr. Kelly's testimony is subject to attack at certain points, Dr. Nulton's testimony is as well.

In closing, the Court reiterates that both Dr. Nulton and Mr. Kelly denied, under oath, placing Dr. Nulton's identifying information on the ReDCo Form. Especially in the face of Mr. Kelly's denial, which the Court does find credible for the reasons outlined above, Dr. Nulton needed to come forward with evidence making it more likely than not that Mr. Kelly placed his information on the ReDCo Form without his consent. Having considered all of the evidence in

this case, the foregoing analysis, and the demeaner of both men at trial, the Court holds that Dr. Nulton has not met that burden.

Therefore, while the Court does not purport to find what actually happened relative to the ReDCo Form, the Court does find that Dr. Nulton has failed to prove, by a preponderance of the evidence, that Mr. Kelly placed his identifying information on the ReDCo Form without his consent.

### 2. Dr. Nulton Failed to Prove that Mr. Kelly Used His Identifying Information for an Unlawful Purpose

To summarize the Court's findings thus far, Drs. Nulton and Kennedy have failed to prove, by a preponderance of the evidence, that Mr. Kelly used or possessed their identifying information without their consent on either the CBH Form or CBH's requests to Highmark seeking reimbursement under Act 62. Therefore, both doctors have failed to prove their case against Mr. Kelly with respect to CBH.

Turning to ReDCo, Dr. Nulton has failed to prove, by a preponderance of the evidence, that Mr. Kelly used or possessed his identifying information without his consent relative to the ReDCo Form.

However, Mr. Kelly did send Dr. Nulton's NPI number and other information to Ms. Symons for use on the ReDCo Form. *See supra* Section V.E.3.b. And ReDCo then used Dr. Nulton's name and NPI number to bill Highmark under Act 62. *See supra* Section V.E.3.[24]

---

[24] As the Court noted earlier, Dr. Kennedy failed to offer any evidence that Mr. Kelly used or possessed his identifying information in the course of ReDCo's billing of Highmark under Act 62. Therefore, given all of the Court's findings relative to Dr. Kennedy, the Court holds that he has failed to prove that Mr. Kelly is liable to him for identity theft. Accordingly, with respect to Dr. Kennedy's claim, the Court will enter judgment against Dr. Kennedy and in favor of Mr. Kelly.

Because Dr. Nulton has failed to prove that Mr. Kelly placed his identifying information on the ReDCo Form without his consent, and because Mr. Kelly played no role in billing at ReDCo, (Tr. Vol. IV, Bolisnky, 56:19–22), the Court has doubts about whether Mr. Kelly can be found to have used or possessed Dr. Nulton's identifying information without consent in the course of ReDCo's billing of Highmark under Act 62. However, even assuming without deciding that Mr. Kelly did use or possess Dr. Nulton's identifying information without his consent in the course of ReDCo's billing, Dr. Nulton has still failed to show that Mr. Kelly used or possessed his identifying information to further an unlawful purpose. 18 Pa. Cons. Stat. § 4120(a).

In order to outline Dr. Nulton's failure to prove that Mr. Kelly used or possessed his identifying information to further an unlawful purpose, the Court must first review Pennsylvania's insurance fraud statute.

a.      **Pennsylvania's Insurance Fraud Statute**

As the Court explained at summary judgment, in order to succeed on his identity theft claim, Dr. Nulton needed to prove that Mr. Kelly used his identifying information "to further an 'unlawful purpose.'" *Kelly*, 2020 WL 5077940, at *7 (quoting 18 Pa. Cons. Stat. §4120(a)). An "'unlawful purpose' is a purpose that violates a civil or criminal law." *Id.* In this case, Dr. Nulton alleges that Mr. Kelly used or possessed his identifying information without his consent for the unlawful purpose of committing insurance fraud. *Id.*

A person violates "'Pennsylvania's insurance fraud statute by: (1) presenting false, incomplete, or misleading statements to [the insurer]; (2) that were material to the claim; and (3) which were knowingly made with an intent to defraud.'" *State Auto Prop. & Cas. Ins. Co. v.*

*Sigismondi Foreign Car Specialists, Inc.*, 533 F. Supp. 3d 268, 276 (E.D. Pa. 2021) (quoting *Wezorek v. Allstate Ins. Co.*, No. 06-CV-1031, 2007 WL 2264096, at *14 (E.D. Pa. Aug. 7, 2007)) (alteration in original). Because Dr. Nulton's claim clearly fails on the third element, the Court now focuses its attention on that element.

Regarding intent to defraud, courts may infer fraudulent intent if the facts show that the insured had presumptive knowledge. *Id.* Indeed, where "'it affirmatively appears from sufficient documentary evidence, that … false answers are shown to have been given by an insured under such circumstances that he must have been aware of their falsity, the court may direct a verdict or enter judgment for the insurer. *Id.* at 277 (quoting *Hepps v. Gen. Am. Life Ins.*, No. CIV. A. 95-5508, 1998 WL 564497, at *4 (E.D. Pa. Sep. 2, 1998)). However, if an individual acts out of ignorance, rather than with actual knowledge that his statements are false, that individual has not committed insurance fraud. *Hepps*, 1998 WL 564497, at *4.

### b. The Court Finds that Dr. Nulton Failed to Prove that Mr. Kelly Intended to Defraud Highmark

Given the Court's findings of fact, Dr. Nulton has only proven that Mr. Kelly used or possessed (or indicated that others should use or possess) his identifying information when Mr. Kelly obtained that information for Ms. Symons relative to the ReDCo Form. Therefore, it is only Mr. Kelly's obtaining of Dr. Nulton's information relative to the ReDCo Form that can potentially support a claim for identity theft. Accordingly, the specific question that the Court must now answer is whether, when Mr. Kelly obtained Dr. Nulton's information relative to the ReDCo Form, Mr. Kelly acted with intent to defraud.

At trial, Mr. Kelly testified that he emailed Dr. Nulton on July 1, 2009, in an effort to obtain Dr. Nulton's NPI number, etc., so that ReDCo could list Dr. Nulton as the prescriber in its submission to Highmark. *See supra* Sections V.E.5–V.F. Specifically, he stated that asking Dr. Nulton for his information was a "small favor" because "the person doing [CBH and ReDCo's] psych evals was to be listed as the prescriber for our Highmark submission[.]" (Tr. Vol. V, Kelly, 37:20–24). Given that Mr. Kelly obtained Dr. Nulton's information with an eye toward listing him as the prescriber on the Highmark submission, it is certainly a fair inference that he forwarded Dr. Nulton's information to Ms. Symons with the intent that ReDCo use that information to indicate to Highmark that Dr. Nulton was the prescribing psychologist.[25] It is likewise a fair inference that he helped Ms. Symons complete the ReDCo Form with the intent that ReDCo use Dr. Nulton's information to indicate to Highmark that Dr. Nulton was the prescribing psychologist.

Further, Dr. Nulton testified at trial that when he sent Mr. Kelly his information on July 1, 2009, he was consenting to Mr. Kelly/ReDCo using his information on a Highmark form to indicate that he was prescribing services. (Tr. Vol. II, Nulton, 89:2–17). Indeed, multiple witnesses testified at trial that: (1) Dr. Nulton was a prescriber of BHRS treatment and (2) individuals for whom Dr. Nulton wrote prescriptions went to ReDCo to receive BHRs treatments. No witness contradicted these facts. Therefore, it is true that Dr. Nulton was a prescriber of BHRS treatments relative to ReDCo. Accordingly, if the Court believes Mr. Kelly's

---

[25] Indeed, Mr. Kelly's July 1, 2009, email to Ms. Woznicki, Mr. Bolisnky, and Ms. Symons very much indicates that he believed he was obtaining Dr. Nulton's information so that ReDCo could indicate to Highmark that Dr. Nulton was the prescribing psychologist, including on the bills that ReDCo submitted to Highmark. (P-17). As Mr. Kelly wrote: "*we need a psychologist on file as the prescriber*. The checks will be sent to us (CBH or ReDCo) *even though the billing will be attached to the psychologist on record.* [Ms.] Hershberger is on board [regarding] how this will be handled on the billing end." (*Id.*) (emphasis added).

testimony that he was under the impression that ReDCo would use Dr. Nulton's information to convey to Highmark that Dr. Nulton was a prescriber of BHRS services, then the Court cannot find that Mr. Kelly knowingly submitted (or caused to be submitted) false information to Highmark.

For four reasons, working together, the Court believes Mr. Kelly on this issue.

### i.  The Court's First Reason for Believing Mr. Kelly on This Issue

First, as multiple witnesses testified at trial, there was significant confusion surrounding Act 62 when it took effect in 2009. *See supra* Section V.C.2. As Ms. Woznicki testified, "for the most part the insurance companies were clueless (regarding credentialing BHRS providers at the time Act 62 went into effect). It was chaos … they didn't understand who we were." (Tr. Vol. IV, Woznicki, 113:11–18). Indeed, Ms. Snider stated that when Act 62 was passed: (1) there were individuals working at ReDCo who could bill for BHRS services, (2) Ms. Snider was under the impression that Highmark was required to reimburse for those individuals' services under Act 62, and (3) Highmark's system did not have the capacity to process the billing for their services. (Tr. Vol. III, Snider at 153:11–18).

As the Court explains in more detail below, in light of the confusion surrounding Act 62, coupled with the feedback Mr. Kelly was receiving from Highmark, the Court believes Mr. Kelly insofar as he testified that he believed he was helping ReDCo indicate to Highmark that Dr. Nulton was a prescriber of BHRS treatments.

### ii.  The Court's Second Reason for Believing Mr. Kelly on This Issue

Second, Mr. Kelly's testimony at trial that he believed that ReDCo was simply listing Dr. Nulton as the prescriber is consistent with his 2009 email, and Ms. Woznicki confirmed the

veracity of that 2009 email. As the Court outlined earlier, on July 1, 2009, Mr. Kelly sent the

following message to Ms. Woznicki, Mr. Bolinsky, and Ms. Symons:

> I had a similar conversation with Highmark out here. All of the billing will go
> through CBH or ReDCo. *However, we need a psychologist on file as the prescriber.*
> The checks will be sent to us (CBH or ReDCo) even though the billing will be
> attached to the psychologist on record. [Ms.] Hershberger is on board [with] how
> this will be handled on the billing end.

(P-17) (emphasis added).

At trial, Ms. Woznicki was asked whether Mr. Kelly's statement that ReDCo needed a

psychologist on file as the prescriber was "consistent with the feedback" that she was receiving

in the course of her discussions with relevant entities. (Tr. Vol. IV, Woznicki, 137). Ms. Woznicki

testified that Mr. Kelly's statement was in fact consistent with the feedback that she was

receiving. (*Id.* at 137:1–12).

Therefore, especially because the Court found Ms. Woznicki's trial testimony extremely

credible, the Court believes that Mr. Kelly received information from Highmark, in 2009,

indicating that Highmark simply needed a psychologist on file as a prescriber.

### iii. The Court's Third Reason for Believing Mr. Kelly on This Issue

Third, as the Court has noted previously, Mr. Kelly played no role with respect to billing

at ReDCo. (Tr. Vol. IV, Bolisnky, 56:19–22). This fact is important because Ms. Snider testified

that since ReDCo was credentialed as a medical group within Highmark's system, ReDCo

needed a "supervising practitioner who was a licensed psychologist or psychiatrist to supervise

the BHRS employees, TSSes and MTs, et cetera." (Tr. Vol. III, Snider, 123:20–23). However, there

was no evidence produced at trial indicating that Mr. Kelly was aware of this requirement.

Indeed, because Mr. Kelly played no role in billing, the fact that Mr. Kelly was not made aware of this requirement is unsurprising.

Moreover, the Court notes that given Mr. Kelly's complete lack of involvement with ReDCo's billing of Highmark, it is unsurprising that there was no evidence produced at trial tending to indicate that Mr. Kelly knew exactly how ReDCo was billing Highmark under Act 62.

### iv.  The Court's Final Reason for Believing Mr. Kelly on This Issue

Finally, the testimony of Ms. Kent, along with the results of Highmark's fraud review very much bolster the notion that Highmark told Mr. Kelly that it simply needed to know who was prescribing BHRS services.

Turning first to Ms. Kent's testimony, when asked about Highmark's requirements regarding who develops a treatment plan, Ms. Kent testified that the "clinical components" of that plan must be developed by a licensed psychologist or a physician. (Tr. Vol. II, Kent, 292:5–13). Specifically, the "clinical diagnosis of autism and autism spectrum disorder … is defined in Act 62[,]" and that portion of the treatment plan is what must be developed by a licensed psychologist or a physician. (*Id.* at 292:5–13). However, she also testified that there "are nonclinical components (of the treatment plan), like wrap-around services, that do not require a clinician or a psychologist—a physician or a psychologist." (*Id.* at 292:9–13). Against the backdrop of the rest of its findings of fact, the Court holds that Ms. Kent's testimony very much confirms the notion that Highmark informed Mr. Kelly that it only needed to know the information of the prescribing psychologist.

Turning second to Highmark's fraud review, Ms. Kent testified that it was immaterial to Highmark whether a claim from ReDCo indicated that Dr. Nulton performed something because that was not the basis for payment. (*Id.* at 271:19–23). Further, Ms. Kent stated that if ReDCo submitted a claim to be reimbursed for a service that required supervision, FIPR would have validated that the supervision had occurred and that it was documented in the medical record. (*Id.* at 272:14–273:9). Indeed, if a "service required supervision, and that did not occur, a payment would not have been appropriate." (*Id.* at 287:24–288:6). Finally, Ms. Kent confirmed that Highmark determined that the services that were billed by ReDCo fit within the Act 62 guidelines—otherwise, Highmark "would have had a recovery." (*Id.* at 273:24–274:7).

Having reviewed this testimony, the Court finds that it very much bolsters the notion that Highmark told Mr. Kelly, in 2009, that it simply needed a psychologist on file as the prescriber.

Taking each of these pieces of evidence together, the Court believes Mr. Kelly insofar as he testified that he obtained Dr. Nulton's information (and, by implication, forwarded that information to Ms. Symons) so that ReDCo could list Dr. Nulton as a prescriber in its submissions to Highmark. Even assuming without deciding that other employees at ReDCo then used Dr. Nulton's information to indicate something different to Highmark, that fact would not mean that Mr. Kelly knowingly submitted false information to Highmark. Indeed, he is only liable for his own actions and those that he caused while acting with the requisite culpability. *Kelly*, 2020 WL 5077940, at *6. And the Court is without evidence sufficient to support a finding that Mr. Kelly knowingly caused any ReDCo employee to indicate anything to Highmark other than the fact that Dr. Nulton was a prescribing psychologist. On the

contrary, Mr. Kelly testified that he never instructed anyone at CBH or ReDCo what, if anything, they should indicate to Highmark with respect to Dr. Nulton. (Tr. Vol. V, Kelly, 4:25–5:3). In sum, on this issue, the Court believes Mr. Kelly.

Therefore, the Court finds that Dr. Nulton has failed to prove, by a preponderance of the evidence, that Mr. Kelly intended to defraud Highmark. Accordingly, because Dr. Nulton has failed to prove that Mr. Kelly used his identifying information in furtherance of an unlawful purpose,[26] the Court holds that Dr. Nulton has failed to prove that Mr. Kelly is liable to him for identity theft.[27]

---

[26] The Court notes that in his post-trial brief, Dr. Nulton contends that Mr. Kelly's unlawful purposes were not only to commit insurance fraud, but also to violate "federal statutes prohibiting mail fraud, wire fraud, and healthcare fraud … as well as conspiracy to do so[.]" (ECF No. 174 at 17). Assuming without deciding that these claims are properly before the Court, Dr. Nulton has still failed to show that Mr. Kelly used or possessed his name and NPI number for any of these unlawful purposes.

Indeed, the Court notes that the elements of mail and wire fraud are the following: "(1) a scheme to defraud; (2) use of the mails or wires for the purpose of executing that scheme; and (3) fraudulent intent." *Coleman v. Commonwealth Land Title Ins. Co.*, 684 F. Supp. 2d 595, 614 (E.D. Pa. 2010) (citing *United States v. Pharis*, 298 F.3d 228, 233–34 (3d Cir. 2002)). Unlike mail fraud, wire fraud has an interstate commerce component that must be satisfied. *Id.* Further, an individual commits health care fraud if he: "(a) knowingly and willfully executes, or attempts to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent presents, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care program, in connection with the delivery of or payment for health care benefits, items, or services[.]" 18 U.S.C. § 1347.

Because the Court has found that Mr. Kelly honestly believed he was giving other employee(s) of ReDCo Dr. Nulton's information so that ReDCo could indicate to Highmark that Dr. Nulton was the prescribing psychologist, a fact that was true, the Court finds that Dr. Nulton has failed to prove that Mr. Kelly used or possessed his identifying information to further any scheme or artifice in an effort to defraud or present false pretenses. Therefore, the Court finds that Dr. Nulton has failed to prove that Mr. Kelly used or possessed his identifying information to further an unlawful purpose.

[27] In closing, the Court addresses Dr. Nulton's contention that one of Mr. Kelly's unlawful purposes in using or possessing his identifying information was to "feign compliance with Act 62[.]" (ECF No. 176 at 14). Dr. Nulton asserts that this action constitutes an unlawful purpose under the identity theft statute. (*Id.*).

At summary judgment, the Court stated that in order to "comply with Act 62, licensed psychologists must (1) evaluate a patient to determine whether he can be diagnosed with ASD; (2) develop a treatment plan for a patient with ASD; and (3) provide treatment or supervise treatment pursuant to the treatment plan." *Kelly*, 2020 WL 5077940, at *8. Then, in discussing why a reasonable jury could find that Mr. Kelly had *insurance fraud as his unlawful purpose*, the Court indicated that the jury could find that Mr. Kelly was responsible for "CBH and ReDCo misrepresent[ing] to Highmark that their billed services complied with Act 62, even though Dr. Nulton and Dr. Kennedy never developed the treatment plan for the patients, rendered services pursuant to the treatment plan, or supervised therapists who rendered services pursuant to the treatment plan." *Id.* However, nowhere in its summary judgment opinion did the Court state that violating Act 62 can constitute a standalone "unlawful purpose" for Mr. Kelly.

The Court now stresses that because Act 62 imposes legal obligations on insurers, not individuals or companies providing BHRS treatments, violating Act 62 cannot be a standalone unlawful purpose for Mr. Kelly. Indeed, Act 62 does not provide requirements for how BHRS providers offer BHRS treatments at all times and in all places throughout Pennsylvania. 40 Pa. Cons. Stat. § 764h.  Rather, Act 62 requires that a "health insurance policy or government program covered under this section shall provide to covered individuals or recipients under twenty-one (21) years of age coverage for the diagnostic assessment of autism spectrum disorders and for the treatment of autism spectrum disorders." § 764h(a). The Act then outlines the types of services for which insurers must provide coverage. *See* § 764h.

Accordingly, because Act 62 imposed no legal obligation(s) on Mr. Kelly, he cannot have violated the Act. And even assuming without deciding that he attempted to contravene its requirements, that attempt cannot be a standalone "unlawful purpose" under the identity theft statute. *Kelly*, 2020 WL 5077940, at *7 (holding that an "unlawful purpose" is a purpose that violates a civil or criminal law).

Given all of this, as the Court recognized at summary judgment, the possible relevance that Act 62 could have to Dr. Nulton's identity theft claim against Mr. Kelly is if Mr. Kelly knowingly misrepresented to Highmark that ReDCo was compliant with that piece of legislation in the course of committing insurance fraud.

Before explaining why Dr. Nulton has failed to prove that Mr. Kelly made a knowing misrepresentation to Highmark, the Court must first note Ms. Kent's testimony that Highmark interpreted Act 62 to mean that the *clinical components* of a treatment plan (i.e., the evaluation) must be developed by a psychologist, but other components of that plan (i.e., the provision of "wrap-around" services) need not be developed by a psychologist. *See supra* Section V.C.3. In light of this and other testimony offered at trial, it may well be that further statutory interpretation is required in order to determine exactly what Pennsylvania's legislature meant when it stated that a "'[t]reatment plan' means a plan for the treatment of autism spectrum disorders *developed* by a licensed physician or licensed psychologist pursuant to a comprehensive evaluation or reevaluation performed in a manner consistent with the most recent clinical report or recommendation of the American Academy of Pediatrics." 40 Pa. Cons. Stat. § 764h(f)(15) (emphasis added). To be clear, the Court need not and does not decide exactly what Act 62 requires in terms of which services it mandates that insurance providers cover. The Court also does not resolve the question of whether ReDCo's provision of BHRS treatments complied with Act 62. The Court need not resolve those questions in order to find that Mr. Kelly is not liable for identity theft.

Indeed, even if Act 62 required a psychologist or a physician to develop a treatment plan, the Court believes Mr. Kelly insofar as he testified that he intended to convey to Highmark that Dr. Nulton was a

**B.      Dr. Nulton and Peerstar Owe Mr. Kelly Prejudgment Interest**

Before concluding, there is one final matter for the Court to address. With respect to Dr. Nulton and Peertsar's breach of the Settlement Agreement, Mr. Kelly argues that he is entitled to prejudgment interest at the statutory rate of 6%. (ECF No. 172 at 15–16). Although Mr. Kelly raised this issue in a footnote, the Court notes that Dr. Nulton did not dispute Mr. Kelly's contention in any of his post-trial submissions. (ECF Nos. 173, 174, 176).

As the Court explained earlier, at summary judgment, the Court held that Dr. Nulton and Peerstar entered into a binding contract (the Settlement Agreement) with Mr. Kelly. *Kelly*, 2020 WL 5077940, at *16. Peerstar and Dr. Nulton then breached the Settlement Agreement on May 1, 2018, at which time they still owed Mr. Kelly 41 monthly payments totaling $3,246,632.64. *Id.*

Under Pennsylvania law, it is "well established that in contract cases, prejudgment interest is awardable as of right." *Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp.*, 643 F. Supp. 2d 675, 686 (E.D. Pa. 2009) (internal quotation marks and citation omitted). The premise underlying the award of prejudgment interest "'centers upon the fact that the breaching party has deprived the injured party of using interest accrued on money which was rightfully due and owing to the injured party.'" *Id.* (quoting *Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs., Inc.*, 685 A.2d 141, 148 (Pa. Super. Ct. 1996)). Interest is recoverable as contract damages:

---

prescriber of BHRS services (which was true). Further, outside of his actions relative to Dr. Nulton, Mr. Kelly played no other role in getting ReDCo credentialed with Highmark, and he played no other role in ReDCo's billing of Highmark under Act 62. Therefore, Dr. Nulton has failed to prove that Mr. Kelly knowingly conveyed to Highmark that Dr. Nulton was doing anything other than providing evaluations/prescriptions for individuals which went to ReDCo. Accordingly, Dr. Nulton has failed to prove that Mr. Kelly knowingly misrepresented anything to Highmark, including ReDCo's compliance with Act 62. In light of these realities, Dr. Nulton has not proven that Mr. Kelly acted with intent to defraud, and Dr. Nulton's identity theft claim must fail.

> (1) [I]f the breach [of a contract] consists of a failure to pay a definite sum of money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

> (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

*Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS §354 (1981); *see also Penneys v. Pennsylvania R.R. Co.,* 183 A.2d 544, 546 (1962) (adopting section 337 of the Restatement of Contracts in determining whether prejudgment interest is recoverable). The legal rate of interest in Pennsylvania is 6% per annum. 41 Pa. Cons. Stat. § 202.

Here, as the Court held at summary judgment, Dr. Nulton and Peerstar breached the Settlement Agreement and failed to pay Mr. Kelly a definite sum of money. *Kelly,* 2020 WL 5077940, at *16. Specifically, on May 1, 2018, Dr. Nulton and Peertstar stopped making payments to Mr. Kelly under the Settlement Agreement, at which point they still owed Mr. Kelly 41 more monthly payments, for a total amount of $3,246,632.64. *Id.* And Dr. Nulton and Peerstar have no available defenses for their failure to make payment. Therefore, Mr. Kelly is entitled to prejudgment interest at a rate of 6% per annum. *Siematic Corp.,* 643 F. Supp. 2d at 687.

## VII.   Conclusion

For the reasons stated above, Dr. Nulton and Dr. Kennedy's request for relief on their identity theft claims is denied. After the Court determines the specific amount of prejudgment interest that Dr. Nulton and Peerstar owe to Mr. Kelly, the Court will enter judgment in favor of Mr. Kelly and against Dr. Nulton, Dr. Kennedy, and Peerstar.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GEORGE V. KELLY, | ) | **CONSOLIDATED CASES** |
| | ) | |
| | ) | |
| Plaintiff/Counterclaim | ) | |
| Defendant, | ) | |
| | ) | **Case No. 3:18-cv-126** |
| | ) | **&** |
| | ) | **Case No. 3:18-cv-187** |
| v. | ) | |
| | ) | |
| PEERSTAR LLC, and | ) | |
| LARRY J. NULTON, | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| Defendants/ | ) | |
| Counterclaim Plaintiffs, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| CHARLES J. KENNEDY, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | |
| GEORGE V. KELLY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW**, this ___11th___ day of August, 2022, the Court having conducted a bench trial

on the issue of Plaintiff Dr. Nulton and Plaintiff Dr. Kennedy's claims of identity theft, and

upon consideration of the parties' Proposed Findings of Fact and Conclusions of Law (ECF Nos.

172, 173), and other relevant filings on the record before the Court, and for the reasons set forth

in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that Plaintiff Dr.

Nulton and Plaintiff Dr. Kennedy's claims for relief are **DENIED**.

**IT IS FURTHER ORDERED** that Dr. Nulton, Peerstar, and Mr. Kelly shall confer in an effort to resolve the issue of the exact sum that Dr. Nulton and Peerstar owe to Mr. Kelly in prejudgment interest. Specifically:

(a) On or before **August 26, 2022,** the parties shall submit a filing to the Court indicating either that: (1) they have come to a mutual agreement regarding the amount of prejudgment interest owed, and what that amount is; or (2) they have not come to a mutual agreement regarding the amount of prejudgment interest owed.

(b) In the event that the parties cannot reach a mutual agreement regarding the amount of prejudgment interest owed by Dr. Nulton and Peerstar to Mr. Kelly, Mr. Kelly shall submit his proposed formula for calculating prejudgment interest to the Court no later than **September 2, 2022.** Dr. Nulton and Peerstar shall submit their opposition to Mr. Kelly's proposed formula no later than **September 9, 2022.**

Once the Court receives the parties' submissions and determines the specific amount of prejudgment interest owed by Dr. Nulton and Peerstar to Mr. Kelly, the Court shall enter judgment in favor of Mr. Kelly.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**